Charles Gerstein (*pro hac vice* application forthcoming)
(DC Bar No. 1033346)
Olevia Boykin (*pro hac vice* application forthcoming)
(TX Bar No. No. 24105518)
Tara Mikkilineni (*pro hac vice* application forthcoming)
(DC Bar No. 997284)
Civil Rights Corps
1601 Connecticut Ave
Washington, DC 20006
charlie@civilrightscorps.org
(202) 670-4809

Jesse Merrithew, OSB No. 074564
jesse@lmhlegal.com
Viktoria Safarian, OSB No. 175487
viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street Suite 415
Portland Oregon 97205
(971) 229-1241

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| VERNON LEE RASMUSSEN | ) | CASE NO. |
| | ) | |
| Petitioner, | ) | |
| | ) | **APPENDIX** |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Sheriff PAT GARRETT, | ) | |
| Washington County Sheriff, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

i

## IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR WASHINGTON COUNTY

STATE OF OREGON,

               Plaintiff,

    vs.

VERNON LEE RASMUSSEN,

               Defendant.

No. 20CR 12593

**INDICTMENT - Secret**

The above named defendant is accused by the Grand Jury of Washington County by this indictment of the crime(s) of

Count 1:    RAPE IN THE FIRST DEGREE, (FSG= 10; A Felony; ORS 163.375)
Count 2:    RAPE IN THE FIRST DEGREE, (FSG= 10; A Felony; ORS 163.375)
Count 3:    UNLAWFUL SEXUAL PENETRATION IN THE FIRST DEGREE, (FSG= 10; A Felony; ORS 163.411)
Count 4:    UNLAWFUL SEXUAL PENETRATION IN THE FIRST DEGREE, (FSG= 10; A Felony; ORS 163.411)
Count 5:    SEXUAL ABUSE IN THE FIRST DEGREE, (FSG= 8; B Felony; ORS 163.427)
Count 6:    SEXUAL ABUSE IN THE FIRST DEGREE, (FSG= 8; B Felony; ORS 163.427)
Count 7:    SEXUAL ABUSE IN THE FIRST DEGREE, (FSG= 8; B Felony; ORS 163.427)
Count 8:    SEXUAL ABUSE IN THE FIRST DEGREE, (FSG= 8; B Felony; ORS 163.427)

committed as follows:

COUNT 1
The defendant, on or between January 1, 1998 and March 8, 2005 in Washington County, Oregon, did unlawfully and knowingly engage in sexual intercourse with N.P., a child under twelve years of age.

COUNT 2
As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Count 1: The defendant, on or between January 1, 1998 and March 8, 2005 in Washington County, Oregon, did unlawfully and knowingly engage in sexual intercourse with N.P., a child under twelve years of age.

COUNT 3
As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Counts 1-2: The defendant, on or between January 1, 1998 and March 8, 2005 in Washington County, Oregon, did unlawfully and knowingly penetrate the vagina of N.P., a person under the age of twelve years, with an object to wit: finger(s).

COUNT 4
As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Counts 1-3: The defendant, on or between January 1, 1998 and March 8, 2005 in Washington County, Oregon, did unlawfully and knowingly penetrate the vagina of N.P., a person under the age of twelve years, with an object to wit: finger(s).

COUNT 5
As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Counts 1-4: The defendant, on or between January 1, 1998 and March 8, 2005 in Washington County, Oregon, did unlawfully and knowingly subject N.P. a child under 14 years of age, to sexual contact by touching her vaginal area, a sexual or intimate part of N.P.

20CR12593
SI
Secret Indictment
12486866



COUNT 6
As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Counts 1-5: The defendant, on or between January 1, 1998 and March 8, 2005 in Washington County, Oregon, did unlawfully and knowingly subject N.P. a child under 14 years of age, to sexual contact by touching her vaginal area, a sexual or intimate part of N.P.

COUNT 7
As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Counts 1-6: The defendant, on or between January 1, 1998 and March 8, 2005 in Washington County, Oregon, did unlawfully and knowingly subject N.P. a child under 14 years of age, to sexual contact by causing N.P. to touch his penis, a sexual or intimate part of the defendant.

COUNT 8
As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Counts 1-8: The defendant, on or between January 1, 1998 and March 8, 2005 in Washington County, Oregon, did unlawfully and knowingly subject N.P. a child under 14 years of age, to sexual contact by causing N.P. to touch his penis, a sexual or intimate part of the defendant.

As to Counts 1-8, the State further alleges:
-    at the time of the crime N.P. was under 18 years of age;
-    at the time this prosecution commenced N.P. was under 30 years of age;
-    at the time this prosecution commenced, this offense had not been reported to a law enforcement agency or the Department of Human Services more than 12 years prior.
 contrary to the statutes and against the peace and dignity of the State of Oregon

It is hereby affirmatively declared for the record, upon appearance of the defendant for arraignment, and before the Court asks how the defendant pleads to the charges, that the State intends that any misdemeanor offenses charged herein each proceed as a misdemeanor.

Dated: ___2/25/2020___

| Witnesses subpoenaed, examined and appeared in person unless otherwise indicated before the Grand Jury for the State of Oregon: | A TRUE BILL |
|---|---|
| | _Lewca A Jewan_ |
| Ashley Birkhead | Foreperson of the Grand Jury |
| Vicki Lynn Crop | |
| Paul Martin | KEVIN BARTON, District Attorney |
| Timothy Miller | _signature_ |
| N.P. | |
| Nora Boumatar (by affidavit) | Marie E Atwood |
| | Deputy District Attorney |
| | Oregon State Bar # 132976 |

**CHILD ABUSE**
DA # 386054
HBS 50-192780562
DOB 02/13/ 1970
FPC #:
☒ Security Amount - $2,000,000
☐ Recognizance/Conditional Release

Grand Jury Proceeding Dates:
2/25/2020

Page 2- Indictment (DA 386054)

IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR WASHINGTON COUNTY

STATE OF OREGON,

Plaintiff,

v.

VERNON LEE RASMUSSEN,

Defendant.

WARRANT OF ARREST

Court No. 20CR12593
D.A. No. 386054

*Verified Correct Copy of Original 3/13/2020.*

*FILED 2020 FEB 28 P 5 OREGON JUDICIAL DEPT WASHINGTON COUNTY*

IN THE NAME OF THE STATE OF OREGON: To any peace officer in the State of Oregon, Greetings:

An accusatory instrument has been filed in this Court accusing the above-named defendant of the crimes of

| Count 1-2: | RAPE IN THE FIRST DEGREE , (FSG= 10; A Felony; ORS 163.375) |
| Count 3-4: | UNLAWFUL SEXUAL PENETRATION IN THE FIRST DEGREE , (FSG= 10; A Felony; ORS 163.411) |
| Count 5-8: | SEXUAL ABUSE IN THE FIRST DEGREE , (FSG= 8; B Felony; ORS 163.427) |

You are commanded forthwith to arrest the above-named defendant and bring said defendant before me or in case of my absence or inability to act, before the nearest accessible magistrate in this county.

SECURITY AMOUNT $2,000,000.00 (or release agreement plus 10 percent of security amount.)

DATED: _2-25-2020_

_____
Judge
Ekwin

**CHILD ABUSE**
SECRET
SID 12313511/DOB 02/13/1970.
W/M  HGT 5'10/WT 197/ SOC 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
Agency/Case #HBS, 50-192780562
LKA: 16457 S Redland Rd, Oregon City, OR 97045
**Warrant instructions:** Issue nationwide

The arresting officer may enter premises, in which he has probable cause to believe the defendant to be present, without giving notice of his authority and purpose.

_____
Judge

20CR12593
WARS
Warrant – Return of Service
12571368

STATE OF OREGON      )
                                        ) ss.
County of Washington  )

I certify that I served this Warrant on _2/27_, 20 _20_, by arresting the above named defendant.

DATED: _2/27_, 20 _20_

_____  37808
Peace Officer

REC'D FEB 26 2020

342576

App'x 4

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR WASHINGTON COUNTY

**ORDER**

| STATE OF OREGON, | )  | |
|---|---|---|
| Plaintiff, | ) | Case # 20CR12593 |
| | ) | DA _Pitcher_ |
| vs. | ) | Defense Attorney _Beilstein_ |
| | ) | Interpreter _____ |
| Vernon Lee Rasmussen | ) | FTR COURTROOM _1 EC_ |
| Defendant. | ) | PROCEEDING _ARR_ |
| Truly named. ☑ Proceeded as named. | ) | |

20CR12593
OR
Order
12606441

☑ ARRAIGNED ☑ RIGHTS GIVEN ☐ WAIVED ☐ INTERPRETER(S) APPOINTED ☑ IN CUSTODY
☑ NOT GUILTY PLEA ☐ DENIAL **ATTORNEY:** ☑ APPOINTED ☐ MAY REQUEST ☐ RETAINED ☐ TO BE RETAINED ☐ WAIVED
OSB#_____ Name _____ _PD_ ☐ DUII ADVISORY COUNSEL ☐ DEFERRED SENT. COUNSEL

If you are arraigned on a Domestic Violence or Sex Crime, you are prohibited from contacting the named victim even while in custody.

☐ RESET to _____ at _____, at REQUEST of _____
by: Telephone / Letter / Motion / Attorney

☐ Waived speedy constitutional trial/60 day rule rights for this continuance or waiver of 14 day rule for probation violation hearing.
☐ GUILTY / NO CONTEST Plea with SENTENCING on _____ at _____
☐ DEFERRED SENTENCING ☐ DECLINED     **PSI** Ordered DOB _____ ☐ Atty to be present
☐ ALLOWED          ☐ INELIGIBLE        Counts/Charges: _____
☐ WAIVED EXTRADITION ☐ REQUESTED GOV. WARRANT    Def. Contact Info.: _____

| NEXT *PERSONAL* APPEARANCE(S) | ☐ PRELIMINARY HEARING ☑ CASE MANAGEMENT | on _3-23-20_ at _3pm_ |
| | ☐ FINAL RESOLUTION CON ☐ _____ | on _____ at _____ |
| | ☐ CASE ASSIGNMENT ☐ _____ | on _Docketed_ at _____ |
| | ☐ TRIAL ☐ _____ | on _____ at _____ |

**PRELIMINARY HEARING** ☐ PRELIM WAIVED** by: _____
☐ Probable cause found on count(s) _____ ☐ Probable cause not found on count(s) _____
                                        ☐ INFORMATION DISMISSED    ☐ INDICTED **
☐ WAIVED INDICTMENT ** ** with NEXT APPEARANCE DATE _____ at _____ in LEC1

☐ FAILED TO APPEAR for _____ ☐ SECURITY FORFEITED    ☐ SECURITY NOT FORFEITED
                                       JUDGMENT TO BE ENTERED       AT THIS TIME
☐ REVOKE RELEASE
☐ *BENCH WARRANT ORDERED* ☐ *ARREST WARRANT ORDERED*  SECURITY: $ _2,000,000_

☐ JUDGMENT OF ACQUITTAL Ct(s): _____ ☐ Finding of NOT GUILTY Ct(s): _____
☐ JUDGMENT OF DISMISSAL (Control # _____) ☐ Finding of GUILTY Ct(s): _____
☐ Other _____

Date: _2-28-20_

_____
(Printed / Stamped Name of Judicial Officer)
_RDB_

(Rev – 11/19) GPO          **Original:** Court   **Yellow:** Defense Attorney   **Pink:** District Attorney   **Goldenrod:** Jail/Defendant

App'x 5

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**
FOR THE COUNTY OF WASHINGTON

Case Number(s):  (circle, or otherwise mark, the case number of the most serious charge or type)

*20CR 12593*

Charges: *RPE1 x 2 , USP1 x 2*
*SA1 x 4*

Case Name: *Vernon Lee Rasmussen*

VERIFICATION RECOMMENDATION
RE:  REQUEST FOR COURT-APPOINTED COUNSEL: ORDER
APPOINTING OR DENYING COUNSEL AND ORDERING
PAYMENT

(left margin, rotated) Verified Corrected Copy of Original 3/4/202...

| VERIFICATION RECOMMENDATION RE: FINANCIAL ELIGIBILITY |
| --- |

(To be completed by Verification Specialist)

20CR12593
ORAC
Order – Appointing Counsel
12624225

Based on the Affidavit of Eligibility, I recommend that the applicant is:

☐   FINANCIALLY ELIGIBLE for court-appointed counsel
☐   NOT FINANCIALLY ELIGIBLE for court-appointed counsel
☐   NO RECOMMENDATION (judge to review affidavit)

Following a review of the applicant's affidavit, I recommend the $20 APPLICATION FEE be:

☐   WAIVED
☐   ORDERED, due immediately or due on _____

I recommend a CONTRIBUTION AMOUNT be:  (Maximum Contribution Amount from schedule is $_____)

☐   WAIVED
☐   ORDERED in the amount of $_____ due immediately or due on _____

_____          _____
Date                                      Verification Specialist

| ORDER |
| --- |

(To be completed by Judge)

The court orders the applicant's request for extraordinary expense authorization be:

☑   Approved          Amount to be determined by Public Defense Services.

☐   Denied          *PD*

_____ is hereby appointed by the court, contingent upon further verification.
(Name of Court-Appointed Counsel)

The court orders the $20 APPLICATION FEE be:

☑   WAIVED
☐   ORDERED in the amount shown on the attached Limited/Supplemental Judgment of the court.

The court orders the CONTRIBUTION AMOUNT be:

☑   WAIVED
☐   ORDERED in the amount shown on the attached Limited/Supplemental Judgment of the court.

Date *2|28|2020*          _____
                                            Judge

_____          _____
Judge's O.S.B. Number                 Print, Type or Stamp Name of Judge

ORAC - Counsel Appointed      ORDY - Counsel Denied

1

2

3

4                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                        FOR THE COUNTY OF WASHINGTON

6    STATE OF OREGON,                    )    No. 20CR12593
                                         )
7                        Plaintiff,      )
                                         )    **Motion and Memorandum for**
8            vs.                         )    **Reduction of Bail**
                                         )
9    VERNON LEE RASMUSSEN,               )
                                         )    *Hearing Requested*
10                       Defendant.      )
                                         )
11          The defendant, Vernon Lee Rasmussen, through his attorney, Brian Decker,

12   moves for an order holding ORS 135.240(5) unconstitutional as applied to the facts of

13
     this case and releasing him on his own recognizance, on such conditions as the Court
14
     finds reasonable, or on a security amount no greater than he can afford. This motion is
15

16   based on the points and authorities set forth below, the attached affidavit, and testimony

17   and evidence to be provided at the bail hearing.

18

19
     **I.  Introduction.**
20

21
         *[Oregon's statute regarding release decisions] shall be liberally construed to*
22

23       *carry out the purpose of relying upon criminal sanctions instead of financial*

24       *loss to assure the appearance of the defendant.*

25           ORS 135.245(7).

26

PAGE 1 - MOTION AND AFFIDAVIT FOR PRETRIAL RELEASE

**METROPOLITAN PUBLIC DEFENDER**
400 E. MAIN STREET,  SUITE 210      HILLSBORO, OREGON  97123-4166      503-726-7900      FAX 503-726-4950

1    As outlined below, the Court must conduct an inquiry as follows.

2    • First, determine whether Rasmussen is ineligible for bail because the state has shown

3    by clear and convincing evidence that there is a danger of physical injury or sexual

4    victimization to the victim or members of the public by the defendant while on

5    release. *See* ORS 135.240; *State v. Slight*, 301 Or App 237 (2019).

6

7    • If Rasmussen is eligible for release, the Court may either release the defendant or set

8    security.

9    • If the Court releases Rasmussen, it may set conditions upon such release, but they

10    must be the least onerous conditions reasonably likely to ensure the safety of the

11    public and the victim and his later appearance. *See* ORS 135.245.

12

13    • If the Court sets security, the amount must be one that will reasonably assure

14    Rasmussen's appearance, but, as explained in section III below, in no event shall the

15    amount be greater than he can afford (and, if the Court finds he can afford it, in no

16    event shall it be less than $50,000). The Court may also impose conditions on this

17    release, and those conditions may take into account dangerousness. But the statutory

18    scheme does not contemplate a finding of, or concern for, dangerousness factoring

19    into the determination of the appropriate amount of security.

20

21    **II. The statutory minimum bail amount of $50,000 does not apply in this case because it is unconstitutionally excessive.**

22

23    Article I, section 14, of the Oregon Constitution provides that "[o]ffences, except

24    murder, and treason, shall be bailable by sufficient sureties." Article I, section 16,

25    provides that "[e]xcessive bail shall not be required." The Eighth Amendment to the

26    United States Constitution contains an identical provision. The Fourteenth Amendment to

PAGE 2 - MOTION AND AFFIDAVIT FOR PRETRIAL RELEASE

1    the United States Constitution may make the Bail Clause applicable to the states. *See*

2    *Schilb v. Kuebel*, 404 U.S. 357 (1971).

3        Despite these constitutional protections, ORS 135.240(5) provides, in pertinent part,

4    that

5

6        (a) Notwithstanding any other provision of law, the court shall set a security
         amount of not less than $50,000 for a defendant charged with an offense listed

7         in ORS 137.700 or 137.707 unless the court determines that amount to be
         unconstitutionally excessive, and may not release the defendant on any form of

8         release other than a security release if:
             (A) The United States Constitution or the Oregon Constitution prohibits the
               denial of release under subsection (4) of this section;

9             (B) The court determines that the defendant is eligible for release under
               subsection (4) of this section; or

10            (C) The court finds that the offense is not a violent felony.
         (b) In addition to the security amount described in paragraph (a) of this

11        subsection, the court may impose any supervisory conditions deemed
         necessary for the protection of the victim and the community…

12

13    The Supreme Court held in *State v. Sutherland*, 329 Or 359 (1999), that former ORS

14    135.240(4) was facially unconstitutional and that ORS 135.240(5) might be

15    unconstitutional as applied in particular cases. The 2007 Legislative Assembly, in

16    adopting current ORS 135.240(5), acknowledged the rule from *Sutherland* by first setting

17    a floor of $50,000 on bail for defendants charged with Measure 11 offenses and then

18    allowing an exception when "the court determines that amount to be unconstitutionally

19    excessive."

20

21        In this case, the Court should hold that the current $2,000,000 bail is excessive. This

22    amount imposes a hurdle that is insurrmountable to all but the wealthiest individuals.

23    Even the minimum ORS 135.240(5) bail of $50,000 would be excessive given

24    Rasmussen's lack of means and the probability that conditional release on reduced

25    security would be at least as efficacious as the current bail amount to secure Rasmussen's

26

PAGE 3 - MOTION AND AFFIDAVIT FOR PRETRIAL RELEASE

1    presence at court. Rasmussen currently has no income and cannot afford bail. ORS

2    135.245(7) provides that it is the policy of the State of Oregon, whenever possible, to

3    "rely[] upon criminal sanctions instead of financial loss to assure the appearance of the

4    defendant."

5

6    **III.    The current bail amount, or any bail amount Rasmussen cannot afford, is unconstitutional absent a showing of danger by clear and convincing evidence.**

7

8         In addition to the statutory minimum bail amount being constitutionally excessive,

9    any amount greater than Rasmussen can afford is unconstitutional unless the state shows

10   by clear and convincing evidence that withholding release is necessary. The Court cannot

11   circumvent these constitutional and statutory requirements by setting an unattainable bail

12   amount that is in effect a detention order made without the required findings.

13

14        Article I, section 43, of the Oregon Constitution addresses the denial of pretrial

15   release in relation to the rights of victims. It bases release on (1) "reasonable protection of

16   the victim and the public" and (2) "the likelihood that the criminal defendant will appear

17   for trial."

18

19        ORS 135.240 codifies the scheme that section 43 sets forth to determine where release

20   may be denied. Cases of murder, aggravated murder, or treason require denial of release

21   where "proof is evident or the presumption strong" that the person is guilty. Other violent

22   felonies are not eligible for bail if the Court finds (1) probable cause that the defendant

23   committed the crime and, (2) "[b]y clear and convincing evidence, that there is a danger

24   of physical injury or sexual victimization to the victim or members of the public by the

25   defendant while on release." ORS 135.240(4)(a). The state bears the burden. *See id.* at

26

PAGE 4 - MOTION AND AFFIDAVIT FOR PRETRIAL RELEASE

**METROPOLITAN PUBLIC DEFENDER**
400 E. MAIN STREET,  SUITE 210    HILLSBORO, OREGON  97123-4166    503-726-7900    FAX 503-726-4950

1   .240(c).

2       To set a security amount beyond a person's means is to effectively order them

3   detained. "Bail may not be set at an amount chosen in order to make it impossible, as a

4   practical matter, for a prisoner to secure his release." *Owens v. Duryee*, 285 Or 75, 80

5   (1979). In *Collins v. Foster*, the Oregon Supreme Court held that permitting release only

6   on a condition of posting an unattainable bail amount "would allow the court to do

7   indirectly that which it cannot do directly." 299 Or 90, 95 (1985). In *Gillmore v. Pearce*,

8

9   the same court held that "[s]ecurity amounts as a whole (not the ten per cent actually

10  deposited) are supposed to represent the least onerous amount whose possibility of loss

11  reasonably assures the attendance at trial or the person charged." 302 Or 572 (1987)

12

13  (cleaned up).

14      The United States Supreme Court has been equally clear that the U.S. Constitution

15  protects against unattainable bail. Equal protection and due process forbid jailing a person

16  solely because of their inability to pay a fine. *See Bearden v. Georgia*, 461 U.S. 660,

17  672–73 (1983). A person's liberty, in the pretrial detention context, is a fundamental right

18

19  protected by substantive due process. *See United States v. Salerno*, 481 U.S. 739, 750

20  (1987).

21      The two substantive constitutional rights at issue— the right against wealth-based

22  detention and the fundamental right to pretrial liberty—cannot be infringed unless the

23  government satisfies strict scrutiny. Before requiring a person to make a monetary

24  payment in exchange for release from detention, the Court must inquire into and make

25  findings concerning the person's ability to pay. If the person cannot pay the amount

26

PAGE 5 - MOTION AND AFFIDAVIT FOR PRETRIAL RELEASE

Case 3:20-cv-00865-IM    Document 1-1    Filed 05/29/20    Page 12 of 123

App'x 11

required, such that the condition of release will function as a de facto detention order, then the government must demonstrate that pretrial detention is the least restrictive way for it to serve a compelling interest. Thus, wealth-based pretrial detention requires the state to demonstrate necessity. The state interest in pretrial detention must be "compelling." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). As the Ninth Circuit has put it, the state must demonstrate that its "infringement [of pretrial liberty] is narrowly tailored to serve a compelling state interest." *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014).

The deprivation of the fundamental right to bodily liberty requires, at a minimum, clear and convincing evidence. *See Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 282–83 (1990) (refusing medical treatment); *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (termination of parental rights); *Addington v. Texas*, 441 U.S. 418, 431–33 (1979) (civil commitment). Clear and convincing should apply to both risk of danger and risk of flight because the individual right at stake is the same: liberty. The American Bar Association's Criminal Justice Standards require clear and convincing evidence for both questions of risk of flight and dangerousness. Am. Bar Ass'n, Criminal Justice Standards, Standard 10-5.8.

For Rasmussen, who is indigent, a money bail amount of $2,000,000 is a condition that is strictly impossible for him to meet. Setting an impossible condition of release is the functional equivalent of setting no condition at all, therefore ordering pretrial detention. And this Court may not do that without a finding of dangerousness by clear and convincing evidence.

**METROPOLITAN PUBLIC DEFENDER**
400 E. MAIN STREET, SUITE 210    HILLSBORO, OREGON 97123-4166    503-726-7900    FAX 503-726-4950

## IV.    Conclusion.

For the foregoing reasons and those set forth in the attached affidavit, the Court should grant Rasmussen's motion, hold ORS 135.240(5) unconstitutional as applied to the facts of this case, and release Rasmussen on his own recognizance, on such conditions as the Court finds reasonable, or on a security amount no greater than he can afford.

DATED this __11__ day of ___March___, __2020__ .

Brian Decker, OSB 165548
Attorney for Defendant

PAGE 7 - MOTION AND AFFIDAVIT FOR PRETRIAL RELEASE

## CERTIFICATE OF SERVICE

I certify that on _____March 11 ____ 2020____, I or a representative of

my office served this motion for bail reduction, along with its accompanying

memorandum and affidavit, on the plaintiff by electronically serving a true copy thereof

as required by UTCR 21.100.

METROPOLITAN PUBLIC DEFENDER

PAGE 10 - MOTION AND AFFIDAVIT FOR PRETRIAL RELEASE

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF WASHINGTON

| | | |
|---|---|---|
| STATE OF OREGON, | ) | No. 20CR12593 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Affidavit in Support of Motion for** |
| | ) | **Reduction of Bail** |
| VERNON LEE RASMUSSEN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | |
|---|---|
| STATE OF OREGON        ) | |
| ) ss. | |
| County of Washington    ) | |

I, BRIAN DECKER, being first duly sworn and under oath, hereby state as

follows.

1. I am the attorney of record for Vernon Lee Rasmussen, having been appointed by this

Court on February 28, 2020.

2. On February 25, 2020, a grand jury indicted Rasmussen for two counts of rape in the

first degree, two counts of unlawful sexual penetration in the first degree, and four counts

of sexual abuse in the first degree. Rasmussen has pleaded not guilty and denies the

allegations.

3. Bail is currently set at an unaffordable $2,000,000.

4. Rasmussen has a history of criminal convictions between 1997 and 2010, all drug and

minor property offenses. He has no criminal convictions since two property

misdemeanors in 2010. His most recent felony conviction was possession of a controlled

substance in 2006. He has eight alleged failures to appear between 1997 and 2012.

5. The state alleges that the charged offenses occured between twenty-two and fifteen

years ago. By all accounts Rasmussen has had no contact with the alleged victim since

that time, with the exception of a single chance encounter when she visited his work

PAGE 8 - MOTION AND AFFIDAVIT FOR PRETRIAL RELEASE

place. He does not know where she lives or works and has no intentions of contacting her. Rasmussen has been a law-abiding citizen for a decade, and his history of criminal convictions has nothing to do with violence.

6. Rasmussen was previously making about $2200 per month making knee and hip replacements at Orchic Orthopedics in Oregon City, but his job will not be available for him to return now that he has been jailed. He worked briefly at Lifeworks NW as well making a similar income. His only remarkable asset is a car worth approximately $1500 that he shares with his wife.

7. Rasmussen has been an Oregon resident since 1995, and he and his wife have lived at the same apartment in West Linn for over five years. He and his wife have a newborn, one month old. Rasmussen also has a brother living in Forest Grove.

8. Rasmussen's wife, Adriana, is willing to serve as a responsible supervising party. Her information is being forwarded to the Court's release office.

7. Rasmussen would abide by all of this Court's orders, including any reasonable conditions of release.

DATED this _11_ day of _March_, _2020_.

_____
BRIAN DECKER, OSB # 165548
Attorney for Defendant

SUBSCRIBED AND SWORN TO this _1_ day of _March 2020_.

_____
Notary Public for Oregon
My Commission Expires: 1/26/2021

OFFICIAL STAMP
MELISSA L WILSON
NOTARY PUBLIC-OREGON
COMMISSION NO. 958408
MY COMMISSION EXPIRES JANUARY 26, 2021

PAGE 9 - MOTION AND AFFIDAVIT FOR PRETRIAL RELEASE

1

2

3

4

5                        IN THE CIRCUIT COURT OF THE STATE OF OREGON

6                              FOR THE COUNTY OF WASHINGTON

7    STATE OF OREGON,                          )      No.  20CR12593
                                               )
8         Plaintiff,                           )      **Supplemental Bail Reduction**
                                               )      **Memorandum Re Coronavirus**
9         vs.                                  )      **Pandemic**
                                               )
10   VERNON LEE RASMUSSEN,                      )
                                               )
11        Defendant.                           )

12        This Court must consider this case in the extraordinary context of the pandemic of the

13   coronavirus disease and its impact on the defendant, Vernon Rasmussen, if he continues to be

14   incarcerated while awaiting resolution. The pandemic, and its likely effect on the Washington

15   County Jail, underscores the foundational principle of Oregon's release statutes: pretrial detention is

16   extraordinarily burdensome and ought to be the exception rather than the rule.

17
     **I.  Coronavirus is an emerging crisis.**
18

19        At the time of this filing, within a span of three months, an outbreak of coronavirus disease has

20   resulted in over a hundred thousand confirmed cases worldwide. These include twenty-one in

21   Oregon, with at least eight here in Washington County. The symptoms are typical of upper

22   respiratory infections: fever, fatigue, and dry cough are common. But the disease, also known as

23   COVID-19, is much deadlier than the common cold or flu. One in six people who contract

24   coronavirus disease develop difficulty breathing, become seriously ill, and require hospital treatment

25

26

PAGE 1  - SUPPLEMENTAL MEMORANDUM REGARDING CORONAVIRUS PANDEMIC

1    such as the use of a ventilator. Confirmed cases are increasing on a daily basis nationally and locally.

2    Abroad, hospitals are overwhelmed with affected patients.

3        The disease disproportionately affects older populations. (*See* Ex. 1, COVID-19 death rate by

4    age.) Rasmussen, at fifty, is in an age group where those who contract the disease face a 1.3%

5    chance of death, six times higher than those in the twenties and thirties like the majority of the

6    incarcerated population at Washington County Jail.

7

8        Washington County Jail is a tinderbox for the coming conflagration. It houses approximately 570

9    incarcerated people at any given time, served by scores of staff. Many of its residents struggle with

10   challenges that put them at greater risk for contracting disease, such as low socioeconomic status,

11   drug addiction, and homelessness. Although it is a secure facility, it is not entirely cordoned off from

12   the outside world: its staff members go home and on with their lives at the end of their shifts, and it

13   constantly cycles through new bookings. Because the jail uses consecutive booking numbers, it's

14   possible to estimate the rate of such admissions: the jail's highest booking numbers last year were

15   around 1918000, suggesting a rate of approximately 18,000 bookings per year, or nearly fifty each

16   day.

17

18   **II. Authorities recommend swift and decisive action to stem the tide.**

19

20       Public authorities and health officials have taken and recommended steps to mitigate the effects

21   of COVID-19 by slowing the rapid spread of the virus, although in Oregon there appears to be no

22   specific guidance for jails and prisons as of the time of this filing. Residential care facilities, which

23   have such guidance, bear certain logistical similarities to jails; they are places where medically

24   vulnerable residents congregate in close proximity to each other. In such facilities the Oregon

25   Department of Human Services has adopted a policy requiring restrictions on nonessential visits and

26

PAGE 2 - SUPPLEMENTAL MEMORANDUM REGARDING CORONAVIRUS PANDEMIC

1   outings, screening of 100% of building entrants, and accommodations for visits via Skype. (*See* Ex.

2   2, Memorandum from DHS Safety, Oversight, and Quality to Nursing Facility Providers et al.,

3   March 10, 2020.) The Centers for Disease Control and Prevention suggests that "minimal to

4   moderate" mitigation measures for such facilities include "stagger[ing] meal times" to "reduce

5   mixing," "[l]imit[ing] programs with external staff," and "limit[ing] exposure to the general

6   community." (Ex. 3, CDC, *Implementation of Mitigation Strategies for Communities with Local*

7   *COVID-19 Transmission*, at 5.)

8   

9       The CDC recommends similar measures for schools, which, like jails, serve populations of

10  hundreds of individuals for long periods and provide a congregating space for meals. (*See id.* at 4.)

11  The Oregon Health Authority echoes this guidance for schools, including "screening students for

12  cough illness at the start of the school day" and "reinforcement of handwashing." (Ex. 4, Oregon

13  Health Authority, *Interim public health recommendations for response to COVID-19 cases in*

14  *Oregon schools*.)

15  

16      The Prison Policy Initiative has recommended measures tailored to jails, including a stop to

17  "medical copays," "[l]ower[ing] jail admissions to reduce 'jail churn,'" and "[r]eleas[ing] medically

18  fragile and older adults." (Ex. 5, Peter Wagner and Emily Widra, *No need to wait for pandemics*,

19  March 6, 2020, at 2–3.) Italy and Iran, two counties whose outbreaks of COVID-19 are more

20  advanced than that in the United States, have already taken steps to release incarcerated people

21  where at all possible. If releasable people are to be released in light of the emerging disease risks, the

22  time to do it is now, before there is any confirmed case of coronavirus in the jail, rather than

23  afterward, when the sheriff and the community are likely to demand a lockdown and quarantine.

24  

25  

26  

PAGE 3 - SUPPLEMENTAL MEMORANDUM REGARDING CORONAVIRUS PANDEMIC

1  ### III.    Washington County Jail's inaction causes hazardous health conditions that
2  implicate constitutional rights.

3    But Washington County Jail's response has thus far been inadequate. There appears to be no

4  message to the public released from either the jail or the Washington County Sheriff's Office

5  regarding any virus mitigation measures. The most recent communication from jail administration,

6  as far as I am aware, is a March 1 email from Commander Karlyn Degman circulated to some

7  members of the local bar. (Ex. 6, FW: Corona Virus and Jail Visiting, Email from Karlyn Degman to

8  Mary Bruington et al., March 1, 2020.) The message provides assurances regarding screening

9  patients who are seen by jail medical staff, providing masks for patients and medical staff, and

10  isolating those with contagious illnesses. It announces "a more frequent cleaning schedule" and

11  promises to "comply[] with recommendations provided by HHS, our medical providers, the CDC

12  and other subject matter experts." I know of no updated announcement of any changes to policies in

13  the past eleven days, as the outbreak has exploded. On the other hand, the Washington County

14  Sheriff's Twitter account seems to make light of the circumstances in the jail during the coronavirus

15  pandemic:

16

17

18

19

20

21

22

23

24

25

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26



*Figure 1 Tweet from Washington County Sheriff's Office, March 11, 2020. That's a little less than three rolls of toilet paper per person booked into the jail. But toilet paper should not be the jail's primary concern during this pandemic.*

For incarcerated residents, the jail appears to operate as usual. There have been no apparent changes to the meal schedule to stagger interpersonal interactions. Though hand soap is available as normal, hand sanitizer is not. There have been no apparent cancelations of classes or group activities. There appears to be no screening of visitors and no changes to visitation.

The Eighth Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment to the states, protects against "cruel and unusual punishments"; so does Oregon's Article I, Section 16. This protection includes a guarantee against "deliberate indifference

PAGE 5 - SUPPLEMENTAL MEMORANDUM REGARDING CORONAVIRUS PANDEMIC

1    to the serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In civil

2    actions under 42 U.S.C. § 1983, federal courts use this "deliberate indifference" standard to analyze

3    causes of action regarding conditions of confinement or failure to address an incarcerated person's

4    serious medical needs. *See Helling v. McKinney*, 509 U.S. 25, 29–30 (1993) (allowing a suit to

5    proceed alleging that a prison's policy permitting tobacco smoking involuntarily exposed a prisoner

6    to health risks). Oregon recognizes that its constitutional guarantee imposes a duty of custodial

7    officials to "protect inmates from known serious health hazards." *Billings v. Gates*, 323 Or 167, 177

8    (1996). The Oregon Supreme Court adopted the federal "deliberate indifference" standard for civil

9    actions. *See id.* at 180–81.

10

11        But this is not a civil action, and so this Court does not need to inquire into the mental state of

12   jail officials or the reasons for the decisions they are making. In this criminal case, the issue before

13   the Court is whether Rasmussen is eligible for bail and, if so, the conditions necessary to ensure his

14   appearance and the safety of the community. Release on personal recognizance is the presumption,

15   and otherwise conditional release must include only the least onerous conditions necessary for the

16   above purposes. *See* ORS 135.245. The seriously hazardous conditions in the jail add a new,

17   potentially deadly layer to the problem of default pretrial detention. This is especially true for

18   accused persons like Rasmussen who are particularly vulnerable to this disease.

19

20

21        DATED this 12th day of March, 2020.

22

23                                        */s/Brian R. Decker*
                                          Brian R. Decker, 165548
24                                        Attorney for Defendant

25

26

PAGE 6 - SUPPLEMENTAL MEMORANDUM REGARDING CORONAVIRUS PANDEMIC

1

**CERTIFICATE OF SERVICE**

2

3    I hereby certify that on March 12, 2020, I or a representative of my office served the foregoing

supplemental bail reduction memorandum on the plaintiff by electronically serving a true copy

4    thereof as required by UTCR 21.100.

5

6                                                    */s/ Brian R. Decker*
                                                     Metropolitan Public Defender
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PAGE 1 – CERTIFICATE OF SERVICE

**Exhibit 1**

**COVID-19 death rate by age**

Pages: 1

*State v. Vernon Rasmussen*

*20CR12593*



# COVID-19 death rate by age

Death rate

Source: Chinese Center for Disease Control and Prevention

BUSINESS INSIDER

**Exhibit 2**

**Memorandum from DHS Safety, Oversight, and Quality to
Nursing Facility Providers et al., March 10, 2020**

Pages: 6

*State v. Vernon Rasmussen*

*20CR12593*



Kate Brown, Governor

**Department of Human Services**
*Safety, Oversight and Quality*
PO Box 14530, Salem, OR 97309
3406 Cherry Ave NE, Salem, OR 97303
Phone: (503) 373-2227
Fax (503) 378-8966

Ref:      **NF-20-67 Provider Alert**

Date:     March 10, 2020

**TO:**     Nursing Facilities Providers, Community Based Care:
            Assisted Living, Residential Care, Memory Care Facilities

**FROM:**   Safety, Oversight, and Quality

SUBJECT: Executive Letter from Mike McCormick, Interim Director of APD

The attached Executive Letter provides additional policies to limit exposure to the Novel Coronavirus (COVID-19), for immediate implementation by all Nursing Facilities.

For general information about the DHS Office of Safety, Oversight and Quality, visit the DHS Web site at www.oregon.gov/DHS/. If you have questions about this alert, please contact the Nursing Facility Licensing Unit at NF.Licensing@state.or.us

FOR CBC PROVIDERS PLEASE CONTACT CBCTEAM@DHSOHA.STATE.OR.US

*"Assisting People to Become Independent, Healthy and Safe"*
An Equal Opportunity Employer

App'x 27

# Oregon

Kate Brown, Governor

**Department of Human Services**
*Aging and People with Disabilities*
500 Summer St. NE, E-02
Salem, OR 97301

)(DHS
Oregon Department
of Human Services

**March 10, 2020**

**To:**   All Licensed Nursing Facilities
All Licensed Residential Care Facilities
All Licensed Assisted Living Facilities
Including, but not limited to, those with Memory Care Endorsements

**Re:**   Executive Letter specifying immediate additional policies to limit
exposure to the Novel Coronavirus (COVID-19)

**Dear Providers:**

**Background:**

Oregon has recently seen COVID-19 cases in people without high-risk
exposures (i.e., travel to affected regions or contact with known cases). This
means COVID-19 has spread in communities in Oregon. Community-wide
measures like hand hygiene and staying home when ill are essential to
decrease further community spread. The CDC states that early information
out of China shows that some people are at higher risk of getting very sick
from this illness. This includes older adults and people who have serious
chronic medical conditions like heart disease, diabetes, lung disease, and
people who are immunocompromised. This policy direction is being
implemented immediately to prevent the spread of COVID-19 to some of the
most vulnerable community members in Oregon.

In consultation with the Oregon Health Authority, based on its public
health recommendations and under the authority of Executive Order 20-
03 issued by the Governor on March 8, 2020, the Oregon Department of
Human Services is adopting policies to:

- Restrict and limit entry to nursing facilities, residential care
  facilities and assisted living facilities, including those with memory
  care endorsements;
- Require 100% screening of all individuals who are allowed to enter
  facilities;
- Document screening procedures for all visitors; and
- Limit community activities.

*"Assisting People to Become Independent, Healthy and Safe"*

These extraordinary actions are being taken to limit the potential for residents' exposure to novel Coronavirus (COVID-19). Long-term care facilities should apply infection control principles used to manage respiratory infections and outbreaks to COVID-19.

We encourage all providers to monitor the CDC website for information and resources and contact their local health department when needed (CDC Resources for Health Care Facilities: https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/index.html).

**AUTHORITY**
Governor Brown's Executive Order 20-03 dated March 8, 2020.

**I.   APPLICATION**
This policy applies to all nursing facilities, residential care and assisted living facilities, including those with memory care endorsements. These actions are required until further notice, with the understanding that guidance from the Department of Human Services may change as the situation evolves.

**II.   RATIONALE**
The long-term care facility visitation policy stems from a desire to have a uniform policy that is better communicated to stakeholders and maximizes facilities' ability to prevent and contain the spread of the COVID-19 virus.

**III.   DEFINITIONS**
   a. *Essential* individual includes:
- Facility staff;
- Outside medical personnel;
- Vendors;
- Adult protective services staff;
- Licensing/ Survey staff;
- Long Term Care Ombudsman and Deputies (not volunteers);
- Friends or family members visiting during end-of-life stages; and
- Friends or family who are essential for the individual's emotional well-being and care.

2

b. *Screening* means: the evaluation by facility staff of every individual entering the facility consistent with the screening criteria.

c. *Screening criteria includes identifying:*

- Signs or symptoms of a respiratory infection, such as fever, cough, shortness of breath, or sore throat.
- Contact, in the last 14 days, with someone with a confirmed diagnosis of COVID-19, or under investigation for COVID-19.
- Whether there has been international travel within the last 14 days to countries with sustained community transmission. For updated information on affected countries visit: https://www.cdc.gov/coronavirus/2019-ncov/travelers/index.html

d. *Restricting* means: not being allowed in the facility at all.

e. *Limiting* means: Not being allowed in the facility, except for certain situations, such as end-of-life situations or when a visitor is essential for the resident's emotional well-being and care.

**IV.  POLICY**

Effective March 10, 2020, facilities must follow CMS guidelines related to screening, limiting and restricting visitors (CMS Ref. QSO-20-14-NH (March 9, 2020)) and must:

1.  Restrict visitation of non-essential individuals.
2.  Screen 100% of essential individuals prior to entry into the building consistent with screening criteria.
3.  Limit visitation of essential individuals.
    a. If an essential visitor meets any of the screening above, visitors must:
        i.   Limit their movement within the facility to the resident's room
        ii.  Limit surfaces touched
        iii. Use appropriate personal protective equipment (PPE) – gown, gloves and mask
        iv.  Limit physical contact with resident

All screenings must be documented via a form and logged. Screening documentation must be maintained and made available for inspection by regulatory agencies.

There can only be two essential visitors per resident at a given time. Essential individuals who meet any of the screening criteria must follow the limitations listed above.

Facilities shall post signage clearly summarizing the essential individual visitor policy.

If a facility has a suspected, presumptive, or confirmed COVID-19 patient, the facility must:
- Consult with local public health.
- Notify its licensing authority (Safety, Oversight and Quality)
- Further restrict visitation.
- Maintain a log of visitors and staff interacting with a patient who is isolated for presumptive or confirmed COVID-19.
- Be able to identify the staff who interacted with the resident and resident's environment.
- Restrict all internal group activities to prevent infection exposure to other residents.

Effective immediately, facilities shall discontinue community outings. Facilities shall provide guidance and education to residents who independently engage in community outings, but MAY NOT prevent residents from embarking on those outings.

Facilities must continue to accommodate medical visits, regardless of whether such visits are routine, preventive or critical.

Visitation and socialization promotes emotional wellness for residents. As such, facilities must provide guidance and technological solutions for "virtual visits" using tools such as FaceTime and Skype to both residents and potential visitors who are being denied entry.

This policy will be updated as additional information is released by the Centers for Disease Control and Prevention, and the Oregon Health Authority. The Department will also provide tools to assist facilities with implementation shortly.

It is so ordered that this policy is in effect from March 10, 2020, until rescinded via executive letter.

_____

Michael McCormick, Interim Director
Aging and People with Disabilities Program
Department of Human Services

**Exhibit 3**

**CDC,** *Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission*

Pages: 10

*State v. Vernon Rasmussen*

*20CR12593*

# Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission

## Background

When a novel virus with pandemic potential emerges, nonpharmaceutical interventions, which will be called community mitigation strategies in this document, often are the most readily available interventions to help slow transmission of the virus in communities. Community mitigation is a set of actions that persons and communities can take to help slow the spread of respiratory virus infections. Community mitigation is especially important before a vaccine or drug becomes widely available.

The following is a framework for actions which local and state health departments can recommend in their community to both prepare for and mitigate community transmission of COVID-19 in the United States. Selection and implementation of these actions should be guided by the local characteristics of disease transmission, demographics, and public health and healthcare system capacity.



## Goals

The goals for using mitigation strategies in communities with local COVID-19 transmission are to slow the transmission of disease and in particular to protect:

- Individuals at increased risk for severe illness, including older adults and persons of any age with underlying health conditions (See Appendix A)
- The healthcare and critical infrastructure workforces

These approaches are used to minimize morbidity and mortality and the social and economic impacts of COVID-19. Individuals, communities, businesses, and healthcare organizations are all part of a community mitigation strategy. These strategies should be implemented to prepare for and when there is evidence of community transmission. Signals of ongoing community transmission may include detection of confirmed cases of COVID-19 with no epidemiologic link to travelers or known cases, or more than three generations of transmission.

Implementation is based on:

- Emphasizing individual responsibility for implementing recommended personal-level actions
- Empowering businesses, schools, and community organizations to implement recommended actions, particularly in ways that protect persons at increased risk of severe illness
- Focusing on settings that provide critical infrastructure or services to individuals at increased risk of severe illness
- Minimizing disruptions to daily life to the extent possible

## Guiding principles

- Each community is unique, and appropriate mitigation strategies will vary based on the level of community transmission, characteristics of the community and their populations, and the local capacity to implement strategies (Table 1).
- Consider all aspects of a community that might be impacted, including populations most vulnerable to severe illness and those that may be more impacted socially or economically, and select appropriate actions.
- Mitigation strategies can be scaled up or down depending on the evolving local situation.
- When developing mitigation plans, communities should identify ways to ensure the safety and social well-being of groups that may be especially impacted by mitigation strategies, including individuals at increased risk for severe illness.
- Activation of community emergency plans is critical for the implementation of mitigation strategies. These plans may provide additional authorities and coordination needed for interventions to be implemented (Table 2).
- Activities in Table 2 may be implemented at any time regardless of the level of community transmission based on guidance on from local and state health officials.
- The level of activities implemented may vary across the settings described in Table 2 (e.g., they may be at a minimal/moderate level for one setting and at a substantial level for another setting in order to meet community response needs).
- Depending on the level of community spread, local and state public health departments may need to implement mitigation strategies for public health functions to identify cases and conduct contact tracing (Table 3). When applied, community mitigation efforts may help facilitate public health activities like contact tracing



**Table 1. Local Factors to Consider for Determining Mitigation Strategies**

| Factor | Characteristics |
|---|---|
| Epidemiology | • Level of community transmission (see Table 3)<br>• Number and type of outbreaks (e.g., nursing homes, schools, etc.)<br>• Impact of the outbreaks on delivery of healthcare or other critical infrastructure or services<br>• Epidemiology in surrounding jurisdictions |
| Community Characteristics | • Size of community and population density<br>• Level of community engagement/support<br>• Size and characteristics of vulnerable populations<br>• Access to healthcare<br>• Transportation (e.g., public, walking)<br>• Planned large events<br>• Relationship of community to other communities (e.g., transportation hub, tourist destination, etc.) |
| Healthcare capacity | • Healthcare workforce<br>• Number of healthcare facilities (including ancillary healthcare facilities)<br>• Testing capacity<br>• Intensive care capacity<br>• Availability of personal protective equipment (PPE) |
| Public health capacity | • Public health workforce and availability of resources to implement strategies<br>• Available support from other state/local government agencies and partner organizations |

**Table 2. Community mitigation strategies by setting and by level of community transmission or impact of COVID-19**

| Factor | Potential mitigation activities according to level of community transmission or impact of COVID-19 by setting | | |
|---|---|---|---|
| | None (preparedness phase) | Minimal to moderate | Substantial |
| **Individuals and Families at Home**<br><br>"What you can do to prepare, if you or a family member gets ill, or if your community experiences spread of COVID-19" | • Know where to find local information on COVID-19 and local trends of COVID-19 cases.<br>• Know the signs and symptoms of COVID-19 and what to do if symptomatic:<br>　» Stay home when you are sick<br>　» Call your health care provider's office in advance of a visit<br>　» Limit movement in the community<br>　» Limit visitors<br>• Know what additional measures those at high-risk and who are vulnerable should take.<br>• Implement personal protective measures (e.g., stay home when sick, handwashing, respiratory etiquette, clean frequently touched surfaces daily).<br>• Create a household plan of action in case of illness in the household or disruption of daily activities due to COVID-19 in the community.<br>　» Consider 2-week supply of prescription and over the counter medications, food and other essentials. Know how to get food delivered if possible.<br>　» Establish ways to communicate with others (e.g., family, friends, co-workers).<br>　» Establish plans to telework, what to do about childcare needs, how to adapt to cancellation of events.<br>• Know about emergency operations plans for schools/workplaces of household members. | • Continue to monitor local information about COVID-19 in your community.<br>• Continue to practice personal protective measures.<br>• Continue to put household plan into action.<br>• Individuals at increased risk of severe illness should consider staying at home and avoiding gatherings or other situations of potential exposures, including travel. | • Continue to monitor local information.<br>• Continue to practice personal protective measures.<br>• Continue to put household plan into place.<br>• All individuals should limit community movement and adapt to disruptions in routine activities (e.g., school and/or work closures) according to guidance from local officials. |

| Factor | Potential mitigation activities according to level of community transmission or impact of COVID-19 by setting | | |
| --- | --- | --- | --- |
| | None (preparedness phase) | Minimal to moderate | Substantial |
| **Schools/childcare**<br><br>"What childcare facilities, K-12 schools, and colleges and universities can do to prepare for COVID-19, if the school or facility has cases of COVID-19, or if the community is experiencing spread of COVID-19)" | • Know where to find local information on COVID-19 and local trends of COVID-19 cases.<br>• Know the signs and symptoms of COVID-19 and what to do if students or staff become symptomatic at school/childcare site.<br>• Review and update emergency operations plan (including implementation of social distancing measures, distance learning if feasible) or develop plan if one is not available.<br>• Evaluate whether there are students or staff who are at increased risk of severe illness and develop plans for them to continue to work or receive educational services if there is moderate levels of COVID-19 transmission or impact.<br>  » Parents of children at increased risk for severe illness should discuss with their health care provider whether those students should stay home in case of school or community spread.<br>  » Staff at increased risk for severe illness should have a plan to stay home if there are school-based cases or community spread.<br>• Encourage staff and students to stay home when sick and notify school administrators of illness (schools should provide non-punitive sick leave options to allow staff to stay home when ill).<br>• Encourage personal protective measures among staff/students (e.g., stay home when sick, handwashing, respiratory etiquette).<br>• Clean and disinfect frequently touched surfaces daily.<br>• Ensure hand hygiene supplies are readily available in buildings. | • Implement social distancing measures:<br>  » Reduce the frequency of large gatherings (e.g., assemblies), and limit the number of attendees per gathering.<br>  » Alter schedules to reduce mixing (e.g., stagger recess, entry/dismissal times)<br>  » Limit inter-school interactions<br>  » Consider distance or e-learning in some settings<br>• Consider regular health checks (e.g., temperature and respiratory symptom screening) of students, staff, and visitors (if feasible).<br>• Short-term dismissals for school and extracurricular activities as needed (e.g., if cases in staff/students) for cleaning and contact tracing.<br>• Students at increased risk of severe illness should consider implementing individual plans for distance learning, e-learning. | • Broader and/or longer-term school dismissals, either as a preventive measure or because of staff and/or student absenteeism.<br>• Cancellation of school-associated congregations, particularly those with participation of high-risk individuals.<br>• Implement distance learning if feasible. |

| Factor | Potential mitigation activities according to level of community transmission or impact of COVID-19 by setting | | |
|---|---|---|---|
| | None (preparedness phase) | Minimal to moderate | Substantial |
| **Assisted living facilities, senior living facilities and adult day programs**<br><br>"What facilities can do to prepare for COVID-19, if the facility has cases of COVID-19, or if the community is experiencing spread of COVID-19)" | • Know where to find local information on COVID-19.<br>• Know the signs and symptoms of COVID-19 and what to do if clients/residents or staff become symptomatic.<br>• Review and update emergency operations plan (including implementation of social distancing measures) or develop a plan if one is not available.<br>• Encourage personal protective measures among staff, residents and clients who live elsewhere (e.g., stay home or in residences when sick, handwashing, respiratory etiquette).<br>• Clean frequently touched surfaces daily.<br>• Ensure hand hygiene supplies are readily available in all buildings. | • Implement social distancing measures:<br>  » Reduce large gatherings (e.g., group social events)<br>  » Alter schedules to reduce mixing (e.g., stagger meal, activity, arrival/departure times)<br>  » Limit programs with external staff<br>  » Consider having residents stay in facility and limit exposure to the general community<br>  » Limit visitors, implement screening<br>• Temperature and respiratory symptom screening of attendees, staff, and visitors.<br>• Short-term closures as needed (e.g., if cases in staff, residents or clients who live elsewhere) for cleaning and contact tracing. | • Longer-term closure or quarantine of facility.<br>• Restrict or limit visitor access (e.g., maximum of 1 per day). |

5

| Factor | Potential mitigation activities according to level of community transmission or impact of COVID-19 by setting | | |
|---|---|---|---|
| | None (preparedness phase) | Minimal to moderate | Substantial |
| **Workplace**<br><br>"What workplaces can do to prepare for COVID-19, if the workplace has cases of COVID-19, or if the community is experiencing spread of COVID-19)" | • Know where to find local information on COVID-19 and local trends of COVID-19 cases.<br><br>• Know the signs and symptoms of COVID-19 and what to do if staff become symptomatic at the worksite.<br><br>• Review, update, or develop workplace plans to include:<br><br>  » Liberal leave and telework policies<br><br>  » Consider 7-day leave policies for people with COVID-19 symptoms<br><br>  » Consider alternate team approaches for work schedules.<br><br>• Encourage employees to stay home and notify workplace administrators when sick (workplaces should provide non-punitive sick leave options to allow staff to stay home when ill).<br><br>• Encourage personal protective measures among staff (e.g., stay home when sick, handwashing, respiratory etiquette).<br><br>• Clean and disinfect frequently touched surfaces daily.<br><br>• Ensure hand hygiene supplies are readily available in building. | • Encourage staff to telework (when feasible), particularly individuals at increased risk of severe illness.<br><br>• Implement social distancing measures:<br><br>  » Increasing physical space between workers at the worksite<br><br>  » Staggering work schedules<br><br>  » Decreasing social contacts in the workplace (e.g., limit in-person meetings, meeting for lunch in a break room, etc.)<br><br>• Limit large work-related gatherings (e.g., staff meetings, after-work functions).<br><br>• Limit non-essential work travel.<br><br>• Consider regular health checks (e.g., temperature and respiratory symptom screening) of staff and visitors entering buildings (if feasible). | • Implement extended telework arrangements (when feasible).<br><br>• Ensure flexible leave policies for staff who need to stay home due to school/childcare dismissals.<br><br>• Cancel non-essential work travel.<br><br>• Cancel work-sponsored conferences, tradeshows, etc. |

| Factor | Potential mitigation activities according to level of community transmission or impact of COVID-19 by setting | | |
| --- | --- | --- | --- |
| | None (preparedness phase) | Minimal to moderate | Substantial |
| **Community and faith-based organizations**<br><br>"What organizations can do to prepare for COVID-19, if the organizations has cases of COVID-19, or if the community is experiencing spread of COVID-19)" | • Know where to find local information on COVID-19 and local trends of COVID-19 cases.<br>• Know the signs and symptoms of COVID-19 and what to do if organization members/staff become symptomatic.<br>• Identify safe ways to serve those that are at high risk or vulnerable (outreach, assistance, etc.).<br>• Review, update, or develop emergency plans for the organization, especially consideration for individuals at increased risk of severe illness.<br>• Encourage staff and members to stay home and notify organization administrators of illness when sick.<br>• Encourage personal protective measures among organization/members and staff (e.g., stay home when sick, handwashing, respiratory etiquette).<br>• Clean frequently touched surfaces at organization gathering points daily.<br>• Ensure hand hygiene supplies are readily available in building. | • Implement social distancing measures:<br>  » Reduce activities (e.g., group congregation, religious services), especially for organizations with individuals at increased risk of severe illness.<br>  » Consider offering video/audio of events.<br>• Determine ways to continue providing support services to individuals at increased risk of severe disease (services, meals, checking in) while limiting group settings and exposures.<br>• Cancel large gatherings (e.g., >250 people, though threshold is at the discretion of the community) or move to smaller groupings.<br>• For organizations that serve high-risk populations, cancel gatherings of more than 10 people. | • Cancel community and faith-based gatherings of any size. |

| Factor | Potential mitigation activities according to level of community transmission or impact of COVID-19 by setting | | |
|---|---|---|---|
| | None (preparedness phase) | Minimal to moderate | Substantial |
| **Healthcare settings and healthcare provider (includes outpatient, nursing homes/long-term care facilities, inpatient, telehealth)**<br><br>"What healthcare settings including nursing homes/long-term care facilities, can do to prepare for COVID-19, if the facilities has cases of COVID-19, or if the community is experiencing spread of COVID-19)" | • Provide healthcare personnel ([HCP], including staff at nursing homes and long-term care facilities) and systems with tools and guidance needed to support their decisions to care for patients at home (or in nursing homes/long-term care facilities).<br><br>• Develop systems for phone triage and telemedicine to reduce unnecessary healthcare visits.<br><br>• Assess facility infection control programs; assess personal protective equipment (PPE) supplies and optimize PPE use.<br><br>• Assess plans for monitoring of HCP and plans for increasing numbers of HCP if needed.<br><br>• Assess visitor policies.<br><br>• Assess HCP sick leave policies (healthcare facilities should provide non-punitive sick leave options to allow HCP to stay home when ill).<br><br>• Encourage HCP to stay home and notify healthcare facility administrators when sick.<br><br>• In conjunction with local health department, identify exposed HCP, and implement recommended monitoring and work restrictions.<br><br>• Implement triage prior to entering facilities to rapidly identify and isolate patients with respiratory illness (e.g., phone triage before patient arrival, triage upon arrival). | • Implement changes to visitor policies to further limit exposures to HCP, residents, and patients. Changes could include temperature/symptom checks for visitors, limiting visitor movement in the facility, etc.<br><br>• Implement triage before entering facilities (e.g., parking lot triage, front door), phone triage, and telemedicine to limit unnecessary healthcare visits.<br><br>• Actively monitor absenteeism and respiratory illness among HCP and patients.<br><br>• Actively monitor PPE supplies.<br><br>• Establish processes to evaluate and test large numbers of patients and HCP with respiratory symptoms (e.g., designated clinic, surge tent).<br><br>• Consider allowing asymptomatic exposed HCP to work while wearing a facemask.<br><br>• Begin to cross train HCP for working in other units in anticipation of staffing shortages. | • Restrict or limit visitors (e.g., maximum of 1 per day) to reduce facility-based transmission.<br><br>• Identify areas of operations that may be subject to alternative standards of care and implement necessary changes (e.g., allowing mildly symptomatic HCP to work while wearing a facemask).<br><br>• Cancel elective and non-urgent procedures<br><br>• Establish cohort units or facilities for large numbers of patients.<br><br>• Consider requiring all HCP to wear a facemask when in the facility depending on supply. |

8

**Table 3. Potential mitigation strategies for public health functions**

| Public health control activities by level of COVID-19 community transmission | | |
|---|---|---|
| **None/minimal** | **Moderate** | **Substantial** |
| Evidence of isolated cases or limited community transmission, case investigations underway, no evidence of exposure in large communal setting, e.g., healthcare facility, school, mass gathering. | Widespread and/or sustained transmission with high likelihood or confirmed exposure within communal settings with potential for rapid increase in suspected cases. | Large scale community transmission, healthcare staffing significantly impacted, multiple cases within communal settings like healthcare facilities, schools, mass gatherings etc. |
| • Continue contact tracing, monitor and observe contacts as advised in guidance to maximize containment around cases.<br><br>• Isolation of confirmed COVID-19 cases until no longer considered infectious according to guidance.<br><br>• For asymptomatic close contacts exposed to a confirmed COVID-19 case, consideration of movement restrictions based on risk level, social distancing.<br><br>• Monitoring close contacts should be done by jurisdictions to the extent feasible based on local priorities and resources.<br><br>• Encourage HCP to develop phone triage and telemedicine practices.<br><br>• Test individuals with signs and symptoms compatible with COVID-19.<br><br>• Determine methods to streamline contact tracing through simplified data collection and surge if needed (resources including staffing through colleges and other first responders, technology etc.). | • May reduce contact tracing if resources dictate, prioritizing to those in high-risk settings (e.g., healthcare professionals or high-risk settings based on vulnerable populations or critical infrastructure).<br><br>• Encourage HCP to more strictly implement phone triage and telemedicine practices.<br><br>• Continue COVID-19 testing of symptomatic persons; however, if testing capacity limited, prioritize testing of high-risk individuals. | • May reduce contact tracing if resources dictate, prioritizing to those in high-risk settings (e.g., healthcare professionals or high-risk settings based on vulnerable populations or critical infrastructure).<br><br>• Encourage HCP to more strictly implement phone triage and telemedicine practices.<br><br>• Continue COVID-19 testing of symptomatic persons; however, if testing capacity limited, prioritize testing of high-risk individuals. |

## Appendix A: Underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age.

- **Blood disorders** (e.g., sickle cell disease or on blood thinners)
- **Chronic kidney disease** as defined by your doctor. Patient has been told to avoid or reduce the dose of mdications because kidney disease, or is under treatment for kidney disease, including receiving dialysis
- **Chronic liver disease** as defined by your doctor. (e.g., cirrhosis, chronic hepatitis) Patient has been told to avoid or reduce the dose of medications because liver disease or is under treatment for liver disease.
- **Compromised immune system (immunosuppression)** (e.g., seeing a doctor for cancer and treatment such as chemotherapy or radiation, received an organ or bone marrow transplant, taking high doses of corticosteroids or other immunosuppressant medications, HIV or AIDS)
- **Current or recent pregnancy** in the last two weeks
- **Endocrine disorders** (e.g., diabetes mellitus)
- **Metabolic disorders** (such as inherited metabolic disorders and mitochondrial disorders)
- **Heart disease** (such as congenital heart disease, congestive heart failure and coronary artery disease)
- **Lung disease** including asthma or chronic obstructive pulmonary disease (chronic bronchitis or emphysema) or other chronic conditions associated with impaired lung function or that require home oxygen
- **Neurological and neurologic and neurodevelopment conditions** [including disorders of the brain, spinal cord, peripheral nerve, and muscle such as cerebral palsy, epilepsy (seizure disorders), stroke, intellectual disability, moderate to severe developmental delay, muscular dystrophy, or spinal cord injury].

**Exhibit 4**

**Oregon Health Authority,** *Interim public health recommendations for response to COVID-19 cases in Oregon schools*

Pages: 2

*State v. Vernon Rasmussen*

*20CR12593*



# Interim public health recommendations for response to COVID-19 cases in Oregon schools

March 8, 2020

## Background

Oregon has recently seen COVID-19 cases in people without high-risk exposures (i.e., travel to affected regions or contact with known cases). This means COVID-19 has spread in communities in Oregon. Community-wide measures like hand hygiene and staying home when ill are essential to decrease further community spread. Measures such as complete closure of a school or schools for extended periods of time come with significant detrimental effects to communities, and their public health benefit in containing the spread of COVID-19 remains unclear at this point. Other measures, outlined below, should be deployed by schools first, with extended closures viewed as a measure of last resort.

## School-based measures

School-based measures for mitigation of community spread of COVID-19 are advised, including telling students, their parents and school staff to remain home while ill, screening students for cough illness at the start of the school day, reinforcement of handwashing, and increasing frequency of cleaning high-touch surfaces. Additional measures are based on the concept of "social distancing" – i.e., reducing interactions between people, such as staggering lunches and recesses or dividing into smaller groups. Although aggressive measures such as complete closure of a school or schools for extended periods of time are being used by numerous countries and sporadically in the United States, data regarding the appropriate timing, duration, geographic scale and effectiveness of such measures are lacking.

Nationally and in Oregon, few children have tested positive for COVID-19. Older populations, especially those with underlying health conditions, are at far greater risk. The public health benefit of school closures is likely low compared to the negative impacts on communities and populations facing health and social inequities. More than 22,000 students in Oregon, for example, experienced some form of homelessness in 2019. For many students, schools may be the only place to access regular meals or medical care. Many parents and caregivers have jobs that don't offer paid time off. Furthermore, extended school closures might increase contact rates within households or at other social gatherings.

The Centers for Disease Control and Prevention (CDC) has issued Interim Guidance for Administrators of US Childcare Programs and K–12 Schools to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19). This document recommends that schools collaborate with local health officials to develop plans to protect the school community while minimizing disruption to teaching and learning.

In 2017, CDC published Community Mitigation Guidelines to Prevent Pandemic Influenza. Although focused on influenza, many of the recommendations apply broadly to large outbreaks of viral respiratory disease. CDC concluded that preemptive, coordinated school dismissals might be recommended during the early stages of a severe or extreme influenza pandemic, but did not find sufficient evidence to advise such dismissals during an influenza pandemic of mild or moderate clinical severity, similar to what we are currently seeing with COVID-19 in Oregon.

The Oregon Health Authority Public Health Division has a High-Impact Pathogen Plan of Operations that identifies assets for use in planning for and identifying high-impact communicable pathogens, monitoring related health effects, and mitigating spread to limit the health burden from outbreaks of these pathogens.

Recently revised in December 2019, it recommends that closure of facilities such as schools can be considered for more severe illnesses, and only after weighing the benefits against disruption to communities.

## Recommendation

**At this time, OHA recommends against closing schools and campuses where no cases of COVID-19 are present. OHA also recommends that schools, colleges and universities consider all alternatives before closing a school, college or university in the event that a COVID-19 case is detected among students or staff.** Schools, colleges and universities should make decisions in concert with public health authorities, based on real-time information about COVID-19 and its transmission and using public health best practices. Meanwhile, schools, colleges and universities should emphasize the simple things people can do to keep healthy and remind students, faculty and staff who are ill not to attend school and remain at home. OHA will continue to reassess this recommendation as the outbreak continues.

## References

Qualls N, Levitt A, Kanade N, et al. Community Mitigation Guidelines to Prevent Pandemic Influenza — United States, 2017. MMWR Recomm Rep 2017;66(No. RR-1):1–34. DOI: http://dx.doi.org/10.15585/mmwr.rr6601a1

Centers for Disease Control and Prevention. Interim Guidance for Administrators of US Childcare Programs and K-12 Schools to Plan, Prepare, and Respond to Coronavirus Disease 2019, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/guidance-for-schools.html

Oregon Health Authority Public Health Division. High-Impact Pathogen Plan of Operations (HIPPO), December 2019.

**Exhibit 5**

**Peter Wagner and Emily Widra, *No need to wait for pandemics*,
March 6, 2020**

Pages: 6

*State v. Vernon Rasmussen*

*20CR12593*

# No need to wait for pandemics: The public health case for criminal justice reform

*We offer five examples of policies that could slow the spread of a viral pandemic in prisons and jails - and would mitigate the everyday impact of incarceration on public health.*

by Peter Wagner and Emily Widra, March 6, 2020

The United States incarcerates a greater share of its population than any other nation in the world, so it is urgent that policymakers think about how a viral pandemic would impact people in prisons, in jails, on probation, and on parole, and to take seriously the public health case for criminal justice reform.

Below, we offer five examples of common sense policies that could slow the spread of the virus. This is not an exhaustive list, but a first step for governors and other state-level leaders to engage today, to be followed by further much-needed changes tomorrow.

Quick action is necessary for two reasons: the justice-involved population disproportionately has health conditions that make them more vulnerable, and making policy changes requires staffing resources that will be unavailable if a pandemic hits.

The incarcerated and justice-involved populations contain a number of groups that may be particularly vulnerable to COVID-19, the novel coronavirus. Protecting vulnerable people would improve outcomes for them, reduce the burden on the health care system, protect essential correctional staff from illness, and slow the spread of the disease.

3/11/2020                Case 3:20-cv-00865-IM    Document 1-1    Filed 05/29/20    Page 49 of 123 | Prison Policy Initiative
No need to wait for pandemics: The public health case for criminal justice reform | Prison Policy Initiative

App'x 48

## Prevalence of health condition by population

| Health condition | Jails | State prisons | Federal prisons | United States |
|---|---|---|---|---|
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

The other reason to move quickly is that, on a good day, establishing and implementing *new* policies and practices is something that the government finds challenging to do on top of its other duties. If a pandemic hits and up to 40% of government lawyers are either sick or taking care of sick relatives and most of the rest are working from home, making policy

*If a pandemic hits — and up to 40% of government lawyers are either sick or taking care of sick relatives — policy change is going to be much harder and take far longer.*

change is going to be much harder and take far longer. If the government wants to protect both justice-involved people and their already overstretched justice system staff from getting the virus and spreading it further, **they need to act now**.

Here are five places to start:

1. **Release medically fragile and older adults.** Jails and prisons house large numbers of people with chronic illnesses and complex medical needs, who are more vulnerable to becoming seriously ill and requiring more medical care with COVID-19. And the growing number of older adults in prisons are at higher risk for serious complications from a viral infection like COVID-19. Releasing these vulnerable groups from prison and jail will reduce the need to provide complex medical care or transfers to hospitals when staff will be stretched thin. (In Iran, where the virus has been spreading for several weeks longer than in the U.S., the government just gave temporary release to almost a quarter of their total prison population.) ⓘ

3/11/2020
Case 3:20-cv-00865-IM    Document 1-1    Filed 05/29/20    Page 50 of 123
No need to wait for pandemics: The public health case for criminal justice reform | Prison Policy Initiative
App'x 49

2. **Stop charging medical co-pays in prison.** Most prison systems have a short-sighted policy that discourages sick people from seeking care: charging the free-world equivalent of hundreds of dollars in copays to see a doctor. In the context of COVID-19, not receiving immediate, appropriate medical care means allowing the virus to spread across a large number of people in a very confined space. These policies should all be repealed, but at a minimum should be immediately suspended until the threat of pandemic is over. (This will also reduce the administrative burden of processing and collecting these fees.)

3. **Lower jail admissions to reduce "jail churn."** About one-third of the people behind bars are in local jails, but because of the shorter length of stay in jails, more people churn through jails in a day than are admitted or released from state and federal prisons in 2 weeks. In Florida alone, more than 2,000 people are admitted and nearly as many are released from county jails each day. ② As we explained in a 2017 report, there are many ways for state leaders to reduce churn in local jails; for example, by: reclassifying misdemeanor offenses that do not threaten public safety into non-jailable offenses; using citations instead of arrests for all low-level crimes; and diverting as many people as possible people to community-based mental health and substance abuse treatment. ③ State leaders should never forget that local jails are even less equipped to handle pandemics than state prisons, so it is even more important reduce the burden of a potential pandemic on jails.

4. **Reduce unnecessary parole and probation meetings.** People deemed "low risk" should not be required to spend hours traveling to, traveling from, and waiting in administrative buildings for brief meetings with their parole or probation officers. Consider discharging people who no longer need supervision from the supervision rolls and allow as many people as possible to check in by telephone.

5. **Eliminate parole and probation revocations for technical violations.** In 2016, approximately 60,000 people were returned to state prison (and a larger number were arrested), not because they were convicted of a new criminal offense, but because of a technical violation of probation and parole rules, such as breaking curfew or failing a drug test. States should cease locking people up for behaviors that, for people not on parole or probation, would not warrant incarceration. Reducing these unnecessary incarcerations would reduce the risk of transmitting a virus between the facilities and the community, and vice versa.

There is one more thing that every pandemic plan needs to include: a commitment to continue finding ways — once this potential pandemic ends — to minimize the number of confined people and to improve conditions for those who are incarcerated, both in anticipation of the next pandemic and in recognition of the *every day* public health impact of incarceration.

None of the ideas in this briefing are new. All five are well established criminal justice reforms that some jurisdictions are already partially implementing and many more are considering. These ideas are not even new to the world of pandemic planning, as we found some of them buried in brief mentions in the resources listed below — albeit after many pages about the distribution of face masks and other technical matters. Correctional systems need to be able to distribute face masks to the people who need them, of course, but making urgent policy decisions about changing how and where you confine people is not something

that should be relegated to a sentence about how agencies may want to "consider implementing alternative strategies."

The real question is whether the criminal justice system and the political system to which it is accountable are willing to make hard decisions in the face of this potential pandemic, in the face of the one that will eventually follow, and in the context of the many public health costs of our current system of extreme punishment and over-incarceration.

## Appendix: Other resources for practitioners

While preparing this briefing, the Prison Policy Initiative identified some resources that may be helpful for facilities and systems that may be starting from scratch on a COVID-19 response plan, which we share below. This list is not intended to be comprehensive, and will hopefully soon be out of date as other agencies update and share their own plans:

- Correctional facilities pandemic influenza planning checklist, CDC, September 2007 (This checklist is very helpful, but many of the links in the document are broken as of this publication. Presumably the CDC will update this soon.)
- Pandemic influenza and jail facilities and populations, Laura Maruschak, et. al., American Journal of Public Health, September 2009
- Pandemic influenza preparedness and response planning: guidelines for community corrections, Patricia Bancroft, American Probation and Parole Association, August 2009
- How public health and prisons can partner for pandemic influenza preparedness: A report from Georgia, Anne C. Spaulding, et al., April 2009

## Footnotes

1. Earlier this week, Iran reportedly released about 54,000 incarcerated people with sentences under five years, which is almost a quarter of their total prison population of 240,000 people, based on 2018 data from the World Prison Brief. ↵

2. Although national numbers of jail releases per day are not available, the number of jail admissions — 10.6 million annually — is relatively stable, with the jail population turning over quickly, at an average rate of 54% each week. Assuming, then, that the number of admissions is about the same as the number of releases, we estimate that about 29,000 people are released from jails in the U.S. every day (10.6 million divided by 365 days per year). In comparison, in 2017, state and federal prisons admitted and released over 600,000 people, averaging about 12,000 releases a week or 1,700 per day. For state-by-state data, we estimated the number of releases in a similar fashion — we divided the number of annual admissions and releases, obtained from the Census of Jails, 2013, by 365 days. Governors of other states may want to see this table based on data from the Census of Jails, 2013:

| State | Jail Admissions | Jail Releases |
|---|---|---|
| Alabama | 286,843 | 249,418 |
| Alaska | 5,392 | 3,686 |
| Arizona | 210,399 | 202,484 |
| Arkansas | 258,321 | 232,255 |
| California | 1,102,972 | 995,338 |
| Colorado | 211,397 | 197,866 |
| District of Columbia | 12,008 | 12,238 |
| Florida | 732,602 | 680,801 |
| Georgia | 602,648 | 537,857 |
| Idaho | 104,539 | 50,384 |
| Illinois | 315,553 | 290,264 |
| Indiana | 270,415 | 277,994 |
| Iowa | 127,179 | 123,693 |
| Kansas | 153,914 | 142,759 |
| Kentucky | 548,733 | 509,413 |
| Louisiana | 317,091 | 334,730 |
| Maine | 37,995 | 33,934 |
| Maryland | 156,659 | 164,736 |
| Massachusetts | 58,115 | 76,253 |
| Michigan | 359,631 | 348,584 |
| Minnesota | 188,662 | 180,393 |
| Mississippi | 125,961 | 119,682 |
| Missouri | 252,131 | 239,562 |
| Montana | 48,418 | 39,179 |
| Nebraska | 72,616 | 72,687 |
| Nevada | 144,256 | 146,657 |
| New Hampshire | 20,841 | 22,187 |
| New Jersey | 147,088 | 134,407 |
| New Mexico | 150,488 | 142,035 |
| New York | 219,320 | 201,939 |
| North Carolina | 417,199 | 433,700 |
| North Dakota | 39,367 | 35,979 |
| Ohio | 405,313 | 395,648 |
| Oklahoma | 409,293 | 261,454 |
| Oregon | 176,549 | 172,476 |
| Pennsylvania | 209,732 | 213,319 |
| South Carolina | 301,594 | 325,976 |
| South Dakota | 56,477 | 56,851 |
| Tennessee | 461,375 | 439,364 |
| Texas | 1,144,687 | 1,083,223 |
| Utah | 97,509 | 98,651 |
| Virginia | 355,549 | 304,466 |
| Washington | 283,627 | 305,963 |
| West Virginia | 47,439 | 46,210 |
| Wisconsin | 227,243 | 208,406 |
| Wyoming | 29,384 | 30,803 |

3. Policymakers should also double their efforts — without slowing down actual releases — to plan for a continuity of health care after release, including getting people signed up for Affordable Care Act coverage and giving them referrals for other treatment as needed. ↵

*Peter Wagner is Executive Director of the Prison Policy Initiative.* (Other articles | Full bio | Contact) *Emily Widra*
*is a Research Analyst at the Prison Policy Initiative.* (Other articles | Full bio | Contact)

**Exhibit 6**

**FW: Corona Virus and Jail Visiting, Email from Karlyn Degman to Mary Bruington et al.**

Pages: 1

*State v. Vernon Rasmussen*

*20CR12593*



**From:** Karlyn Degman <​███████████████████████████>
**Sent:** Sunday, March 1, 2020 10:02 PM
**To:** ███████████████████; Mary Bruington <███████████████>; Erin Calvert
<███████████████>; Richard Moellmer <██████████████████████>;
Stephanie Brown <████████████████████>; John Koch
<███████████████████>
**Cc:** Pat Garrett <█████████████████████>
**Subject:** FW: Corona Virus and Jail Visiting

Greetings:

The Washington County Jail updated our Intake process as the initial news of the Corona virus was coming in several weeks ago.  We worked with county Health and Human Services (HHS) and our medical services contractors to update the questions we ask arrestees upon arrival.  We work closely with our medical services providers to screen every patient in order to obtain and document more information when a patient reports any active or contagious illness, or shows signs/symptoms of active or contagious illness.  We are equipped with personal protection equipment for both staff and patients, in order to prevent wide spread exposure.  We also take precautions to isolate any individual we believe may be at risk of spreading any infection to others. We have reviewed procedures again with our staff to ensure full understanding.  We are also on a more frequent cleaning schedule, with focus on disinfecting commonly used surfaces.

Undersheriff Fischer has started sending out daily updates on the status of the Corona virus and we will continue to be diligent in complying with recommendations provided by HHS, our medical providers, the CDC and other subject matter experts. We are committed to the care and well being of our community.  Regarding professional visitors, we will continue to work with all visitors in order to keep lines of communications and the opportunities to have access to clients uninterrupted.  If someone in custody is medically unstable or contagious, we will advise you at the time of your visit so other arrangements can be made.

If you have other questions or concerns, please feel free to contact me directly.

Kind regards,


Cmndr. Karlyn Degman
Washington County Jail

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF WASHINGTON

*ORDER on*   ☒ *Release Hearing*
☐ *Modification of Release*
☐ *Violation of Release*

STATE OF OREGON )
Plaintiff, )
*Vernon Lee Rasmussen*
vs )
Defendant. )

Case No. *20CR12593*
Deputy DA *Weiner*
Defense Atty *Decker*
Interpreter
Hearing Date *3·18·2020*

This matter having come before the Court with:

☒ Defendant present
☐ Defendant <u>not</u> present

it is hereby ORDERED by the Court that:

**Security Release:** _____ Same / _____ Raised / _X_ Reduced/and Special Conditions____ *X*____
New Security Amount: $ *250,000*

_____ Standard Release, with no special conditions
_____ Conditional Release, with special conditions as listed below
_____ NO FORCED RELEASE

**Special Conditions:**

_X_ 1. Responsible person, approved by Court Release office: *none approved yet*
_X_ 2. Reside with responsible person
_X_ 3. Obey all house rules
_____ 4. Curfew from _____ PM to _____ AM
_X_ 5. House arrest
_X_ 6. Not to leave the residence unless with the responsible person
_____ 7. Not to leave residence unless with person(s) responsible person designates
_____ 8. May leave residence for ~~school~~, ~~work~~, counseling, ~~other~~ *legal medical treatment*
_X_ 9. Not to possess or consume (a) alcohol, (b) illegal drugs, (c) dangerous or deadly weapons, (d) other *marijuana*
_X_ 10. Not to have any contact with (a) victim, (b) family of victim, (c) witnesses
_____ 11. Allowed to leave the State for purposes of work
_X_ 12. Sign and abide by the "no contact with minors" addendum
_____ 13. Not possess ID, checks or credit cards that do not belong to defendant
_X_ 14. Additional conditions ordered by the Court: *May have contact with own minor child.*

**Next court date, time & courtroom:** *CMC· 3·23·20C 3pm*
Dated *3·18·2020*

Judge's Signature (Please print or stamp name below) *Griffin*

Release Hearing
(Rev – 03/08)

Original: Court    Yellow: Defendant    Pink: District Attorney    Goldenrod: Jail/Defense Attorney    Green: Release Office
Page 1 of 1

Verified Correct Copy of Original 3/18/2020

/20CR12593
| ORDO
Order – Release
| 12592159

1

2

3

4                  IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                      FOR THE COUNTY OF WASHINGTON

6    STATE OF OREGON,                    )    No. 20CR12593
                                         )
7                     Plaintiff,         )    **Motion to Withdraw**
                                         )
8         vs.                            )
                                         )
9    VERNON LEE RASMUSSEN,               )
                                         )
10                    Defendant.         )

11         Brian Decker, attorney of record for the defendant, moves to withdraw from any

12  further representation of the defendant for the reasons in the affidavit filed herewith.

13         Because conflict withdrawal is mandatory and because the Court has implemented

14  level-three restrictions to avoid unnecessary hearings, Decker further requests that this

15  motion be granted on the pleadings without a hearing and that the case management

16  conference currently scheduled for Monday, March 23, at 3:00 p.m. be reset to provide

17  sufficient time for new counsel to appear.

18         March 20, 2020. _____.

19
                                         */s/Brian R. Decker*_____
20                                       Brian Decker, OSB# 165548
                                         Attorney for Defendant
21

22  <u>AUTHORITY</u>:

23  ORS 9.380(2)

24

25

26

PAGE 1 - MOTION, AFFIDAVIT AND ORDER TO WITHDRAW

1

2

3

4            IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                  FOR THE COUNTY OF WASHINGTON

6    STATE OF OREGON,                )    No. 20CR12593
                                     )
7            Plaintiff,              )    DECLARATION IN SUPPORT OF
                                     )    MOTION TO WITHDRAW
8        vs.                         )
                                     )
9    VERNON LEE RASMUSSEN,           )
                                     )
10           Defendant.              )

11

12        I, Brian Decker, declare that

13        1.  I am the attorney of record for the defendant, and

14        2.  The basis for my motion to withdraw is that this case presents an ethical

15   conflict due to prior representation of an adverse party, mandating withdrawal.

16        I hereby declare that the above statement is true to the best of my knowledge and

17   belief and that I understand it is made for use as evidence in court and is subject to penalty

18   for perjury.

19        DATED March 20, 2020.

20

21
                                          /s/Brian R. Decker
22                                        Brian Decker, OSB # 165548
                                          Attorney for Defendant
23

24

25

26

PAGE 2 - MOTION, AFFIDAVIT AND ORDER TO WITHDRAW

**METROPOLITAN PUBLIC DEFENDER**
400 E. MAIN STREET,  SUITE 210      HILLSBORO, OREGON  97123-4166      503-726-7900      FAX 503-726-4950

1

2

<u>CERTIFICATE OF SERVICE</u>

3

4          I certify that on March 20, 2020, I or a representative of my office served the

5   within motion to withdraw, along with its accompanying declaration and proposed order,

6   on the plaintiff by electronically serving a true copy thereof as required by UTCR 21.100.

7

8                                        /s/Brian R. Decker
                                         METROPOLITAN PUBLIC DEFENDER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PAGE 3 - MOTION, AFFIDAVIT AND ORDER TO WITHDRAW

20CR12593

1          IN THE CIRCUIT COURT OF THE STATE OF OREGON

2              FOR THE COUNTY OF WASHINGTON

3    STATE OF OREGON,                  )    No. 20CR12593
                                        )
4                  Plaintiff,           )    ORDER TO WITHDRAW
                                        )
5          vs.                          )
                                        )
6    VERNON LEE RASMUSSEN,              )
                                        )
7                  Defendant.           )

8          THIS MATTER having come before the Court upon the motion of Brian Decker to

9    withdraw as the attorney for the defendant;

10          Good and sufficient reason for allowing such withdrawal having been shown to the

11    Court by said attorney's affidavit filed herein; and

12          The Court now being fully advised;

13          NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED that the

14    motion to withdraw is granted. Brian Decker and the Metropolitan Public Defender are

15    hereby relieved of any further representation of the defendant.

16          IT IS SO ORDERED this _____ day of _____, _____.

17          _____ IT IS FURTHER ORDERED that new counsel be appointed to represent

18    the defendant.

                                        Signed: 3/23/2020 10:56 AM

19                                      _____
                                        Circuit Court Judge Janelle Factora Wipper

20                                      _____
                                              JUDGE

21    Submitted By:
       Brian Decker, OSB #165548
22    Attorney for Defendant

23

24

25

26

PAGE 4 - MOTION, AFFIDAVIT AND ORDER TO WITHDRAW

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF WASHINGTON
150 N First Avenue  Hillsboro Oregon  97124

**Case No:** 20CR12593

**State of Oregon**
**vs**
**Vernon Lee Rasmussen**

**ORDER RE:**
**COURT-APPOINTED COUNSEL**

*Case Type: Offense Felony*

**Applicant:** Vernon Lee Rasmussen

## The court orders as follows:

The applicant's request for court-appointed counsel is:

☐ **Denied**

☒ **Approved** *(attorney name):* Alexander Hamalian

is appointed as counsel for the defendant, contingent upon further verification

The $20 Application Fee is:

☐ **Ordered**, due immediately (or due on $\Sigma$)

☒ **Waived**

The Contribution Amount is:

☐ **Ordered**, in the amount of $, due immediately (or due on $\Sigma$ )

☒ **Waived**

***If Applicant is a minor,*** *the ordered amounts are payable by (name):*

Signed: 3/26/2020 01:25 PM

Circuit Court Judge: Janelle Factora Wipper

1

2

3

4              IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                    FOR THE COUNTY OF WASHINGTON

6    STATE OF OREGON,                )    No. 20CR12593
                                     )
7                    Plaintiff,      )    **Declaration Re Bail Reduction**
                                     )
8        vs.                         )    **Hearing**
                                     )
9    VERNON LEE RASMUSSEN,           )
                                     )
10                   Defendant.      )

11       I, Brian Decker, declare that

12   1.  On March 18, 2020, the Washington County Circuit Court held a hearing on my

13       motion to reduce the security amount required for Vernon Rasmussen's release.

14

15   2.  I argued that the security amount should be reduced to an amount he could afford, and

16       I explained that he had no current income and very limited assets.

17   3.  I argued that the court should consider the context of the coronavirus pandemic. I

18       stated reasons the Washington County Jail is at particular risk and the reasons to

19       suspect people in contact with the jail are already contracting the virus. I incorporated

20       my comments on the matter from the hearing that occurred immediately prior to this

21       one in *State v. Jayson Mee*, 19CR32388.

22   4.  I explained that Rasmussen's age of fifty, while not in the high-risk category of sixty

23       or above, nevertheless places him at an elevated risk of serious illness or death—six

24       times higher than those in their twenties and thirties.

25

26

1    5.  The state argued that he should not be released and recounted the allegations against

2        Rasmussen but presented no evidence.

3

4    6.  The court found that Rasmussen is not at high risk of serious illness and incorporated

      its findings regarding jail safety from the *Mee* case.

5

6    7.  The court lowered the security amount from $2,000,000 to $250,000, which is still

7        unaffordable to Rasmussen, and imposed conditions.

8    8.  That afternoon, my staff requested the FTR recording of the hearing and that of the

9        *Mee* case. Court staff has since informed me that delivery of such recordings will be

10       slower than usual due to staffing issues during the coronavirus crisis. I have not yet

11       received the recordings.

12       I hereby declare that the above statement is true to the best of my knowledge and

13  belief and that I understand it is made for use as evidence in court and is subject to

14  penalty for perjury.

15

16       DATED March 30, 2020

17

18                              */s/Brian Decker*

                            Brian Decker, OSB #165548

19                              Attorney for Defendant

20

21

22

23

24

25

26

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,
Plaintiff-Adverse Party,

v.

VERNON LEE RASMUSSEN,
Defendant-Relator.

Washington County Circuit Court
20CR12593

S067624

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS OR WRIT OF MANDAMUS

Upon consideration by the court.

The petition for writ of habeas corpus or writ of mandamus is denied.

MARTHA L. WALTERS
CHIEF JUSTICE, SUPREME COURT
5/21/2020   9:39 AM

---

## DESIGNATION OF PREVAILING PARTY AND AWARD OF COSTS

Prevailing party: Adverse Party                          [ X ] No costs allowed.

---

c:  Jesse Alan Merrithew
    Viktoria Safarian
    Carl D Macpherson, IV
    Benjamin Gutman
    Carson L Whitehead
    Paul L Smith
    Hon. Rebecca D Guptill

els

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS OR WRIT OF MANDAMUS

# IN THE SUPREME COURT OF THE

# STATE OF OREGON

| | |
|---|---|
| STATE OF OREGON, | No. |
| Plaintiff-Adverse Party, | Washington County Circuit Court No. 20CR12593 |
| v. | PETITION FOR WRIT OF HABEAS CORPUS, PEREMPTORY WRIT OF MANDAMUS, OR ALTERNATIVE WRIT OF MANDAMUS |
| VERNON LEE RASMUSSEN, | |
| Defendant-Relator. | |

**Jesse Merrithew**, OSB No. 074564
jesse@lmhlegal.com
**Viktoria Safarian**, OSB No. 175487
viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street Suite 415
Portland Oregon 97205
(971) 229-1241

**Carl Macpherson, IV**, OSB No. 120208
cmacpherson@mpdlaw.com
Metropolitan Public Defender Inc
630 SW Fifth Avenue Suite 500
Portland Oregon 97204
(503) 295-9100

**Charles Gerstein**

charlie@civilrightscorps.org
**Olevia Boykin**
olevia@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, D.C. 20009
(202) 844-4975

**Attorneys for Defendant-Relator**

**Ellen Rosenblum**, OSB No. 753239
ellen.f.rosenblum@doj.state.or.us
Oregon Department of Justice
1162 State Street NE
Salem Oregon 97301
(503) 378-6002

**Attorney for Plaintiff-Adverse Party**

## PETITION FOR WRIT OF HABEAS CORPUS OR MANDAMUS

Relator alleges:

1.  Vernon Rasmussen is a 50-year-old man who is currently jailed at the Washington County Jail because he cannot afford to pay the security amount required for his release. The court ordered that a $250,000 security amount be set in Rasmussen's case knowing that Rasmussen could not afford to pay this amount.  The amount was set without the court finding, after an adversarial hearing, that clear and convincing evidence supported the conclusion that pretrial detention is necessary to ensure community safety and Rasmussen's return to court.

2.  Rasmussen was arrested on February 27, 2020, for eight counts related to sexual abuse of a minor. The Circuit Court for Washington County ordered Rasmussen detained by setting a security amount of $2,000,000. Rasmussen could not afford to pay this amount for his release, nor could he afford to pay the $200,000 that, under Oregon law, he would have to deposit to secure his release.

3.  By setting an unattainable security amount, the trial court imposed a *de facto* order of detention without the procedural protections, legal standards, and substantive findings that must accompany such an order under the Oregon Constitution and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.

4. On March 11, 2020, Rasmussen filed a motion and memorandum of law to reduce the security amount required for his release. He argued, in part, that under federal law, the court had ordered him detained pretrial by setting an unattainable security amount, without the required finding of dangerousness or flight risk by clear and convincing evidence, citing among other precedent, *United States v. Salerno*, 481 U.S. 739 (1987). The next day, Rasmussen filed a supplemental memorandum in support of his motion for release, arguing that he was vulnerable to the global health crisis posed by exposure to Covid-19 at the jail.

5. On March 18, 2020, Rasmussen and his lawyer appeared for a hearing on his motion before the Washington County Circuit Court. At this hearing, Rasmussen challenged the constitutionality of his pretrial confinement. Rasmussen asserted that he could not afford any security amount, because he had no income and very limited assets, such that he could not afford to pay any monetary amount required for his release. If the court did not set security at zero, Rasmussen asked that the court set it at an amount that he would actually be able to afford. He requested to be released to his wife as a responsible party. He argued that ensuring his detention through an unattainable financial condition of release violated his rights under the U.S. Constitution and Oregon law.

6. The state argued that he should not be released and due to the seriousness of the charges, his criminal history, the alleged victim's concerns about his release, and

a history of "multiple" failures to appear. The state put on no evidence at the hearing, nor filed any briefing or supporting documentation.

7.  Rasmussen responded that if the state's argument is that Rasmussen should not be released, then the state must convince the court by clear and convincing evidence that he should be subject to detention. Rasmussen explicitly pointed out that if the court sets an unaffordable bail amount, then that would be equivalent to a "back door" detention order, which is unconstitutional.

8.  The court reduced the security amount to $250,000. The order reducing the security amount is attached to this petition. Because Rasmussen is indigent and cannot afford to buy his release by paying $25,000 to go home, he remains jailed on an unlawful money-bail confinement order.

9.  This petition is timely made because it is being filed less than 30 days after the *de facto* detention order issued against Rasmussen. *See State ex rel Redden v. Van Hoomissen,* 281 Or 647 (1978). Additionally, the state is not prejudiced by the court taking up review under the doctrine of laches. *State v. Peekema*, 328 Or. 342, 346 (1999).

10. In addition to the fact of his ongoing unlawful incarceration and the risk to his health it presents, each passing day brings an increased likelihood that Rasmussen's individual claims—albeit not the legal questions presented in his petition—will be rendered moot by the resolution of his underlying case.  Absent

expedited adjudication of his claims, Rasmussen will continue to languish under an unlawful detention order and eventually lose the ability to prosecute claims deriving therefrom.

11. Because there is no mechanism to directly appeal bail determinations in Oregon, Rasmussen could not appeal to the Circuit Court or the Court of Appeals for relief.

12. Rasmussen is subject to an unlawful detention order. Because there is no other mechanism to appeal, and because issues regarding unlawful pretrial confinement necessarily dissipate at trial or upon conviction, there is no plain, speedy and adequate remedy at law for the constitutional violations caused by the order below. *Stack v. Boyle*, 342 US 1, 4 (1951) ("[r]elief in this type of case must be speedy if it is to be effective") *accord id*. at 12 (Jackson, J., concurring) ("[U]nless it can be reviewed before sentence, it never can be reviewed at all."); *ODonnell v. Harris County*, 251 F. Supp. 3d 1052, 1168 (SD Tex 2017) (finding irreparable harm where plaintiffs were detained because they could not pay money bail).

13. A writ of mandamus or, in the alternative, habeas corpus is the only relief available.

   ///

## **REQUEST FOR RELIEF**

WHEREFORE,

Petitioner respectfully requests that this Court enter a writ of mandamus or habeas corpus declaring Rasmussen's detention unconstitutional and ordering his immediate release. Alternatively, Petitioner respectfully requests that this Court enter a writ of mandamus ordering the State to seek and the Circuit Court to conduct a thorough adversarial hearing that complies with the requirements for preventative detention described by the United States Supreme Court in *United States v. Salerno*, 48l U.S. 739 (1987), which include making findings by clear and convincing evidence about whether he poses a flight risk and/or a danger to the community and, if so, whether conditions of release exist that could reasonably assure Rasmussen's presence at trial and the safety of the community.

Respectfully submitted this 13th day of April, 2020,


/s/*Jesse Merrithew*
Jesse Merrithew
Viktoria Safarian
Levi, Merrithew, Horst LLP
610 SW Alder Street, Suite 415
Portland, OR  97205

Carl Macpherson, IV
Metropolitan Public Defender Inc
630 SW Fifth Avenue
Suite 500

Portland Oregon 97204


Charles Gerstein
Olevia Boykin
Civil Rights Corps
1601 Connecticut Ave. NW
Suite 800
Washington, D.C. 20009


*Counsel for Defendant-Relator*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing *Petition For Writ of Habeas Corpus, Peremptory Writ of Mandamus, or Alternative Writ of Mandamus; Memorandum Supporting Petition;* and *Excerpt of Record* on the following persons on this date by US mail, first-class, postage paid:

Honorable Rebecca Guptill
Washington County Circuit Court
145 NE Second Avenue
Hillsboro, OR 97124

Attorney General of the State of Oregon
Office of the Solicitor General
400 Justice Building
1162 Court Street NE
Salem, OR 97301-4096

Jason Weiner, Deputy District Attorney
Washington County District Attorney's Office
150 North First Ave #300
Hillsboro, OR 97124

I further certify that I filed it on the Administrator by eFiling.

April 13, 2020.

<u>/s/ Jesse Merrithew</u>
Jesse Merrithew, OSB No. 074564
Of Attorneys for Relator

# IN THE SUPREME COURT OF THE
# STATE OF OREGON

STATE OF OREGON,

       Plaintiff-Adverse Party,

v.

VERNON LEE RASMUSSEN,

       Defendant-Relator.

No.

Washington County Circuit Court
No. 20CR12593

MEMORANDUM OF LAW IN
SUPPORT OF PETITION FOR WRIT
OF MANDAMUS OR HABEAS
CORPUS

**MANDAMUS PROCEEDING**

**Jesse Merrithew**, OSB No. 074564
jesse@lmhlegal.com
**Viktoria Safarian**, OSB No. 175487
viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street Suite 415
Portland Oregon 97205
(971) 229-1241

**Carl Macpherson, IV**, OSB No.
120208
cmacpherson@mpdlaw.com
Metropolitan Public Defender Inc
630 SW Fifth Avenue Suite 500
Portland Oregon 97204
(503) 295-9100

**Olevia Boykin**
olevia@civilrightscorps.org
**Charles Gerstein**
charlie@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, D.C. 20009
(202) 844-4975

**Attorneys for Defendant-Relator**

**Ellen Rosenblum**, OSB No. 753239
ellen.f.rosenblum@doj.state.or.us
Oregon Department of Justice
1162 State Street NE
Salem Oregon 97301
(503) 378-6002

**Attorney for Plaintiff-Adverse Party**

**Filed March 2020**

# **TABLE OF CONTENTS**

INTRODUCTION................................................................................5

FACTS ............................................................................................5

LEGAL AUTHORITIES AND ARGUMENT ....................................9

I.  HISTORICAL AND STATUTORY BACKGROUND ..............................11

II. ARGUMENT ..............................................................................18

   A. Relator's pretrial detention violates Oregon law. ....................20

   B. Relator has federal constitutional rights against wealth-based detention and to pretrial liberty. ....................................................24

      1.     Relator has a right against wealth-based detention. ........................24

      2.     Relator has a fundamental constitutional right to pretrial liberty. ..28

   C. The trial court violated relator's equal protection and due process rights when it required an unattainable security amount without making a finding that detention is necessary to serve a compelling government interest. .......30

      1.     An unattainable financial condition is equivalent to an unconstitutional order of pretrial detention.............................................31

      2.     Wealth-based pretrial detention requires the government to demonstrate necessity. ...........................................................................32

   D. Rasmussen did not receive adequate procedural safeguards prior to his pretrial detention. ......................................................................36

      1.     When requiring financial conditions, the government must conduct an inquiry into ability to pay and make on-the-record findings concerning ability to pay..............................................................................37

      2.     The government must provide additional procedural safeguards to protect against an erroneous deprivation of relator's substantive rights..39

         a.  The government must provide notice, an adversarial hearing, an impartial decisionmaker, and findings on the record.....................39

         b.  The government must prove by clear and convincing evidence that the relator is either a flight risk or a danger to the community. 41

      3.     The detention order in this case violates due process. ....................47

III. CONCLUSION ...........................................................................49

# TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas*, 441 U.S. 418 (1979) ...............................................35, 36, 40

*Aime v. Com*, 414 Mass 667, 611 NE2d 204 (1993) ..........................................39

*Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998) ......................................6

*Bearden v. Georgia*, 461 U.S. 600 (1983) ..................................................14, 32

*Booth v. Galveston County*, 352 F Supp 3d 718 (SD Tex 2019) .....................21

*Brangan v. Commonwealth*, 477 Mass 691, 80 NE3d 949, 963–65 (2017)22, 24, 26, 28

*Brill v. Gurich*, 1998 OK CR 49, 965 P2d 404, 409 (Okla Crim App 1998).....39

*Caliste v. Cantrell*, 329 F Supp 3d 296 (ED La 2018)......................................22

*Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 617 (1993)..........................................................................................................35

*Cooper v. Burks*, 289 Or 449, 615 P2d 314 (1985).....................................18, 40

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261 (1990) ......37

*Daves v. Dallas County*, 341 F Supp 3d 688 (ND Tex 2018)...........................21

*Dixon v. St. Louis*, No 4:19-cv-0112-AGF, 2019 WL 2437026 (ED Mo June 11, 2019) ..........................................................................................................21

*Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ...................................................14

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ..............................................................35

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973) ........................................................34

*Gillmore v. Pearce*, 302 Or 572, 731 P2d 1039 (1987) ................................9, 18

*Holland v. Rosen*, 895 F3d 272 (3d Cir 2018) ....................................................6

*In re Humphrey*, 228 Cal Rptr 3d 513 (Ct App 2018) ....................22, 24, 28, 38

*Kleinbart v. United States*, 604 A2d 861 (DC 1992) .........................................40

*Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989) ......................................30

*Lauder, Inc. v. City of Houston*, 751 F Supp 2d 920 (SD Tex 2010)................30

*Lopez-Valenzuela v. Arpaio*, 770 F.3d 772 (9th Cir. 2014) (en banc) .........23, 28

*Lora v. Shanahan*, 804 F3d 601 (2d Cir 2015) .................................................40

*Lynch v. United States*, 557 A2d 580 (DC 1989) (en banc)...............................39

*M.L.B. v. S.L.J.*, 519 US 102, 117 S Ct 555, 136 L Ed 2d 473 (1996) ..............19

*McNeil v. Community Probation Services LLC,* No 1:18-cv-00033, 2019 WL 633012 (MD Tenn Feb 14, 2019) ...................................................................21

*Mendonza v. Com*, 423 Mass 771, 673 NE2d 22 (1996) ..................................39

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ........................................................34

*ODonnell v. Harris County*, 892 F3d 147 (5th Cir 2018)................14, 20, 29, 31

*Owens v. Duryee*, 285 Or 75, 589 P2d 1115 (1979) .........................................17

*Padilla v. Kentucky*, 559 US 356, 130 S Ct 1473, 176 L Ed 2d 284 (2010)......41

*Priest v. Pearce*, 314 Or 411, 840 P2d 65 (1992) ...................................................10

*Reem v. Hennessy*, No 17-CV-6628, 2017 WL 6765247 (ND Cal Nov 29, 2017) .........................................................................................................................24

*Reno v. Flores*, 507 US 292, 113 S Ct 1439, 123 L Ed 2d 1 (1993)..................27

*San Antonio Independent School District v. Rodriguez*, 411 US 1, 93 S Ct 1278, 36 L Ed 2d 16 (1973). ..........................................................................................20

*Santosky v. Kramer*, 455 U.S. 745 (1982)....................................................37, 40

*Schultz v. State*, 330 F Supp 3d 1344 (ND Ala 2018)..........................................21

*Sexson v. Merten*, 291 Or 441, 631 P2d 1367 (1981) ....................................9, 18

*Shapiro v. Thompson*, 394 U.S. 618 (1969)........................................................28

*Simpson v. Miller*, 241 Ariz 341, 387 P3d 1270, 1276 (Ariz 2017) .................27

*Singh v. Holder*, 638 F.3d 1196 (9th Cir 2011)...................................................40

*Stack v. Boyle*, 342 US 1, 72 S Ct 1, 96 L Ed 3 (1951)......................................20

*State ex rel Lowrey v. Merryman*, 296 Or 254, 674 P2d 1173 (1984) ...........8, 18

*State v. Brown*, 2014-NMSC-038, 338 P3d 1276 (2014)...........................23, 26

*State v. Butler*, No. 2011-K-0879, 2011 WL 12678268 (La App 4th Cir July 28, 2011) ....................................................................................................................39

*State v. Ingram*, 230 NJ 190, 165 A3d 797, 803 (NJ 2017)...............................39

*State v. Sutherland*, 329 Or 359, 987 P2d 501 (1999) ..................................10, 11

*Strickland v. Washington*, 466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984) .........................................................................................................................41

*Swarthout v. Cooke*, 562 U.S. 216 (2011).........................................................30

*Tate v. Short*, 401 US 395, 91 S Ct 668, 28 L Ed 2d 130 (1971)...........19, 20, 29

*Turner v. Rogers*, 564 U.S. 431 (2011).........................................................32, 34

*United States v. Leathers*, 412 F.2d 169 (D.C. Cir. 1969) .................................25

*United States v. Mantecon-Zayas*, 949 F.2d 548(1st Cir. 1991) .......................25

*United States v. Payan*, 992 F.2d 1387 (5th Cir. 1993) .....................................32

*United States v. Salerno*, 481 US 739, 107 S Ct 2095, 95 L Ed 2d 697 (1987) ................................................................................................................. passim

*United States v. Teague*, 953 F2d 1525 (11th Cir 1992)....................................41

*Ward v. Village of Monroeville*, 409 US 57, 93 S Ct 80, 34 L Ed 2d 267 (1972) .........................................................................................................................35

*Washington v. Glucksberg*, 521 US 702, 117 S Ct 2258, 138 L Ed 2d 772 (1997)....................................................................................................................27

*Washington v. Harper*, 494 U.S. 210 (1990) .....................................................14

*Wheeler v. State*, 160 Md App 566, 864 A2d 1058 (2005)................................39

*Williams v. Illinois*, 399 US 235, 90 S Ct 2018, 26 L Ed 2d 586 (1970)8, 19, 20, 29

*Wolff v. McDonnell*, 418 U.S. 539 (1974).........................................................35

*Youngberg v. Romeo*, 457 U.S. 307 (1982)..................................................14, 23

*Zablocki v. Redhail*, 434 US 374, 98 S Ct 673, 54 L Ed 2d 618 (1978)............28

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .................................................. 23, 24

**Statutes**
18 USC § 3142 ........................................................................................... 8
ORS 135.230–135.295 ............................................................................... 8

**Other Authorities**
Brief Amicus Curiae CATO Institute Supporting Plaintiff-Appellee at 2–12,
   *Walker v. City of Calhoun*, 682 F App'x 721 (5th Cir 2017) (No. 17-13139),
   2017 WL 5615459 .................................................................................. 6
Brief of Conference of Chief Justices as *Amicus Curiae* at 38, *ODonnell v.*
   *Harris Cnty.*, No. 17-20333, 2017 WL 3536467 (5th Cir. Aug. 9, 2017) ...... 41
Brief of Conference of Chief Justices as *Amicus Curiae* in Support of Neither
   Party, *ODonnell*, 892 F3d at 147 (No. 17-20333), 2017 WL 3536467 .......... 20
Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U Pa L Rev 959
   (1965) ..................................................................................................... 7
U.S. Department of Justice—National Institute for Corrections, *Fundamentals*
   *of Bail: A Resource Guide for Pretrial Practitioners and a Framework for*
   *American Pretrial Refor*m (August 2014) .............................................. 6

**Constitutional Provisions**
Or Const, Art I, § 14 ................................................................................. 5

## INTRODUCTION

Relator Vernon Rasmussen sits in a Washington County jail cell as a global pandemic sweeps the country and ravages through jails. He is 50 years old, which places him at an elevated risk of complications should he contract the novel coronavirus in jail. He would like to be released and would be if he could pay $25,000 to secure his release. Because he cannot afford that amount, he will remain in a jail cell until his trial. By requiring an amount beyond Rasmussen's means, the state is achieving indirectly what Oregon law forbids it to achieve explicitly: pretrial detention without the substantive findings and procedural safeguards required by Oregon and federal law. Rasmussen respectfully petitions this Court for a writ of habeas corpus ordering his release or, in the alternative, for a writ of mandamus directing the Circuit Court of the State of Oregon for Washington County to conduct a hearing that complies with Oregon law and the federal constitution.

## FACTS

Vernon Rasmussen is 50-years old. Prior to being incarcerated pre-trial, Rasmussen worked at Orchic Orthopedics, making $2,200 per month. ER-15. However, due to being jailed in this case he lost his job and became unemployed. Since being jailed, he has no income. ER-71. His only remarkable asset is a car which he shares with his wife, valued at approximately $1500. ER-15; ER-71. He has lived in Oregon since 1995, most recently with his wife at an apartment

in West Linn for over five years. ER-15; ER-71. He and his wife have a newborn, one month old. ER-71. Rasmussen also has a brother living in Forest Grove. ER-15. His criminal history is limited to drug and minor property offenses, most recently two property misdemeanors a decade ago. ER-15. The current criminal allegations are alleged to have occurred between twenty-two and fifteen years ago. He has had no contact with or knowledge about the alleged victim's whereabouts since then, aside from a chance encounter at his workplace on one occasion. ER-14-15. Rasmussen has been a law-abiding citizen for a decade, and his history of minor property and drug convictions is not probative of a danger to the public. ER-15.

Rasmussen was indicted on February 25, 2020, for eight counts related to sexual abuse of a minor. ER-1. That day, a security amount calculated solely by reference to the charges against Rasmussen was pre-printed on the indictment filed against him. ER-3. By the terms of the indictment, Rasmussen was ordered to pay "$2,000,000.00 (or release agreement plus 10 percent of security amount)." ER-3. A warrant for his arrest issued that same day, and he was arrested shortly thereafter, on February 27, 2020. ER-3. On February 28, 2020, the court imposed $2,000,000 as Rasmussen's initial security amount. ER-4. Unable to pay the cost of his release, which was ten percent of $2,000,000, Rasmussen remained in jail.

On March 11, 2020, Rasmussen filed a motion to reduce the security

amount required for his release. ER-6-15. As a basis for the reduction of his security amount, Rasmussen asserted that he had no significant assets, no income, and could post no bond. ER-15; ER-71. He stated that even though he worked before and had an income, he lost his job due to his pretrial detention. ER-15. He requested to be released under any release conditions the court found necessary to reasonably ensure community safety and court appearance. ER-12. He stated that his wife, with whom he shared a newborn child, would be willing to be a responsible party for his release. ER-15; ER-71. He argued that ensuring his detention through an unattainable financial condition of release violated his rights under the U.S. Constitution and Oregon law. ER-6-12.

Rasmussen also requested to be released in light of the COVID-19 pandemic. *See* ER-16-54. Rasmussen is fifty years old. He argued that his age places him at an elevated risk of serious illness if he contracts the disease. ER-69. He argued it is virtually impossible for the jail to protect him from the virus, and that should he contract it he is likely to die. ER-17; ER-19-20; ER-27-31; ER-48; ER-54.

At his release hearing on March 18, 2020, the state objected to release and recounted the charges, stated without detail that he had a "lengthy criminal history," and "multiple FTAs," but presented no evidence. ER-73. The state asked the court to deny release due to flight risk and addressed the security amount in a single sentence "As far as the amount of security, I think the amount

of security is appropriate given the seriousness of the charges." ER-74. The state presented no witnesses and no documentary evidence – simply making argument to support its position. ER-72-74.

Rasmussen pointed out in his rebuttal argument to the court that if the state is asking that Rasmussen should be held pretrial, then the state must meet its burden to prove "by clear and convincing evidence that it is inappropriate to release him." Rasmussen pointed out that keeping security at an unattainable amount is equivalent to an unconstitutional back door detention order. ER-76.

The Circuit Court for Washington County reduced the security amount from $2,000,000 to $250,000, an amount still beyond Rasmussen's means. ER-55. In so doing, the court found Rasmussen does not fall into a high-risk category for COVID-19. ER-77-78. The court also ordered additional conditions in case Rasmussen manages to pay the security amount required for his release. Namely, the court ordered that a responsible party for release be approved by the release office, no contact with the victim, family members of the victim, or witnesses, no contact with minors with the exception of his newborn baby, no alcohol, no marijuana, no drugs, no possession of pornography, and house arrest. ER 55, ER-78-79. The financial conditions of release make going home impossible for Rasmussen.

The court did not state why the non-financial release conditions standing alone were not sufficient to meet the state's interests in reasonably ensuring court

appearance or community safety. Nor did the court address Rasmussen's arguments that Oregon law and the U.S. Constitution forbid jailing someone solely because he cannot make a monetary payment, without findings based on clear and convincing evidence that release would pose an immitigable risk of either flight or community safety.

Unable to buy his freedom for $25,000, Rasmussen remains in jail.

## LEGAL AUTHORITIES AND ARGUMENT

"In our society," the U.S. Supreme Court has explained, "liberty is the norm and detention prior to trial * * * is the carefully limited exception." *United States v. Salerno*, 481 US 739, 755, 107 S Ct 2095, 95 L Ed 2d 697 (1987). In courts throughout Oregon every day, however, individuals accused of crimes are routinely ordered released on bail but in fact detained prior to trial solely because they do not have access to enough cash. Pretrial detention cannot be the "carefully limited exception" if trial courts accomplish detention of presumptively innocent people by requiring financial conditions of release that individuals cannot pay without making the substantive findings or providing the procedural safeguards that federal law requires for a constitutional order of detention.

Rasmussen is incarcerated at the Washington County jail because he cannot pay $25,000 to buy his release. In ordering him released subject to his payment of $25,000, the court ensured Rasmussen would be detained because he lacked access to sufficient cash. The court knew this because it was clearly

represented by counsel. ER-15; ER-71. This *de facto* order of detention violates the United States Constitution, the Oregon Constitution, and Oregon statutory law.

The trial court did not make the constitutionally required substantive finding to detain Rasmussen prior to trial. If the government wants to detain someone pretrial, it is required to prove that pretrial detention is necessary because no less restrictive alternatives reasonably exist to serve a compelling government interest in court appearance or public safety. Moreover, the U.S. and Oregon Constitutions demand robust procedural safeguards in order to ensure the accuracy of any substantive finding that pretrial detention is necessary. *See infra* Part II(B). The lower court did not comply with those requirements here. Accordingly, Rasmussen prays for a writ of habeas corpus ordering his release, or a writ of mandamus requiring the trial court to provide an adversarial hearing that complies with the requirements for pretrial detention required by the U.S. and Oregon Constitutions. Those requirements include notice of the critical issues at stake, an opportunity to be heard and to present and confront evidence, representation by counsel, and findings on the record by clear and convincing evidence concerning whether Rasmussen is a danger to the community and, if so, whether less restrictive alternative conditions of release exist that could reasonably serve those government interests.

## I.  HISTORICAL AND STATUTORY BACKGROUND

The Constitution of the State of Oregon has protected a right to bail for all people not charged with murder or treason since the founding of the state. *See* Or Const, Art I, § 14 ("Offences [sic], except murder, and treason, shall be bailable by sufficient sureties. Murder or treason, shall not be bailable, when the proof is evident, or the presumption strong."). As a matter of history and law, the term "bail" means, and has always meant, *release* before trial. *See, e.g.*, *Armatta v. Kitzhaber*, 327 Or 250, 280, 959 P2d 49 (1998) (describing Article I, section 14 of the Oregon Constitution as entitling arrestees to "release").

Although common in recent years, the sentence "the Defendant is held on $10,000 bail" is a contradiction: as a historical matter, being "held on bail" was impossible. U.S. Department of Justice—National Institute for Corrections, *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform* 13 (August 2014), https://s3.amazonaws.com/static.nicic.gov/Library/028360.pdf [https://perma.cc/WQ6B-HK6Y]. Since well before the Magna Carta, bail has been understood as a device to *free* defendants prior to their trial proceedings. *See* Brief Amicus Curiae CATO Institute Supporting Plaintiff-Appellee at 2–12, *Walker v. City of Calhoun*, 682 F App'x 721 (5th Cir 2017) (No. 17-13139), 2017 WL 5615459, at *2–12, https://object.cato.org/sites/cato.org/files/pubs/pdf/walker-v-city-of-calhoun.pdf

[https://perma.cc/FE3F-54Z6]. "Money bail," or "security release," *see* ORS 135.230(12), is merely one form of conditional release on bail. *See generally Holland v. Rosen*, 895 F3d 272, 290 (3d Cir 2018) (discussing history of bail as "a means of achieving pretrial release from custody conditioned on adequate assurances"); *ODonnell v. Harris County*, 251 F Supp 3d 1052, 1068–71 (SD Tex 2017), *aff'd as modified*, 892 F3d 147 (5th Cir 2018). Money bail is the practice of requiring an individual to forfeit money or property if the person does not appear for trial. Money bail can be either "secured" or "unsecured." A secured money-bail condition requires a person to deposit money before the person is released; an unsecured condition allows the person to be released without depositing any money in exchange for the promise to pay a designated amount if the person later fails to appear.

As the criminal systems in many jurisdictions became flooded with cases in the second half of the twentieth century, jurisdictions across the country departed from the original understanding of bail as a mechanism of pretrial release. Instead, courts with increasingly crowded dockets routinely jailed people solely because they were unable to pay money-bail amounts set without the lengthy and robust proceedings that had been required by law for pretrial detention, the use of which was carefully limited. This routine use of unaffordable secured money bail without regard to ability to pay resulted in a "crisis." *See United States v. Salerno*, 481 US 739, 742, 107 S Ct 2095, 95 L Ed 2d 697 (1987)

(describing "a bail crisis in the federal courts"); Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U Pa L Rev 959, 960 (1965). Two distinct evils of the secured-money-bail system provoked the crisis: It imperiled public safety by allowing potentially dangerous defendants to be released without any intentional consideration of their dangerousness, and it worked an "invidious discrimination" against those presumptively innocent individuals who could not pay by detaining them in jail cells solely because they were poor. *See, e.g.*, *Williams v. Illinois*, 399 US 235, 242, 90 S Ct 2018, 26 L Ed 2d 586 (1970).

This national crisis led to the adoption of a new federal bail statute, which required that "[t]he judicial officer may not impose a financial condition that results in the pretrial detention of the person." 18 USC § 3142. The U.S. Supreme Court upheld that federal statute in *Salerno*, explaining that an individual's interest in pretrial liberty is "fundamental" and reaffirming the longstanding understanding that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 US at 750, 755 (upholding statute allowing for pretrial detention in certain "extremely serious" federal felony offenses after an adversary hearing showing by clear and convincing evidence that detention is necessary because "no condition of combination" of alternative conditions of release are sufficient to reasonably protect the community).

Oregon responded to this crisis as well. In 1973, seeking a return to the presumption of release, Oregon "abandoned the concept of 'bail'" as it had then come to be understood in practice. *State ex rel Lowrey v. Merryman*, 296 Or 254, 256 n 2, 674 P2d 1173 (1984). In its place, the legislature adopted a comprehensive system of pretrial release. *See* ORS 135.230–135.295. Under this system, an arrested person is *presumed eligible for release on personal recognizance* without any restrictions on her liberty. ORS 135.245(3). Only if the magistrate finds that "release of the person on personal recognizance is unwarranted, the magistrate shall impose either conditional release or security release." ORS 135.235(4). Conditional release "means a * * * release which imposes regulations on the activities and associations of the defendant." ORS 135.230(2). Typical regulations may require defendants to surrender their passport, restrict their movements to the state or even their home, check in regularly with the court, or use electronic monitoring to track their whereabouts. Security release "means a release conditioned on a promise to appear in court at all appropriate times which is secured by cash, stocks, bonds or real property." ORS 135.230(12). To effect a security release, ten percent of the security-release amount (but in no event less than $25) must be deposited with the clerk of court. ORS 135.265(2).

Under Article I, section 16 of the Oregon Constitution, although "the likelihood that a particular accused person will commit further crimes if released

is relevant to the decision to release the person on recognizance or conditional release, * * * this criterion * * * plays no role in setting the *amount* required for security release." *Gillmore v. Pearce*, 302 Or 572, 577, 731 P2d 1039 (1987) (citing *Sexson v. Merten*, 291 Or 441, 448, 631 P2d 1367 (1981)) (emphasis in original). Instead, "[s]ecurity amounts as a whole (not the ten per cent actually deposited) * * * are supposed to represent the least onerous amount whose possibility of loss reasonably assures the attendance at trial of the person charged," *id.* (citation omitted), and the release statutes "shall be liberally construed to carry out the purpose of relying upon criminal sanctions instead of financial loss to assure the appearance of the defendant." ORS 135.245(7). Security amounts are "not to be set so as to make it impossible, *as a practical matter*, for a prisoner to secure release." *Gillmore*, 302 Or at 580 (emphasis added).

In 1994, Oregon voters adopted "Measure 11." *See State v. Sutherland*, 329 Or 359, 362 n 2, 987 P2d 501 (1999). Subsection (4) of Measure 11 "require[d] a trial court to deny release to a defendant accused of [certain offenses], unless the court determine[d] by clear and convincing evidence that the defendant will not commit any new crime while on release." *Id.* at 363. This Court held that Subsection (4) violated the right to bail articulated in Article I, section 14 of the Oregon Constitution. *Id.* at 364–65. This was an unsurprising conclusion given the clear language of Article I, section 14: "[o]ffences [sic],

except murder, and treason, shall be bailable by sufficient sureties." Subsection

(4), this Court explained, "requires a court to *deny* release and, it follows, to deny

bail, if the court concludes that the defendant might commit crimes while on

release," *id.* (emphasis in original), while "Article I, section 14, grants most

defendants accused of crimes a constitutional right to bail." *Id.* (citing *Priest v.*

*Pearce*, 314 Or 411, 417, 840 P2d 65 (1992)).

This Court's holding that Subsection (4) violated the Oregon Constitution

triggered a backup provision of Measure 11: Subsection (5). That section

provides:

> If the United States Constitution or the Oregon Constitution
> prohibits application of subsection (4) of this section, then
> notwithstanding any other provision of law, the court shall set a
> security amount of not less than $50,000 for a defendant charged
> with an offense listed in ORS 137.700 * * * and may not release the
> defendant on any form of release other than a security release. In
> addition to the security amount, the court may impose any
> supervisory conditions deemed necessary for the protection of the
> victim and the community.

*Id.* at 363 (quoting ORS 135.240 (omission in *Sutherland*)). This Court upheld

Subsection (5) against a facial challenge because "[f]or a statute to be facially

unconstitutional, it must be unconstitutional in all circumstances." *Id.* at 365.

Both parties and the Court agreed that there would be some circumstances under

which a $50,000 security was not unconstitutional, namely, where the accused is

"entitled to a hearing or individualized consideration of his or her circumstances

before the trial court imposes and enforces the minimum $50,000 security release requirement." *Id.* at 366. Because Subsection (5) provided no such right to a hearing, the Court held that the right must exist in Article 1, Section 16 of the Oregon Constitution. *Id.* at 366–67. ("We hold that any defendant who wishes to make an 'as applied' challenge to the propriety of imposing the specified security release amount of $50,000 or higher under ORS 135.240(5) has a constitutional right to a hearing to address that question.").[1]

In 2008, the voters of Oregon amended the Oregon Constitution, through Measure 52, to add, among other provisions, Article I, Section 43. Under the plain terms of this provision, the State may detain a person prior to trial if the person is charged with a "violent felony" and if the State makes a specific legal showing by a specific evidentiary standard after a hearing with specific procedural safeguards. In the eleven years since it was ratified, this Court has never interpreted the pretrial-detention provisions of Section 43, including what qualifies as a "violent felony." Still, unlike the previously invalidated

---

[1] In 1996, the voters of Oregon approved a "crime victims' rights" Constitutional amendment that, among other things, "chang[ed] the circumstances in which certain criminal defendants otherwise would be entitled to release under Article I, section 14 [of the Oregon Constitution]." *Armatta*, 327 Or at 252, 280. As relevant here, that amendment, which was voted on as Measure 40 in the 1996 election, would have mandated the jailing of any arrestee charged with certain crimes "unless a court determines by clear and convincing evidence that the person will not commit new criminal offenses while on release[.]" *Id.* at 280 n 12. This Court invalidated Measure 40 on the grounds that its adoption violated the separate-vote requirement of the Oregon Constitution. *See id.* at 252.

amendments, Section 43 requires the *State* to prove by clear and convincing evidence that the person entitled to release poses a danger to the public, and it specifically gives defendants the robust procedural rights at a release hearing that the Due Process Clause requires and that the U.S. Supreme Court upheld in *Salerno.*

The framework for pretrial release in Oregon shows Oregon's longstanding commitment to release people, not detain them, prior to trial. Yet today, trial courts evade these constitutional and statutory requirements, routinely setting unaffordable securities for people accused of non-violent misdemeanors and felonies who should be presumed eligible for personal recognizance release. An unaffordable security amount is the same as an order of detention. As a result, every night and throughout the state, thousands of presumptively innocent people like Rasmussen sit in a jail cell because they do not have sufficient cash to buy their freedom.

## II. ARGUMENT

Rasmussen has two sets of constitutional claims: state and federal. First, under the Oregon Constitution, the requirements of Article I, sections 16 and 43 allow for detention only under very narrow circumstances and require all findings in support of detention to be made by clear and convincing evidence. By routinely imposing unaffordable security amounts that operate as detention orders issued without the procedural and substantive safeguards enshrined in the Oregon

constitution, Oregon's trial courts violate both the letter of the law and the norm in favor of pretrial release that undergirds Oregon's system.

Second, Rasmussen's detention violates the Equal Protection and Due Process Clauses of the U.S. Constitution. Rasmussen's claims have both substantive and procedural aspects. *See, e.g.*, *Washington v. Harper*, 494 US 210, 220, 110 S Ct 1028, 108 L Ed 2d 178 (1990) (explaining the interaction between claims that share substantive and procedural aspects). Substantively, Rasmussen's claims flow from two lines of precedent. First, equal protection and due process forbid jailing a person solely because of her inability to make a payment. *ODonnell v. Harris County*, 892 F3d 147, 163 (5th Cir 2018); *Bearden v. Georgia*, 461 US 660, 665–68, 103 S Ct 2064, 2070, 76 L Ed 2d 221 (1983); *Pugh v. Rainwater*, 572 F2d 1053, 1057 (5th Cir 1978); *Frazier v. Jordan*, 457 F2d 726, 728–29 (5th Cir 1972). Second, due process protects a "fundamental" right to pretrial liberty. *United States v. Salerno*, 481 US 739, 749–50, 107 S Ct 2095, 95 L Ed 2d 697 (1987); *see also Foucha v. Louisiana*, 504 US 71, 80, 112 S Ct 1780, 118 L Ed 2d 437 (1992) (citing *Youngberg v. Romeo*, 457 US 307, 316, 102 S Ct 2452, 73 L Ed 2d 28 (1982)) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

The government must satisfy the demands of strict scrutiny before a court can hold up a government scheme that infringes upon the right against

wealth-based detention and the fundamental right to pretrial liberty. Specifically, the government must demonstrate that wealth-based pretrial detention is necessary to serve a compelling government interest. Thus, before requiring a person to make a payment in exchange for release from detention, the government must first make findings concerning the person's ability to pay any amount contemplated. If the person cannot pay the amount, such that the condition of release will function as a *de facto* detention order, then the government must justify the order to pay an unattainable money bail in the same way that it justifies a transparent order of detention. That is, the government must prove that the *de facto* order of detention is narrowly tailored to serve a compelling government interest.

The Constitution requires the government to meet strict procedural safeguards which protect against the erroneous deprivation of defendants' pretrial rights, so that the people may have sufficient confidence in the substantive finding that the deprivation of individual liberty it justified. *Harper*, 494 US at 228. Here, the basic procedures required include notice, an opportunity to be heard and to present and confront evidence at a hearing with counsel, and findings on the record by clear and convincing evidence. Those were not provided here.

A.    *Relator's pretrial detention violates Oregon law.*

Oregon law imposes strict conditions on pretrial detention: arrestees must be charged with a violent felony, a court must find that there is reason to believe

the person committed that violent felony, and the State must prove, at a robust

hearing and by clear and convincing evidence, that releasing the person poses a

serious risk to the community. Requiring an unaffordable security amount—

which, this Court has repeatedly held, is equivalent to ordering a person detained

pretrial—without satisfying those strict conditions violates Oregon law.

Under Section 43(1)(b) of the Oregon Constitution:

> [P]retrial release of a criminal defendant [shall be] based upon the principle of reasonable protection of the victim and the public, as well as the likelihood that the criminal defendant will appear for trial. Murder, aggravated murder and treason shall not be bailable when the proof is evident or the presumption strong that the person is guilty. Other violent felonies shall not be bailable when a court has determined there is probable cause to believe the criminal defendant committed the crime, and the court finds, by clear and convincing evidence, that there is danger of physical injury or sexual victimization to the victim or members of the public by the criminal defendant while on release. * * * Nothing in this section abridges any right of the criminal defendant guaranteed by the Constitution of the United States, including the rights to be represented by counsel, have counsel appointed if indigent, testify, present witnesses, cross-examine witnesses or present information at the release hearing.

Section 43 mandates that a person charged with a violent felony may be detained

only when a court has determined there is probable cause to believe the criminal

defendant committed the crime, *and* the court finds by clear and convincing

evidence that there is danger of physical injury or sexual victimization to the

victim or members of the public by the criminal defendant while on release.

Oregon legislators passed ORS 135.240 to make the substantive and procedural requirements for detention consistent with Article I, section 43 of the Oregon Constitution and the requirements of the US Constitution discussed below. ORS 135.240 reiterates the substantive standard in Art. I, Sec. 43, and mandates a release hearing if requested by the defendant within five days of the request. ORS 135.240(4)(b). At the hearing, the court is required to conduct an inquiry into whether there is probable cause that the defendant committed the crime charged *and* whether there is clear and convincing evidence that there is a danger of physical injury or sexual victimization to the victim or members of the public if the defendant is released. ORS 135.240(4)(d). The state bears the burden of producing evidence at the release hearing. ORS 135.240(4)(c).

In the eleven years since it was ratified, this Court has never interpreted the pretrial-detention provisions of Section 43, including what qualifies as a "violent felony," though the constitutional and statutory provisions described above plainly mandate both substantive findings before a defendant may be detained and rigorous procedures to ensure the accuracy of those findings. Section 43 amended section 14 of the Oregon Constitution only by expanding the number of offenses for which pretrial detention was permissible and setting strict conditions for when that may occur. Section 43 did not amend the portion of section 16 that prohibits excessive bail. This Court's jurisprudence on security amounts, which explicitly requires that the amounts be set to allow the person to

obtain release, remains good law. In *Owens v. Duryee*, 285 Or 75, 80, 589 P2d 1115 (1979), this Court stated it plainly: "[b]ail may not be set at an amount chosen in order to make it impossible, as a practical matter, for a prisoner to secure his release." It reiterated the same in *Gillmore v. Pearce*: "This court has stated on many occasions that the total amount of security to be posted must be no more than is necessary to reasonably assure the attendance of the person charged at trial. It is not to be set so as to make it impossible, as a practical matter, for a prisoner to secure release." 302 Or 572, 580, 731 P2d 1039 (1987); *see also Cooper v. Burks*, 289 Or 449, 615 P2d 314 (1985); *State ex rel Lowrey v. Merryman*, 296 Or 254, 674 P2d 1173 (1984); *Sexson v. Merten*, 291 Or 441, 631 P2d 1367 (1981).

The trial court's order here, which set the security amount at an unattainable level for relator, violated both section 43 (by imposing a de facto detention order without the requisite procedural and substantive safeguards) and section 16 (by setting bail at an amount that results in detention). By setting unaffordable financial conditions, Oregon trial courts detain defendants every day without according them the proper procedural protections and without making the requisite finding (let alone by clear and convincing evidence) that the person charged poses a danger of physical injury or sexual victimization to any member of the public. The Oregon Constitution provides robust substantive and procedural safeguards that must be met before detaining a person pretrial. It does

not allow the court to disregard all of them by relying on the fiction that they are releasing an individual for whom the condition of release—an unaffordable money bond—is impossible to meet.

B.    *Relator has federal constitutional rights against wealth-based detention and to pretrial liberty.*

1.    *Relator has a right against wealth-based detention.*

The U.S. Supreme Court recognized the right against wealth-based detention decades ago, holding in *Tate v. Short* that a person may not be "subjected to imprisonment solely because of his indigency." 401 US 395, 397–98, 91 S Ct 668, 28 L Ed 2d 130 (1971). This principle led the Court to strike down state and local practices that created wealth-based imprisonment in *Tate*, *Williams v. Illinois*, 399 US 235, 90 S Ct 2018, 26 L Ed 2d 586 (1970), and *Bearden*, 461 US at 660. In *Bearden*, the Court reiterated the core principle behind the right, namely the "impermissibility of imprisoning a defendant solely because of his lack of financial resources." *Id*. at 661. The right against wealth-based detention is unusual because it "reflect[s] both equal protection and due process concerns." *M.L.B. v. S.L.J.*, 519 US 102, 120, 117 S Ct 555, 136 L Ed 2d 473 (1996). Hence, when the U.S. Supreme Court held that indigence status is not a suspect class for equal-protection purposes, it expressly exempted the *Williams-Tate-Bearden* line of cases because they involved an "absolute deprivation" of liberty to a "class * * * composed only of persons who were

totally unable to pay the demanded sum." *San Antonio Independent School District v. Rodriguez*, 411 US 1, 20–22, 93 S Ct 1278, 36 L Ed 2d 16 (1973).

Though *Williams*, *Tate*, and *Bearden* involved penal fines (fines imposed on those already convicted), courts have extended those cases' holdings to the pretrial context. The *en banc* Fifth Circuit did so, for example, in *Pugh*, 572 F2d at 1053. The *Pugh* court recognized that the core holding of *Williams*, *Tate*, and *Bearden*—that post-conviction imprisonment "solely because of indigent status is invidious discrimination and not constitutionally permissible"—has even "broader effects and constitutional implications" with pretrial arrestees, that is, individuals "accused but not convicted of crime." *Id*. at 1056. That conclusion accords with the U.S. Supreme Court's explanation that pretrial release "serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence * * * would lose its meaning." *Stack v. Boyle*, 342 US 1, 4, 72 S Ct 1, 96 L Ed 3 (1951).[2]

The Fifth Circuit recently reaffirmed its holding in *Pugh* when it found the bail-setting practices in Houston (Harris County), Texas unconstitutional.

---

[2] The Conference of Chief Justices, consisting of the highest judicial officer of each state, the District of Columbia, and each US territory and commonwealth, recently affirmed this principle. *See* Brief of Conference of Chief Justices as *Amicus Curiae* in Support of Neither Party at 38, *ODonnell*, 892 F3d at 147 (No. 17-20333), 2017 WL 3536467, at *27 (quoting *Dodds v. Richardson*, 614 F3d 1185, 1192 (10th Cir 2010)) ("[T]he right of an accused to freedom pending trial is inherent in the concept of a liberty interest protected by the due process clause of the Fourteenth Amendment.").

*ODonnell* 892 F3d at 163 (striking down the use of secured money bail set without regard to ability to pay because it invidiously discriminates against the poor). Federal district courts throughout the country have recently reached the same conclusion. *See, e.g.*, *Dixon v. St. Louis*, No 4:19-cv-0112-AGF, 2019 WL 2437026 at *13–14 (ED Mo June 11, 2019) (enjoining city of St. Louis from jailing arrestees without making findings about arrestees' ability to pay before setting bail); *McNeil v. Community Probation Services LLC,* No 1:18-cv-00033, 2019 WL 633012, at *15–16 (MD Tenn Feb 14, 2019) (granting class-wide preliminary injunction against setting secured bail on misdemeanor probation violation warrants absent judicial findings on the record about the arrestee's ability to pay, the unsuitability of alternatives to secured bail, and whether pre-revocation detention is necessary to meet a compelling governmental interest); *Booth v. Galveston County*, 352 F Supp 3d 718, 737–38 (SD Tex 2019) (holding that Plaintiffs' stated claim that detaining arrestees before trial solely due to their inability to pay bail violated Equal Protection and Due Process clauses); *Daves v. Dallas County*, 341 F Supp 3d 688, 694–96 (ND Tex 2018) (holding that Plaintiffs had shown likelihood of success on the merits that Dallas County violated Equal Protection of arrestees through "mechanical application of [ ] bond schedules"); *Schultz v. State*, 330 F Supp 3d 1344, 1358 (ND Ala 2018) (holding that "at a minimum, a judge must state on the record why the court determined that setting secured money bond above a defendant's financial means

was necessary to secure the defendant's appearance at trial or protect the community"); *Caliste v. Cantrell*, 329 F Supp 3d 296, 311 (ED La 2018) (holding that "an informed inquiry into the ability to pay and findings on the record regarding that ability prior to detention based on failure to pay" is constitutionally required).

State courts have followed suit. On April 9, 2020, the Supreme Court of the State of Nevada, after taking up the same issue on mandamus *after* petitioners had been convicted, agreed that "[b]ail in an amount greater than necessary to ensure the defendant's appearance and the safety of the community is unconstitutional" and that "when bail is set in an amount that results in continued detention, it functions as a detention order, and accordingly is subject to the same due process requirements applicable to a deprivation of liberty." *Valdez-Jimenez v. The Eighth Judicial District of Nevada*, __ P3d __, No 76417, 136 Nev Adv Op 20, available at http://caseinfo.nvsupremecourt.us/public/caseView.do?csIID=46658 (Nov April 9, 2020). The Court then imposed a procedural scheme explicitly modeled from *Salerno*.

In *In re Humphrey*, the California Court of Appeal held that "a court which has not followed the procedures and made the findings required for an order of detention must, in setting money bail, consider the defendant's ability to pay and refrain from setting an amount so beyond the defendant's means as to result in

detention." 228 Cal Rptr 3d 513, 535 (Ct App 2018) (review pending). The court also held that "[i]f the court concludes that an amount of bail the defendant is unable to pay is required to ensure his or her future court appearances, it may impose that amount only upon a determination by clear and convincing evidence that no less restrictive alternative will satisfy that purpose." *Id.* The Massachusetts Supreme Judicial Court has held that where it appears an arrestee's inability to pay money bail will result in pretrial detention, the bail-setting order must include factual findings about the defendant's resources, and reasons why the risk of flight is so great that no alternative, less restrictive condition will suffice to ensure court appearance. *Brangan v. Commonwealth*, 477 Mass 691, 706–07, 80 NE3d 949, 963–65 (2017). And the New Mexico Supreme Court stated definitively that "[n]either the New Mexico Constitution nor our rules of criminal procedure permit a judge to set high bail for the purpose of preventing a defendant's pretrial release * * *. If a defendant should be detained pending trial under the New Mexico Constitution, then that defendant should not be permitted any bail at all. Otherwise the defendant is entitled to release on bail, and excessive bail cannot be required." *State v. Brown*, 2014-NMSC-038, ¶ 1, 338 P3d 1276, 1292 (2014).

2.    *Relator has a fundamental constitutional right to pretrial liberty.*

A second, independent constitutional right is also implicated by the pretrial detention of a presumptively innocent person due to her inability to make a

monetary payment: the right to pretrial liberty. In *Salerno*, the U.S. Supreme Court addressed the liberty interests of pretrial arrestees detained without bail under the federal Bail Reform Act (BRA). 481 US at 749–50. Finding that the pretrial liberty interest of an accused is "fundamental," the Court acknowledged that as a "'general rule' of substantive due process, the government may not detain a person prior to a judgment of guilt." *Id.* at 749. Courts have repeatedly affirmed this principle. *See Foucha*, 504 US at 80 ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.") (citing *Youngberg*, 457 US at 316); *Zadvydas v. Davis*, 533 US 678, 690–91, 121 S Ct 2491, 150 L Ed 2d 653 (2001) (same); *Lopez-Valenzuela v. Arpaio*, 770 F3d 772, 780 (9th Cir 2014) (en banc) (applying strict scrutiny to Arizona pretrial detention law because it infringed on the "fundamental" right to pretrial liberty); *Schultz*, 330 F Supp 3d at 1358 (holding that "[c]riminal defendants have a constitutional right to pretrial liberty" and "[a]bsent extenuating circumstances like flight risks or dangers to the community, the State may not incarcerate a defendant pretrial"); *Caliste*, 329 F Supp 3d at 310, 313 ("Plaintiffs have been deprived of their fundamental right to pretrial liberty"; the "deprivation of liberty requires a heightened standard"); *Buffin v. City & Cty of San Francisco*, No. 15-CV-04959-YGR, 2018 WL 424362, at *6 (ND Cal Jan 16, 2018) (holding that pretrial detention due to inability to pay "implicates plaintiffs' fundamental right to liberty"); *Reem v.*

*Hennessy*, No 17-CV-6628, 2017 WL 6765247, at *1 (ND Cal Nov 29, 2017)

("The due process clauses of the Fifth and Fourteenth Amendments bar pretrial

detention unless detention is necessary to serve a compelling government

interest."); *Humphrey*, 228 Cal Rptr 3d at 545 (recognizing the "fundamental

constitutional right to pretrial liberty"); *Brangan*, 80 NE3d at 961 (holding that

the right to pretrial liberty is "fundamental").

In sum, Rasmussen's detention pretrial on an unaffordable bond implicates

two fundamental interests—the right against wealth-based detention, and the

right to pretrial liberty—and the concomitant constitutional protections

associated with each.

> C. *The trial court violated relator's equal protection and due process*
> *rights when it required an unattainable security amount without*
> *making a finding that detention is necessary to serve a compelling*
> *government interest.*

Requiring a security amount that a person cannot meet is the equivalent of

requiring detention. As courts around the country have overwhelmingly held, the

U.S. Constitution requires a finding of *necessity* prior to an order of pretrial

detention and rigorous procedural safeguards to ensure the accuracy of that

finding. *See infra* Part II.C.2. Rasmussen is subject to an unattainable financial

condition of release that functions as a detention order without the substantive

findings and procedural safeguards required by the Equal Protection and Due

Process Clauses to justify an order of detention.

1.    *An unattainable financial condition is equivalent to an unconstitutional order of pretrial detention.*

Courts around the country have squarely held that an order requiring a person to pay an unattainable amount of money to secure release is an order of pretrial detention. *United States v. Mantecon-Zayas*, 949 F2d 548, 550 (1st Cir 1991) ("[O]nce a court finds itself in this situation—insisting on terms in a "release" order that will cause the defendant to be detained pending trial—it must satisfy the procedural requirements for a valid *detention* order * * *."); *United States v. Leathers*, 412 F2d 169, 171 (DC Cir 1969) ("[T]he setting of bond unreachable because of its amount would be tantamount to setting no conditions at all."); *ODonnell*, 251 F Supp 3d at 1131, 1156, 1161 (holding that secured money bail set in an amount that an arrestee cannot afford is constitutionally equivalent to an order of detention); *Brangan*, 80 NE3d at 963 (unattainable money bail "is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty."); *Brown*, 338 P3d at 1292 ("Intentionally setting bail so high as to be unattainable is simply a less honest method of unlawfully denying bail altogether.").

For Rasmussen, who is indigent, a money bail amount of $250,000 is equivalent to the money bail amount of $250,000,000: these conditions are strictly impossible from him to meet. As Rasmussen explained to the trial court,

he has no income—because his social security payments are suspended while he is detained—no assets, and no ability to pay any security amount. Setting an impossible condition of release is the functional equivalent of setting no condition at all and, therefore, ordering pretrial detention. In other words, a court that imposes an impossible-to-meet condition, as here, has imposed a detention order that must comport with the due process requirements articulated by *Salerno* and discussed below.

2.    *Wealth-based pretrial detention requires the government to demonstrate necessity.*

Because a person's "interest in liberty" is "fundamental," the Supreme Court has held that it is a "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial." *Salerno*, 481 US at 749–51. Like other constitutional rights, however, the right to pretrial liberty is not absolute: the government may deprive a person of her right to pretrial liberty if the government's interest is sufficiently compelling and the deprivation is narrowly tailored to serve that interest—meaning that pretrial detention is necessary because alternatives are inadequate. *Id.* at 749, 751 (describing the government interest in preventing serious pretrial crime as "compelling" and the statute as "careful[ly] delineat[ing] * * * the circumstances under which detention will be permitted"); *Reno v. Flores*, 507 US 292, 113 S Ct 1439, 123 L Ed 2d 1, 301–02 (1993) (describing *Salerno* as a case that "forbids

the government to infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (emphasis in original); *see also Washington v. Glucksberg*, 521 US 702, 721, 117 S Ct 2258, 138 L Ed 2d 772 (1997) (same).

Thus, every court to consider the question has held that the government must demonstrate that its "infringement [of pretrial liberty] is narrowly tailored to serve a compelling state interest." *Lopez-Valenzuela*, 770 F3d at 780 (quoting *Flores*, 507 US at 302); *see also Simpson v. Miller*, 241 Ariz 341, 347, 387 P3d 1270, 1276 (Ariz 2017), *cert denied sub nom Arizona v. Martinez*, 138 S Ct 146, 199 L Ed 2d 37 (2017) ("[I]t is clear from *Salerno* and other decisions that the constitutionality of a pretrial detention scheme turns on whether particular procedures satisfy substantive due process standards."); *ODonnell*, 251 F Supp 3d at 1156–57 (holding that government action infringing pretrial liberty must be the least restrictive means necessary to serve court appearance and community safety); *Humphrey*, 19 Cal App 5th at 1028, 1037 (holding that a person may be detained only if "no less restrictive alternative will satisfy" the government's interests because pretrial detention is permissible "only to the degree necessary to serve a compelling governmental interest"); *Reem*, 2017 WL 6765247, at *1 ("The due process clauses of the Fifth and Fourteenth Amendments bar pretrial detention unless detention is necessary to serve a compelling government interest."); *Brangan*, 80 NE3d at 962 (holding that pretrial detention is

permissible if "such detention is demonstrably necessary" to meet a compelling interest).[3]

Independently, government action that infringes the right against wealth-based detention must likewise satisfy strict scrutiny. In *Frazier*, the Fifth Circuit held that strict scrutiny was the appropriate constitutional standard when it invalidated a practice requiring an indigent person to either pay a fine or be jailed after conviction because the alternative jail term was not "necessary to promote a compelling governmental interest." 457 F2d at 728–30 (internal quotation marks omitted). *Frazier* explained that there were "far less onerous alternatives" that would satisfy the "state's interest in collecting its fine revenue." *Id.* at 728-30. *Bearden*, while not labeling the level of scrutiny that it applied to wealth-based post-conviction detention, similarly required "careful inquiry" into the state's asserted interests and "the existence of alternative means for effectuating" those interests. 461 US at 666–67 (quoting *Williams*, 399 US at 260 (Harlan, J., concurring); *see also Pugh*, 572 F2d at 1057 (explaining that the same principles apply prior to trial and that the Constitution requires "meaningful consideration

---

[3] Any deprivation of that liberty interest must withstand heightened constitutional scrutiny, which requires that the deprivation be narrowly tailored to advance a compelling government interest. *See, e.g.*, *Zablocki v. Redhail*, 434 US 374, 388, 98 S Ct 673, 54 L Ed 2d 618 (1978) (noting that when the government's action infringes a fundamental right, "it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests").

of * * * alternatives" to "incarceration of those who cannot" pay a financial condition of release, and a finding that secured money bail "is *necessary* to reasonably assure defendant's presence at trial.") (emphasis added). Accordingly, if the government's interest in "appearance at trial could reasonably be assured by * * * alternate [conditions] of release, pretrial confinement for inability to post money bail" is unconstitutional. *Id.* at 1058; *see also Buffin*, 2018 WL 424362, at *8 (holding that "an examination of the *Bearden-Tate-Williams* line of cases persuades the court that strict scrutiny applies to plaintiffs' Due Process and Equal Protection claims.").

Therefore, pursuant to either the *Bearden-Frazier-Rainwater* wealth-based detention cases or the fundamental right to pretrial liberty articulated in *Salerno*, an unattainable financial condition of release triggers strict scrutiny.[4] Applying

---

[4] The Fifth Circuit has held that "heightened" scrutiny applies to policies infringing the right against wealth-based detention. *ODonnell*, 892 F3d at 161. Strict scrutiny and intermediate scrutiny are both forms of "heightened" scrutiny. *ODonnell*, 251 F Supp 3d at 1138 (citing *Lauder, Inc. v. City of Houston*, 751 F Supp 2d 920, 933 (SD Tex 2010), *aff'd*, 670 F3d 664 (5th Cir 2012)). Both require the government to show that its policy is narrowly tailored to a compelling interest. *Id.* Under strict scrutiny, the policy must be necessary to achieve that interest. *Id.* Under intermediate scrutiny, the policy is constitutional only if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting *Lauder*, 751 F Supp 2d at 933).

This court need not resolve which form of heightened scrutiny applies if it finds that the practices do not comport with intermediate scrutiny, or if it concludes that the Government's policies infringe relator's fundamental right to pretrial liberty, because strict scrutiny unquestionably applies when a fundamental right is at issue.

strict scrutiny as required by both lines of precedent, the detention at issue here is unconstitutional unless the government demonstrates that less-restrictive alternatives are inadequate and incapacitation is therefore necessary to serve a compelling government interest in court appearance or community safety.

> D. *Rasmussen did not receive adequate procedural safeguards prior to his pretrial detention.*

Procedural-due-process analysis "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 US 216, 219, 131 S Ct 859, 178 L Ed 2d 732 (2011) (citing *Ky. Dep't of Corr. v. Thompson*, 490 US 454, 460, 109 S Ct 1904, 104 L Ed 2d 506 (1989)). Here, Rasmussen has been deprived of two substantive liberty interests: the right against wealth-based detention and the "fundamental" "interest in [pretrial] liberty." *Salerno*, 481 US at 750.[5] These rights were deprived when the trial court imposed an unaffordable security-release amount, which operated as a de facto detention order. The second step of the procedural-due-process analysis—determining the procedures required for a valid pretrial detention order—proceeds under the *Mathews v. Eldridge* three-part balancing test, pursuant to which a court must consider, for each procedure: (1) "the private interest" at issue, (2) "the risk of an erroneous

---

[5] As the Fifth Circuit noted, the Relators also had a state-created liberty interest in bail by "sufficient sureties." *ODonnell*, 892 F3d at 158.

deprivation" absent the additional safeguard, and (3) the state's interest in not providing it. 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976).

As explained below, the balancing of the *Mathews* factors here establishes that, at a hearing to determine whether a person will be detained prior to trial, the government must provide notice of the critical issues; an inquiry into ability to pay if a financial condition is contemplated; an adversarial hearing at which the arrestee is represented by counsel and has an opportunity to be heard, to present evidence, and to confront evidence offered by the government; an impartial decision-maker; meaningful consideration of less restrictive alternatives to pretrial detention; and, if the decision-maker issues a transparent or *de facto* order of detention, findings on the record by clear and convincing evidence that detention is necessary to serve a compelling government interest, and a statement of reasons explaining the decision.

1.      *When requiring financial conditions, the government must conduct an inquiry into ability to pay and make on-the-record findings concerning ability to pay.*

As a threshold matter, when the government contemplates requiring a secured financial condition of pretrial release, it must provide procedures adequate to determine whether the monetary condition will operate as a detention order. The U.S. Supreme Court has held that, if the government seeks to condition physical liberty on a payment, due process requires notice that financial information will be collected and of the nature and significance of the financial

information; an inquiry into the person's ability to pay; and findings on the record as to whether the person has the ability to pay. *See Turner v. Rogers*, 564 US 431, 447–48, 131 S Ct 2507, 180 L Ed 2d 452 (2011) (applying the *Mathews* test and holding that, before the state may jail a person for not paying child support, the government must provide notice that ability to pay is a "critical issue," an opportunity to be heard, and "an express finding by the court that the defendant has the ability to pay"); *Bearden*, 461 US at 672–73 (holding that, before the state can revoke probation for nonpayment, it must inquire into whether the nonpayment was willful). *See also United States v. Payan*, 992 F2d 1387, 1396 (5th Cir 1993) (the "court must inquire into the reasons" the person did not pay and determine whether she willfully refused to pay); *ODonnell*, 251 F Supp 3d at 1144–45 (concluding that Harris County's automatic use of secured money bail, without an inquiry into ability to pay, presents an intolerably high risk of erroneous deprivation of a fundamental right, and that Defendants failed to demonstrate an interest in not providing these procedural safeguards); *id.* at 1161 (requiring an inquiry into ability to pay and notice to arrestees about the significance of the financial information they are asked to provide). If, after notice and inquiry into ability to pay, the government determines that the person cannot pay the contemplated financial condition, then further procedures are required before the government may detain the person.

2.    *The government must provide additional procedural safeguards to protect against an erroneous deprivation of relator's substantive rights.*

The substantive rights to pretrial liberty and against wealth-based detention also require rigorous process to ensure the accuracy of any finding that preventive pretrial detention is necessary and to ensure that detention of the presumptively innocent remains the "carefully limited exception." *Salerno*, 481 US at 755.

In *Salerno*, the Court upheld the procedural protections required by the Bail Reform Act and emphasized that an order of detention under the Act may be issued only after the provision of robust procedural safeguards, including: a "full-blown adversary hearing," "findings of fact" by "clear and convincing evidence," and a "statement of reasons for a decision to detain." *Id.* at 750, 752. Balancing the individual and government interests at stake, the *Mathews* test makes clear as explained below, that due process requires safeguards similar to the provisions of the federal statute that the Supreme Court emphasized when it upheld that law.

a.    The government must provide notice, an adversarial hearing, an impartial decisionmaker, and findings on the record.

The procedures due process requires prior to the deprivation of *any* liberty interest are well established. Most of them apply even in the post-conviction context, where a person's liberty interest is less than that of Rasmussen, who is presumptively innocent. In *Gagnon v. Scarpelli*, 411 US 778, 786, 93 S Ct 1756, 36 L Ed 2d 656 (1973), the Court explained what due process requires at a

probation revocation hearing for a person whose liberty interest has been diminished by a criminal conviction: (a) "notice" of the critical issues to be decided at the hearing; (b) "disclosure" of the evidence presented by the government at the hearing; (c) an "opportunity to be heard in person and to present witnesses and documentary evidence"; (d) "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)"; (e) a "neutral and detached" factfinder; and (f) findings and reasons on the record of "the evidence relied on." *See also Morrissey v. Brewer*, 408 US 471, 489, 92 S Ct 2593, 33 L Ed 2d 484 (1972) (holding that "the minimum requirements of due process" require the same six procedural protections in the context of parole revocation of a convicted and sentenced person); *Turner*, 564 US at 447 (requiring "notice to the defendant that his 'ability to pay' is a critical issue," the opportunity to be heard, and findings on the record); *see also, e.g.*, *Fuentes v. Shevin*, 407 US 67, 80, 92 S Ct 1983, 32 L Ed 2d 556 (1972) ("Parties whose rights are to be affected are entitled to be heard."); *Concrete Pipe & Prods of Cal, Inc v. Constr Laborers Pension Tr for S Cal*, 508 US 602, 617, 113 S Ct 2264, 124 L Ed 2d 539 (1993) ("[D]ue process requires a 'neutral and detached judge in the first instance.'") (quoting *Ward v. Village of Monroeville*, 409 US 57, 61–62, 93 S Ct 80, 34 L Ed 2d 267 (1972)); *Wolff v. McDonnell*, 418 US 539, 564–65, 94 S Ct 2963, 41 L Ed 2d 935 (1974) (requiring a statement of reasons for revocation of good-time credits).

Because a bail hearing implicates the fundamental right to bodily liberty prior to trial, each of these safeguards is required.

> b.    The government must prove by clear and convincing evidence that the relator is either a flight risk or a danger to the community.

When the government seeks to infringe the fundamental right to bodily liberty prior to or absent a criminal conviction, the government also bears a heightened evidentiary burden. As the Supreme Court explained in *Addington v. Texas*, 441 US 418, 432–33, 94 S Ct 1804, 60 L Ed 2d 323 (1979), the deprivation of the fundamental right to bodily liberty requires a heightened standard of proof beyond a mere preponderance to ensure the accuracy of the decision. Since *Addington*, the Supreme Court has never permitted application of a standard lower than "clear and convincing" evidence in any context in which bodily liberty is at stake.

In *Addington*, the Supreme Court held that, under the Due Process Clause, the standard of proof required before a person can be confined in state custody for mental illness based on the possibility of future dangerousness must be "equal to or greater than" the "clear and convincing" evidentiary standard. *Id.* at 433. Applying the *Mathews* balancing test, the Court first articulated the government's interest: "to protect the community from the dangerous tendencies of some who are mentally ill." *Id.* at 426. However, the Court explained, "[s]ince the preponderance standard creates the risk of increasing the number of individuals

erroneously committed, it is at least unclear to what extent, if any, the state's interests are furthered by using a preponderance standard in such commitment proceedings." *Id*. The Court then balanced the important private interests and concluded that "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Id*. at 427. In determining what the appropriate due process standard was above a mere preponderance, the Court explained that the "clear and convincing" standard enables the government to achieve its interest when it has a convincing basis but rigorously protects the fundamental individual rights at stake. *Id.*

The Court has reached the same conclusion in every other context in which a person's bodily liberty is at stake. *See Santosky v. Kramer*, 455 US 745, 756, 102 S Ct 1388, 71 L Ed 2d 599 (1982) ("This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'"); *Cruzan by Cruzan v. Dir, Missouri Dep't of Health*, 497 US 261, 282–83, 110 S Ct 2841, 111 L Ed 2d 224 (1990) (explaining that the Court has required the clear and convincing evidence standard in deportation proceedings, denaturalization proceedings, civil commitment proceedings, proceedings for the termination of parental rights, in

cases involving allegations of civil fraud, and in a variety of other kinds of civil cases implicating important interests).

In another seminal case on the evidentiary standard required for deprivation of bodily liberty, the Court struck down, on due process grounds, Louisiana's statutory scheme for perpetuating the confinement of those acquitted on the basis of insanity in criminal trials. *Foucha*, 504 US at 82–83. The Court held that although "[t]he State may [ ] confine a mentally ill person if it shows by clear and convincing evidence that the individual is mentally ill and dangerous[;] [h]ere, the State has not carried that burden." *Id.* at 80 (quotation and citation omitted). In reaching this holding, *Foucha* relied on *Salerno*, 481 US at 749, explaining that the Court had upheld the federal statute's preventive detention mechanism in part because it required findings of dangerousness by the longstanding "clear and convincing" standard. *Foucha* concluded with a reminder about the doctrinal importance of the "clear and convincing" standard: "freedom from physical restraint being a fundamental right," administrative detention must remain the "carefully limited exception[ ]" in our society. *Id.* at 83, 86.

Lower courts, interpreting *Salerno*, have consistently required clear and convincing evidence to justify detaining a person prior to trial. *Lopez-Valenzuela* stuck down the Arizona pretrial detention statute in part because the Arizona law, unlike the federal Bail Reform Act, did not require the government to prove by

clear and convincing evidence that an individual arrestee's detention was necessary. 770 F3d at 784–85. As the Ninth Circuit explained, one of the features that *Salerno* explicitly relied on was that the Act required the government "to prove by 'clear and convincing evidence' that the individual presented 'a demonstrable danger to the community' and that 'no conditions of release c[ould] reasonably assure the safety of the community.'" *Id*. at 785. Most recently, in *Humphrey*, the California Court of Appeal held under the federal Constitution that "[i]f [a] court concludes that an amount of bail the defendant is unable to pay is required to ensure his or her future court appearances, it may impose that amount only upon a determination by clear and convincing evidence that no less restrictive alternative will satisfy that purpose." 228 Cal Rptr 3d at 535.[6] *See also Dixon*, 2019 WL 2437026, at *16 (requiring, as part of preliminary injunction against jail commissioner defendant, that financial conditions of release be

---

[6] Numerous other state courts have held this standard to apply. *See, e.g.*, *State v. Ingram*, 230 NJ 190, 202, 204–05, 165 A3d 797, 803, 805 (NJ 2017); *State v. Butler*, No. 2011-K-0879, 2011 WL 12678268 (La App 4th Cir July 28, 2011), *writ not considered*, 75 So 3d 442 (La 2011); *Wheeler v. State*, 160 Md App 566, 578–80, 864 A2d 1058, 1065 (2005); *Brill v. Gurich*, 1998 OK CR 49, ¶ 5, 965 P2d 404, 409 (Okla Crim App 1998) *as corrected* (Sept 23, 1998); *Lynch v. United States*, 557 A2d 580, 581 (DC 1989) (en banc). *Compare Aime v. Com*, 414 Mass 667, 678–83, 611 NE2d 204, 212–14 (1993) (striking down preventive detention statute because it did not require the "clear and convincing" burden of proof), *with Mendonza v. Com*, 423 Mass 771, 782–83, 673 NE2d 22, 30–31 (1996) (upholding successor statute and holding that "clear and convincing" evidence standard is required for pretrial detention decisions based on a prediction of future dangerousness).

imposed only upon finding by clear and convincing evidence that no alternative conditions would reasonably assure the arrestee's future court appearance or the safety of others); *Caliste*, 329 F Supp 3d at 313 (holding that clear and convincing evidentiary standard applies to risk of flight determination, due to "vital importance of the individual's interest in pretrial liberty recognized by the Supreme Court.").

The intermediate standard of "clear and convincing" evidence should apply regardless of whether the government seeks to detain a person pretrial based on a purported risk of danger to the community or a purported risk of flight because the private right at stake is the same. And the Supreme Court has already held in *Santosky*, *Addington*, and *Foucha* that the government must meet a heightened level of proof before it can infringe upon fundamental private interests, because those interests are "particularly important" and "more substantial than mere loss of money." *Santosky*, 455 US at 756 (quoting *Addington*, 441 US at 424). There is no compelling reason that "the degree of confidence our society thinks [it] should have in the correctness of factual conclusions," *id*. at 755 (quoting *Addison*, 441 US at 423), should be *lower* when the question is whether a person poses a risk of flight than when the question is whether the person poses a danger to other people in the community.[7]

---

[7] Analogous case law from the immigration context, where the liberty interest is considered more constrained than in the pretrial context, supports this conclusion.

Only one court appears to have addressed in depth whether the standard of proof the government must satisfy to detain someone due to a concern about flight risk is the same as the standard when the concern is community safety. In *Kleinbart v. United States*, 604 A2d 861, 868 (DC 1992), the DC Court of Appeals held that the "clear and convincing" evidence standard should apply to determinations about whether to order pretrial detention based on flight risk. The court explained that "[a] defendant's liberty interest is no less—and thus requires no less protection—when the risk of his or her flight, rather than danger, is the basis for justifying detention without right to bail." *Id.* at 870. The court therefore held: "[a]lthough the federal Bail Reform Act could be construed—purely as a matter of statutory construction—to require only a preponderance standard in risk of flight cases * * * we believe that *Salerno*'s emphasis on the clear and convincing evidence standard to sustain the constitutionality of that statute as applied to danger necessarily carries over, as a requirement of due process, to risk

---

*See Singh v. Holder*, 638 F.3d 1196, 1203, 1204 (9th Cir 2011) (requiring clear and convincing evidence regardless of whether the government seeks detention based on flight or dangerousness because "due process places a heightened burden of proof [when] the individual interests at stake * * * are both particularly important and more substantial than mere loss of money.") (quoting *Cooper v. Oklahoma*, 517 US 348, 363, 116 S Ct 1373, 134 L Ed 2d 498 (1996); *Lora v. Shanahan*, 804 F3d 601, 616 (2d Cir 2015) (same), *vacated and remanded on other grounds*, 138 S Ct 1260 (2018).

of flight cases." *Id*. This analysis has been adopted by the American Bar Association's Criminal Justice Standards.[8]

Thus, in order for Rasmussen to be validly detained, the circuit court needed to have found, upon clear and convincing evidence, that he posed a danger to the community or was a flight risk. The court did not. Instead of holding an adversarial hearing and requiring the state to meet its burden by presenting evidence, the court entered an order of detention without the procedural and substantive protections due process requires.

3.    *The detention order in this case violates due process.*

As explained above, the Due Process Clause imposes substantive and procedural requirements on pretrial detention. In Rasmussen's case, the lower court did not make constitutionally adequate findings on the record about his dangerousness or risk of flight; nor did the court inquire into less restrictive alternatives that would achieve the government's interests. Instead, the court

---

[8] ABA Standard 10-5.8 explains that the "clear and convincing" standard applies to decisions relating to dangerousness and risk of flight. Courts have long looked to the Standards for guidance when answering constitutional questions about the appropriate balance between individual rights and public safety in the field of criminal justice. *See, e.g.*, *Padilla v. Kentucky*, 559 US 356, 367, 130 S Ct 1473, 176 L Ed 2d 284 (2010); *Strickland v. Washington*, 466 US 668, 688–89, 104 S Ct 2052, 80 L Ed 2d 674 (1984); *United States v. Teague*, 953 F2d 1525, 1533 n 10 (11th Cir 1992). Similarly, the Conference of Chief Justices has emphasized the safeguards upheld in *Salerno* and argued that misdemeanor arrestees detained due to inability to pay money bail are entitled to the same procedural safeguards afforded to arrestees who are detained pursuant to transparent orders of detention. *See* Brief of Conference of Chief Justices, *supra* note 5, at 38.

ordered Rasmussen released but required him to pay for his release. Because Rasmussen happens to be unable to pay, he has remained in detention even though no court has made the requisite showing pursuant to the requisite standards.

Here, there is no question the court did not make the requisite findings by clear and convincing evidence. Indeed, it made none. Despite Rasmussen's assertions that he had no income and no ability to pay security, the court stating that "he does not have significant assents," the court made no inquiry or finding on that basis. ER-78. Even though the Court ordered Rasmussen released under home arrest and other conditions, it provided no basis for why payment of $25,000 was a necessary condition of that release. And the court did not find or provide any basis as to why less-restrictive alternatives to detention were insufficient to satisfy the government's interests in court appearance and community safety. Instead, based on a "significant history of failures to appear and a reasonably significant criminal history" and the nature of the charges, the court entered a *de facto* order of detention without the procedural and substantive requirements Oregon law and the Constitution requires. ER-78.

If this Court issues the writ requested by Rasmussen, the State will have the opportunity to seek an order of detention Rasmussen at a constitutionally adequate hearing. But as this case stands, Rasmussen's detention does not comply with the procedural requirements of the Due Process Clause. The court had no

constitutionally sufficient basis on which to detain Rasmussen and, therefore, a writ of habeas corpus should issue ordering his release unless the State seeks a thorough adversarial hearing that complies with the requirements for preventive detention described by the United States Supreme Court, which include making findings by clear and convincing evidence about whether he is a danger to the community and risk of flight, and, if so, whether conditions of release exist that could reasonably assure Rasmussen's presence at trial and the safety of the community.

## III. CONCLUSION

Vernon Rasmussen is sleeping in a jail cell tonight because he does not have enough money to buy his freedom. Jails are a hotbed for the spread of COVID-19. He therefore faces—in addition to the irreparable harm of his unconstitutional detention—a high risk of illness and death each passing day he spends in jail. If the state believes he must stay in jail, there are lawful procedures available to secure his detention. Setting a security amount at a level that he cannot afford is not one of them. Therefore, Rasmussen asks this Court to either release him, or order the trial court to follow those lawful procedures.


Dated: April 13, 2020

/s/*Jesse Merrithew*
Jesse Merrithew
Viktoria Safarian

Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, OR  97205

Carl Macpherson, IV
Metropolitan Public Defender Inc
630 SW Fifth Avenue, Suite 500
Portland Oregon 97204

Charles Gerstein
Olevia Boykin
Civil Rights Corps
910 17th St. NW, Suite 200
Washington, D.C. 20006

*Counsel for Defendant-Relator*