1

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF WASHINGTON


STATE OF OREGON,             )
                             )
                Plaintiff, )
                             )
vs.                      ) Case No. 19CR32388
                             )
JAYSON ROBERT MEE,       )
                             )
                Defendant. )


TRANSCRIPT OF PROCEEDINGS

BE IT REMEMBERED THAT, the above-entitled Court
and Cause came on regularly for hearing before the Honorable
Rebecca D. Guptill, on Wednesday, March 18, 2020, at the
Washington County Courthouse, Hillsboro, Oregon.


Proceedings recorded by digital sound recording; transcript
provided by Professional Reporter.

                                                              2

1                          APPEARANCES

2    Appearing for Plaintiff:
     WASHINGTON COUNTY DISTRICT ATTORNEY'S OFFICE
3    BY: JASON B. WEINER, Assistant District Attorney
     150 N. First Street, Suite 300
4    Hillsboro, Oregon 97124-3002
     (503)846-8671
5

6
     Appearing For Defendant:
7    Metro Public Defender, Inc.
     BY:  BRIAN R. DECKER
8    400 E. Main Street, Suite 210
     Hillsboro, Oregon 97123
9    (503)726-7924
     bdecker@mpdlaw.com
10   Via Teleconference

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                        3
1                      GENERAL INDEX

2                                              PAGE NO.

3   March 18, 2020, Proceedings                    4

4   Victim Impact Statement                       18

5   Reporter's Certificate                        31

6                      *  *  *

7

8                     WITNESS INDEX

9                       (None)

10                     *  *  *

11

12                    EXHIBIT INDEX

13                      (None)

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          (Wednesday, March 18, 2020, 1:40 p.m.)

2

3              P R O C E E D I N G S

4          (Whereupon, the following proceedings were held in

5    open court:)

6          THE COURT:  Instead, let's go ahead and handle

7    State of Oregon vs. Jayson Robert Mee.

8          MR. WEINER:  So Judge, I'm appearing for the State

9    on that case.  One of the victim's fathers wants to address

10   the Court, and I'm told that he's walking over from our

11   courthouse.

12         THE COURT:  Okay.  So we'll hold off on that.

13         How about --

14         MR. WEINER:  Nope.  Here we go.

15         UNKNOWN SPEAKER:  Okay.  Let me --

16         THE COURT:  Okay.  Actually -- so let -- let's get

17   Mr. Decker on the phone, then.

18                    (Phone call being placed.)

19         UNKNOWN SPEAKER:  Please state your name after the

20   tone, and Google Voice will try to connect you.

21         THE COURT:  Judge Rebecca Guptill.

22                    (Phone ringing.)

23         MR. DECKER:  Hello.

24         THE COURT:  Hi.  Mr. Decker, can you hear me?

25         MR. DECKER:  Yes, I can.

5

1          THE COURT:  Okay.  You're on the record in State

2    of Oregon vs. Jayson Robert Mee, Case No. 19CR32388, on --

3    behalf -- we have Brian Decker on the phone on behalf of the

4    defendant, who's presently in custody; and Jason Weiner's

5    here on behalf of the State today.

6          Good afternoon.

7          MR. DECKER:  Good afternoon, Your Honor.  Thank

8    you for permitting me to appear telephonically.

9          We're here on my motion for bail reduction for

10   Mr. Mee.  And I need to start off by discussing the

11   circumstances regarding the coronavirus pandemic.  That is

12   the reason that I'm appearing telephonically, and the reason

13   that I filed this motion when I did.

14          And then I want to address Mr. Mee's particular

15   circumstances.  The pandemic that's going on right now, the

16   national emergency, is the essential context for this

17   motion.  And -- and, in part, that's the -- the reason for

18   that is, that by statute, this Court has to consider the

19   reasonable protection of the public.

20          And -- and this -- this context is what very

21   seriously implicates a reasonable protection.  Not just of

22   Mr. Mee, not just of those he comes in contact with in the

23   jail, but the public.

24          I -- I provided some facts in a supplemental

25   memorandum that I filed regarding the coronavirus, and I

6

1  need to update those facts now because the situation has

2  been rapidly changing.

3         At the time of filing, there were 21 confirmed

4  cases in Oregon; there are now 75.  There were eight cases

5  in Washington County; there are now 23.  These numbers seem

6  to be going up every day.  There has, since that time, been

7  one death from this virus in Portland; and just yesterday,

8  Washington County had its first death from this virus.

9         I raised some issues in -- in my filing with the

10 jail's lack of response to this emerging crisis.  The jail

11 has since taken some steps regarding the crisis, and -- and

12 I want to outline those.

13        Per a press release that the jail sent out on the

14 16th, which was Monday, the jail has suspended all social

15 visiting; although, it is permitting professional visits to

16 continue.  And I still do not have any indication that any

17 of those professional visitors:  Attorneys, DHS workers,

18 case workers, things like that, who are going in to see

19 these -- these inmates, whether they are being screened when

20 they go in.

21        The -- the guidance says that those who are

22 incarcerated will not be allowed to congregate in groups of

23 more than 20.  This is in contrast to the limits recommended

24 by the Centers for Disease Control and the White House and

25 Governor Kate Brown, for group -- no more than groups of 10.

7

1           The jail also indicates that it has been working

2    to lodge all the people who are incarcerated there in

3    single-occupancy cells.  I have not been able to confirm

4    with Mr. Mee whether he is currently lodged in a

5    single-occupancy cell.  I believe that he is.

6           THE COURT:  There are no people occupying any

7    cells with more than one person at this time.

8           MR. DECKER:  Okay.  Thank you for clarifying that,

9    Your Honor.  That -- that -- that is a -- that is a

10   significant step.

11          I understand the last number I saw was the release

12   of approximately 120 people from the jail; although, I'm not

13   sure how many of those are -- are counting people who were

14   just going to be released anyway by the regular schedule,

15   which is about a 20 percent reduction in the -- the inmate

16   population of the jail, assuming we're talking about the

17   main jail, and not just the -- and not including the

18   Community Corrections Center.

19          That, nevertheless, is insufficient.  It is -- it

20   does increase the spacing and limits the contact between

21   people who are in custody at the jail.  But the jail also

22   needs additional room to be able to institute quarantine to

23   separate people who are infected with this disease from

24   those who have symptoms but have not been confirmed, and

25   from those who are healthy in the general population.  That

8

1   requires moving about people.  That requires space, and that

2   requires empty bed space.

3        Now, the recommendations from all (indiscernible)

4   are to prioritize the release of two categories of people:

5   Number 1, people who, just because of the nature of their

6   charged offenses, pose a very low risk to society because

7   they're misdemeanors or -- or not violent offenses; and

8   number 2, those who are particularly vulnerable to this

9   disease.  And that's Mr. Mee.  I want to get to that in a

10  second, because there's a couple of other points I need to

11  address about the jail.

12       There -- yesterday, there was an article published

13  by Oregon Public Broadcasting, quoting Sheriff Garrett,

14  indicating that there have been tests of some -- of some

15  people who are incarcerated there at the jail.  Some tests

16  to determine whether or not they are infected with this

17  virus.

18       It's now 24-hours later.  I still don't know

19  whether there have been positive or negative results from

20  those tests.  The -- the sheriff indicated, we still have a

21  few inmates who we're monitoring.  The very fact that there

22  were tests at all is significant because testing is very

23  limited.  Testing in -- in Oregon only occurs under

24  circumstances where people have significant symptoms of this

25  virus, and either have had contact with some -- some

STATE OF OREGON v. JAYSON ROBERT MEE                      19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                     3/18/2020

9

1  confirmed case or been out of the country to an affected

2  area or are hospitalized, potentially.  So to get to the

3  point of testing at all suggests that there are some people

4  with very serious health concerns who are incarcerated at

5  the jail right now.

6           There's also reports, that the sheriff has

7  declined to confirm or deny, that jail -- one or more jails

8  deputies have been tested and/or have tested positive --

9           THE COURT:  There have been no positive --

10          MR. DECKER:  -- or --

11          THE COURT:  -- tests in the jail or amongst the

12  Washington County Sheriff's Office employees.

13          MR. DECKER:  Okay.  Washington County Sheriff's

14  Office employees may have been tested and may be awaiting

15  results, and the sheriff has declined to -- to confirm or

16  deny whether that is true.  That report was, to my

17  knowledge, at least reported on Friday without being

18  confirmed by anyone.

19          On Sunday, a letter was sent from some community

20  groups to the sheriff raising the concern about that report,

21  and at that time, the sheriff declined to deny or, indeed,

22  even address the reports that jail deputies had been tested

23  for this disease.  Still, to my knowledge, there has been no

24  confirmation or denial of the report that jail deputies have

25  been tested for this disease.  And, again, getting to the

10

1   point of being tested is significant.

2          Deputies, in particular, it's -- I mean, it's not

3   just significant for the deputies who are -- who are

4   directly affected, that they are coming into contact with

5   many, many, many people who are incarcerated at the jail, as

6   well as court staff and members of the public.  So it is a

7   significant public safety concern if there are cases of

8   people where this suspicion has been raised.

9          We're also talking, it's been five days since

10  Friday when these initial reports of tests came out.  They

11  ought to be answered back by now whether they were positive

12  or -- or negative.  And lack of information --

13          THE COURT:  As I have said, as of this point in

14  time, there are no positive tests results.

15          MR. DECKER:  Okay.  That -- that sure sounds like

16  it leads into the possibility that there are some pending

17  test results regarding deputies at the jail.  And I don't --

18  I don't have information denying that fact from sources who

19  would be able to deny that fact.

20          There are other jails and correctional

21  institutions across the country with confirmed cases right

22  now, including a wildly publicized case of an employee at

23  the Washington State Department of Corrections just across

24  the border, and in various other areas that are affected by

25  this disease.

11

1        There are suspected cases at this jail.  We, at

2   Metropolitan Public Defender, have four people who have, in

3   the last week, come down with COVID-19-like symptoms after

4   having contact with -- there are people who are at the jail,

5   including one person who is a legal assistant at our office,

6   who -- whose symptoms were so severe that she did get tested

7   for the flu, and was negative for the flu.  She still does

8   not qualify, based on those circumstances, to be tested at

9   all for COVID-19.  But she has been directed to

10  self-quarantine for 14 days on the suspicion that what she

11  has is COVID-19.

12        And this is a legal assistant who works routinely

13  there in the law enforcement center, and is in contact with

14  the arraignment and ECR population on a basis of multiple

15  times per a week, or was, until she had to go into

16  quarantine.

17        All jails, prisons, and court symptoms -- court

18  systems are susceptible to this virus.  Washington County

19  Jail is certainly not exempt, and these measures that the

20  jail has taken, while welcome, are insufficient and went

21  into effect alarmingly late.

22        It is very likely that COVID-19 is already in the

23  jail.  If it is not, it will be soon.  And once it is in

24  this building, everyone living in this building, everyone

25  working inside this building, is going to be in danger,

12

1   including court staff, including the public at large.  Some

2   people may be symptomatic; some people may have mild

3   symptoms.  Jayson Mee is -- is a person who's very

4   susceptible to becoming very seriously ill from this

5   disease.

6            And -- and the jail, itself, the risk of this jail

7   becoming an incubator for this disease, is a risk that

8   implicates serious public safety concerns.  It's going to be

9   a danger for all who come into contact at the jail.  All who

10  are booked into the jail.  Even those who are released very

11  quickly.

12           The staff that -- that -- you know, those home at

13  night, the court staff that is there in the building, having

14  contact with people.  The public that is coming into the

15  building for various purposes, and each additional person

16  who is incarcerated in that jail increases the chances of

17  that jail becoming a very serious incubator for this disease

18  and the disease getting out.

19           The sheriff has announced additional steps to

20  limit the number of people who are coming into the jail, to

21  limit the kinds of arrests, and -- and bookings and --

22  and -- and things like that, to clear priority cases.  But

23  it's still not enough.  And we still have cases within the

24  last 24 hours of people being booked into the jail for

25  crimes like criminal mischief in the second degree; unlawful

STATE OF OREGON v. JAYSON ROBERT MEE                           19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                          3/18/2020

13

1   use of a motor vehicle; harassment; a misdemeanor; failure

2   to appear.  These kinds of people are going in there and

3   then getting out immediately after having contact with jail

4   deputies, potentially after having contact with people who

5   are incarcerated.

6           The -- the releases need to continue to make sure

7   that that jail has enough space to adequately deal with this

8   virus once it gets inside, if it has not gotten inside

9   already.  So the -- so the releases need to continue.

10          And the people to release are not just the people

11  who have low-level charges, but also those who are in

12  incredible danger because of the high risk of -- of serious

13  illness if they contract this disease.

14          Mr. Mee is one of those people.  He -- he is

15  immunocompromised.  He is HIV positive.  He has

16  neurosyphilis.  He has a rare neurological disease called

17  moyamoya.  He's confined to a wheelchair.  He has and

18  requires multiple contact with medical staff per week, and

19  he requires regular contact with medical appointments that

20  have to occur outside of the jail, as well.

21          THE COURT:  Can I pause you for just a moment?

22          MR. DECKER:  He --

23          THE COURT:  Can I pause -- I apologize.

24          MR. DECKER:  Yes.

25          THE COURT:  So the alleged victim's father is

STATE OF OREGON v. JAYSON ROBERT MEE                          19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                        3/18/2020

14

1   sitting in my courtroom right now.  And just to get some

2   information on the record, that has him visibly upset.

3   So --

4          MR. DECKER:  Okay.

5          THE COURT:  -- in terms of your client's health

6   diagnoses --

7          MR. DECKER:  Okay.

8          THE COURT:  -- is your client, in fact, HIV

9   positive?

10         MR. DECKER:  Yeah.

11         THE COURT:  Okay.  Continue.

12         MR. DECKER:  Thank you.

13         Mr. Mee currently has a bail amount set of one and

14  a quarter million dollars.  If he were wealthy enough to

15  have $125,000 to post, he could leave the jail today, and be

16  out on, well, essentially, just the regular release

17  agreement that the -- that the jail asks people to sign

18  after they post bail.

19         He's not wealthy.  He -- he is indigent.  He -- he

20  was living on a very limited income of Social Security.

21  That has been suspended since he has been incarcerated, so

22  he has no income right now.  He cannot afford to post

23  $125,000.  He cannot afford to post anything.

24         He does not pose a danger to the public, or to the

25  alleged victim.  He denies the allegations, but he has been

STATE OF OREGON v. JAYSON ROBERT MEE                    19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                   3/18/2020

15

1   out of the house where the alleged victim resides, and where

2   the abuses alleged to have occurred.

3           Prior to his arrest, for several months, he was

4   living at a care facility.  He has no criminal history,

5   whatsoever.  He has no history of failures to appear,

6   whatsoever.

7           He has, while in the jail, struggled to get

8   adequate medical care, and struggled to get adequate

9   nutritional care.

10          I -- you know, I believe that the medical staff,

11  through Naphcare (that is the jail contractor), is doing the

12  best they can, but they have limited resources, and they are

13  not -- they are -- they are not the kind of medical facility

14  that anybody in this room would want to -- who'd want to

15  have to go to or want to send their parents to when they are

16  seriously ill.  And they are not equipped to -- to deal with

17  the medical conditions that Mr. Mee has, currently, on site.

18  They're certainly not going to be equipped on site to deal

19  with him if he contracts serious illness from this disease.

20          He -- I have attempted to arrange bed space at a

21  care facility for him.  I have not been successful at doing

22  that -- in doing that, at this point.  He needs to -- to get

23  back into a care facility will require reapplying for the

24  same kind of benefits he was receiving when he was taken

25  into custody, and -- and then being -- and then being placed

STATE OF OREGON v. JAYSON ROBERT MEE                           19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                         3/18/2020

16

1  into an assisted living facility.  He requires a very

2  particular kind of assisted care facility.  There are only

3  about half a dozen in the state of Oregon that are equipped

4  to deal with his particular health concerns.

5          He has a pending aid and assist contested hearing

6  set for April 13th.  He may or may not be ordered into

7  fitness treatment at Oregon State Hospital at that time.

8          We are asking the Court to release him on the

9  condition that -- that will adequately take into account the

10 -- the risk of life that he poses, and the -- all of the --

11 the full scope of danger to the community.

12         Given his health condition, he is not in a

13 position to -- to flee.  He is not in a position to pose a

14 danger to anyone.  And so we're asking the Court to find the

15 -- the -- reduce his bail amount.  Find the statutory

16 minimum bail amount unconstitutional as applied to him

17 because he cannot afford it.  The unconstitutionality of --

18 the constitutionality or unconstitutionality of the

19 statutory minimum bail amount means nothing more or less

20 than the Court finding whether a person can afford it.  He

21 cannot.  He's indigent and has no income, whatsoever.

22         So reduce it to zero, release him on conditions,

23 find whatever appropriate conditions are necessary, and

24 permit him to get out of there just 'cause he would if he

25 were a wealthy man.

17

1          THE COURT:  Mr. Weiner?

2          MR. WEINER:  Okay.  So Your Honor, at this point,

3  I -- I would like to let the victim's father address the

4  Court.  It's my understanding he wishes.

5          MR. HAILEY:  I'm sorry, I didn't hear you.

6          MR. WEINER:  Do you wish to address the Court?

7          MR. HAILEY:  Yes, I do.

8          MR. WEINER:  Go ahead.

9          THE COURT:  Sir, come up to this microphone,

10  please.

11          Hi, sir.

12          MR. HAILEY:  Hello.  Hi.

13          THE COURT:  Thank you for being here.  What do you

14  want me to know?

15          MR. HAILEY:  Okay.  I'll start with the -- the

16  statement first.  But, actually, I wanted to make

17  corrections about Mr. Mee's diagnosis.

18          The HIV positive is -- is false.  We were in a

19  current triad relationship prior to him being taken into the

20  care home.  Our third party was HIV positive, and -- both

21  myself and Mr. Mee were taking medication Truvada, to

22  prevent barr -- to have a chemical barrier to prevent HIV

23  spread.

24          THE COURT:  Okay.

25          MR. HAILEY:  So I'm a firm believer that Jayson

STATE OF OREGON v. JAYSON ROBERT MEE                           19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                         3/18/2020

18

1   Mee does not have HIV.  I just wanted to share that with

2   you.  That was very upsetting hearing that.

3              And now, here's the statement.  I'd like to read

4   it.  If I can, I'm gonna ask for -- is it Nadia?

5              UNKNOWN SPEAKER:  Yes.

6              MR. HAILEY:  I would ask Nadia to probably

7   continue reading it more.  It's kind of detailed.

8              UNKNOWN SPEAKER:  Okay.  And -- and go ahead and

9   give it your best shot.  And I think, maybe, I also could

10  read it privately up here if it's written down.

11             MR. HAILEY:  Okay.  I'll just go ahead and read it

12  to you right now.

13             UNKNOWN SPEAKER:  Thank you.

14             MR. HAILEY:  "The natural curiosity of a

15  10-year-old boy, who is starting to experience puberty,

16  presents a unique opportunity to shape a child's attitude

17  towards sex, relationships, gender, and consent" --

18  "consent.  Every parent wants to raise a child with healthy

19  attitudes and to prepare them to become sexually healthy

20  teenagers and adults.

21             "I hope that my son could be adequately informed

22  about his body development, respect for himself and for

23  others, and be coached towards a path of enlightened

24  self-discovery.  I wanted and still want him to be able to

25  be a positive model for every one of his peers.  These goals

19

1  are challenging for any parent under the best circumstances,

2  so it's hard to express how much harder these goals are for

3  me to achieve" -- "achieve them" -- "achieve now.  I want

4  you to know that my loss for words hasn't stopped me from

5  trying.

6          "My son faces more challenges than most.  He is a

7  child affected by developmental delay and ADHD.  The

8  defendant saw a completely different set of opportunities in

9  my son.  And he not only took advantage of my son, he took

10  advantage of me.  The defendant devoured" -- "devoured the

11  best" -- sorry -- "the best opportunities my son had for

12  good" -- "for good sexual health to feed his selfish

13  perversion.

14          "The defendant groomed my son by showing him

15  pornographic images and videos.  He asked my son to practice

16  becoming comfortable dressing down for PE.  He pressured my

17  son to undress in his presence.  My son refused, so the

18  defendant resorted to authority, admonishing my son for

19  back-talking, and demanded that my son get completely naked.

20  That set the stage for my son to connect authority and

21  validation with sex.

22          "The defendant then raped my son, and generated

23  fear by telling him to lie about what happened.  The

24  defendant was evidently aware of the consequences of his

25  actions, since he told my son that it -- that he would go to

20

1   jail should my son reveal the truth.

2          "There have been many gut-wrenching moments since

3   my son came forth.  Among the worst of those was a time when

4   my son revealed that he believed he would be in trouble for

5   doing what he was told not to:  Telling.  I choked back the

6   tears to praise him for his actions instead, but I believe

7   he still feels responsible for the defendant's current

8   circumstances.

9          "And then, recently, I was asked by my son whether

10  all men like other men to pee in their mouths, and whether

11  I'd like that too.  My son is 12, and should have much

12  simpler things on his mind.  I'm still unraveling the damage

13  the defendant has done, and I have come to realize what I

14  may never" -- "what" -- sorry -- "realize that I may never

15  be done; that it may never be done.

16         "If the defendant were to be released, the

17  psychological terror it would visit upon me and my partner

18  would be dire.  Should he be allowed to contact my son, I

19  can hardly imagine the additional damage he could and would

20  do.  He cannot be allowed to rob more families of the

21  opportunities he took from mine; and he cannot be allowed

22  to" -- sorry -- "read" -- I lost my place.  I'm sorry --

23  "family opportunities he took from mine; and he cannot be

24  allowed to rob my family of the closure a verdict would

25  bring for us.

21

1          "I believe the defendant would deny us closure by

2     taking his own life should he be released.  He made no

3     secret" -- "he made no secret of his intention to do that

4     before his arrest, when he collected a significant amount of

5     money using online fundraising services, with the stated

6     goal being doctor-assisted suicide.  He was near his

7     fundraising goal, and his arrest came just in time to

8     prevent him from killing himself, along with our opportunity

9     for justice.

10          "I respectfully ask that the defendant petitions

11     for lower bail be denied.  There is a heinous action for

12     which the defendant has been indicted, and they must be" --

13     "and he must be adjudicated.  I and my family deserve no

14     less."

15          THE COURT:  Thank you, sir.

16          MR. WEINER:  Judge, I'm not going to comment on

17     Mr. Decker's foray into epidemiology, other than to say, the

18     courts have a lot of balancing to do.  They've already

19     undergone the balancing.  They've designated which people in

20     custody the ongoing crisis might apply to.  The charges here

21     do not fit within that, so I'm just not going to address

22     anything else along those lines.  But I do want to pick up

23     where Mr. Hailey left off.

24          I just want the Court to know that this is a case

25     where the defendant took advantage of a position of trust.

STATE OF OREGON v. JAYSON ROBERT MEE                        19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                       3/18/2020

22

1  He was living in the house with the victim.  He was, in some

2  sense, a -- a stepfather to the victim.  He was given the, I

3  guess, honor or task of starting to talk to the victim about

4  sexual development.  And he used that position of trust, he

5  used that opportunity, to sexually abuse the child in this

6  case, in the ways that are reflected in the indictment.

7        And I think that's important because, again, it

8  demonstrates that the defendant is somebody who is capable

9  of manipulation and taking advantage of trust.

10       And then, additionally, I want to talk a little

11 bit about the aid and assist procedural history in this

12 case, because I think it -- it demonstrates, to some degree,

13 the same thing.

14       The defendant has twice been evaluated for aid and

15 assist purposes.  The first time the defendant was evaluated

16 at the Oregon State Hospital, the conclusion was that he was

17 able to aid and assist.  But, interestingly, the -- the

18 doctor basically said, "Well, if I saw some of these other

19 behaviors, it -- it could possibly change my opinion."

20       And then, I don't know the exact amount of time

21 that lapsed but, a matter of months later, the defense was

22 asking that the defendant be evaluated a second time for

23 aiding and assisting.  So he went to the Oregon State

24 Hospital, and the doctor who evaluated him the first time,

25 evaluated him the second time, and concluded that the

23

1  defendant was, in fact, malingering and was able to aid and

2  assist.

3         And so, procedurally, Mr. Decker is correct, that

4  we are now, basically, set for a contested hearing, because

5  Mr. Decker and his client don't want to accept that

6  diagnosis.  They want to pursue that.

7         But from the State's point of view, again, I think

8  that demonstrates a significant degree of manipulation and

9  disingenuousness.  So I believe the Court should have very

10 grave concerns about releasing this individual into the --

11 into the community, given the nature of the charges, and the

12 background and history that I just went over.

13        Mr. Decker began his discussion talking about

14 community safety.  I -- I think the Court should be looking

15 at community safety, and concluding that the defendant is

16 somebody who were, security, the way we're set right now, is

17 absolutely appropriate.  And I have no doubt that the

18 community would not agree with Mr. Decker's conclusions that

19 community safety interests would be better served by

20 essentially recogging the defendant with whatever conditions

21 of release that the Court finds appropriate.

22        THE COURT:  And correct me if I'm wrong, this is

23 the first --

24        MR. WEINER:  Yes.

25        THE COURT:  -- release hearing; correct?

24

1      MR. WEINER:  Correct.  It's -- it's basically been

2  in an aid and assist posture from very early on.

3      THE COURT:  And I will note for everyone on the

4  record, that I do recognize the fact-pattern here from

5  either a warrant or a PC affidavit that I've reviewed at

6  some point in the past, so I am familiar with the alleged

7  facts in this case from previous -- previous interviews

8  in -- in this case.

9      Mr. Decker?

10      MR. DECKER:  Thank you, Your Honor.

11      To address one of the points raised by the -- the

12  statement of the victim's father and concern.  Mr. Mee is --

13  is not suicidal.  He does not want to die, and is requesting

14  his release because he wants to live.  To insist on

15  detaining him at this point is something that is going to

16  potentially sentence him to death.  So he wants to have a

17  chance at surviving.

18      To Mr. Weiner's point regarding aid and assist.

19  Mr. Weiner left out one evaluation.  The evaluation report

20  of Dr. Kennemer (Kordell Kennemer), who is a

21  neuropsychiatrist, particularly trained in dealing with

22  neurological conditions, such as those that Mr. Mee has.

23  He, in addition, to Dr. Grinnell [verbatim] at the State

24  Hospital, who is not so trained, evaluated Mr. Mee, and

25  concluded that Mr. Mee was not fit to proceed, and did not

25

1   raise the same concerns regarding the -- the symptoms being,

2   you know, wholly invented or -- or manipulated for purposes

3   of -- of this court hearing.  They are genuine symptoms per

4   the experts who -- per the experts who -- who have a

5   background in understanding neurological conditions.  And

6   that -- the -- the idea of these two competing experts is

7   the reason that there is going to be an aid and assist

8   contested hearing next month.

9           But, at the end of the day, Your Honor, the -- the

10  concerns that the State raises and urges the Court to take

11  into account are fair game for the Court to determine what

12  are the appropriate conditions under which Mr. Mee can be

13  safely in the community.  What they are not is evidence from

14  which the Court can determine that Mr. Mee is ineligible for

15  release, and must be detained prior to trial.

16          And if the Court cannot determine by clear and

17  convincing evidence that Mr. Mee is ineligible for release

18  and must be detained prior to trial, then the Court may not

19  set a bail amount that is unaffordable to him, and, thus,

20  find a backdoor to ordering him detained.  The Court must

21  not deny him the opportunity to be released on these

22  conditions in the same way that somebody who is wealthy

23  would have the opportunity.

24          THE COURT:  Okay.  So I'm -- I am going to start

25  by addressing the COVID-19 pandemic in general for the

26

1   record this afternoon.  And for the other release matters

2   that come after it, I will simply adopt my statements from

3   this portion, and only add to it as necessary.

4           I'll start by saying that, as the judge who has

5   volunteered to be, at lack, doing this docket until further

6   notice, and who goes inside the jail on nearly a daily

7   basis, I have stayed well apprised of the efforts that are

8   going on within the Washington County Jail and my courtroom,

9   as well as the -- basically, surrounding the system, in

10  general.

11          I can suggest that your talks earlier, while

12  incorporating some facts, also include a lot of conjecture

13  and speculation about what is going on.  At this point in

14  time, the Washington County Jail, I believe, is still now

15  below 500 inmates.  As of Monday, there were at least 60

16  additional inmates that were released, on top of the normal

17  number that would typically be released from the jail.

18          All the law enforcements agencies in the county

19  are acting to not arrest people and book people into the

20  jail for anything but serious-level offenses.  Most matters

21  are being asided to avoid adding to the numbers in the jail.

22          All of Pod 1, which would be the only pod that has

23  the multiple-bunk jail spaces, is empty.  There are no

24  inmates that are sharing cells at this time.

25          Additionally, there have been no positive COVID

27

1  cases in the jail, and I have no information to believe that

2  there is concern that there is someone actively awaiting a

3  result; although, I don't -- you know, up to the minute on

4  that.  I certainly know that that was something that will

5  fluctuate over time.

6         What I can say is that inmate work crews are

7  actively sanitizing the jail pretty much around the clock,

8  and they're doing so in my own courtroom prior to us having

9  court appearances in the morning and after we're done.

10        So I will note that you mentioned testing taking

11 place in the jail, and suggested that that was a concern.

12 What it suggests to me is that unlike a vast majority of our

13 society right now, if you are in the jail and you are

14 showing symptoms, you may have a higher likelihood of

15 actually receiving a test.

16        I know that the jail is taking active measures to

17 ensure that anyone who is ill is being cared for to the best

18 of their ability, and to make sure that any sort of

19 quarantine-type set-up can be managed within the medical

20 observation unit.  So they're taking any sort of

21 symptomology very seriously.  And I know that they are

22 actively working to reduce the jail population, and maintain

23 it at a safe number.

24        What I hear proposed today, and I will note that

25 the sanitizing that they are doing uses EPA disinfectants.

28

1  There is still hand sanitizer and soap, and, proactively

2  making sure that we are maintaining fewer people at any

3  given time, even here in the courtroom and in the tank where

4  the inmates are brought, including staggering court

5  appearances to ensure that social distancing can take place.

6          Again, where I was going a moment ago is that your

7  plan at this point for Mr. Mee involves trying to find him a

8  better care facility.  I'm not sure that care facilities are

9  particularly safe places for people who have the issues that

10 you've talked about Mr. Mee having.  Whether or not he has

11 certain issues or not, I do believe that he has some health

12 conditions that likely do put him at a higher risk than some

13 of the population; although, his age is not one of them.

14         But currently in our community, unlike inside

15 Washington County Jail, there are, apparently, positive

16 tests happening on a regular basis outside, and care

17 facilities are one of the places that have been really

18 rampant with outbreaks of this type of illness.  So I'm not

19 sure that your plan is necessarily looking just at the

20 COVID-19 concerns, particularly provably better than the

21 situation that Mr. Mee finds himself in.

22         In terms of looking at what the risk factors are.

23 In general, I'm going to continue to adopt the chief

24 justice's definitions for those purposes, and at this point

25 in time, the chief justice has stated that social distancing

STATE OF OREGON v. JAYSON ROBERT MEE                          19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                       3/18/2020

29

1   needs at least three feet between each participant, or

2   actively trying to ensure that we have six feet between

3   people.

4          In terms of high risk, she's adopted the person 16

5   and older, persons with underlying health conditions,

6   including heart disease, lung disease, or diabetes, persons

7   with weakened immune symptoms, and persons who are pregnant,

8   as the list of concerns.

9          In terms of the public safety concerns in this

10  particular case.  The allegations here demonstrate or

11  provide concern for the safety of community members, in

12  particular, the allegations that this defendant took

13  advantage of a close relationship in these circumstances and

14  the severity of the crimes that are alleged are also

15  extremely concerning to me.

16         That being said, I don't necessarily think that he

17  is a flight risk, and I don't necessarily -- I don't believe

18  that he's someone who has significant means to impose the

19  security of what would be $125,000.

20         Knowing all of that and, specifically, because of

21  just simply how high the security is currently set, I will

22  reduce security.  I will reduce security to 250,000, post

23  10 percent, but I am adding conditions to that.

24         For Mr. Mee to be released, I want to know that he

25  has a bed at a care facility.  I'm not going to release him

STATE OF OREGON v. JAYSON ROBERT MEE                          19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                        3/18/2020

30

1  without a plan of where he is going.  He's going to then

2  have to obey by the routine conditions and current with the

3  order in the case such as this one.

4          He's going to have to have no contact with the

5  victim, family of the victim, and any witnesses.  He'll have

6  to sign a no-contact with minors addendum, and he'll also

7  need to be on house arrest at that care facility.  So he

8  will not be able to leave that residence, other than for

9  counseling, treatment, medical and legal purposes, period.

10          Any other conditions that the State would request?

11          MR. WEINER:  No Judge, thank you.

12          THE COURT:  All right.  And that's all I have on

13  that matter, thank you.  And I will ...

14                  (End of proceedings.)

15

16

17

18

19

20

21

22

23

24

25

STATE OF OREGON v. JAYSON ROBERT MEE                                19CR32388
TRANSCRIPT OF PROCEEDINGS (3-18-2020)                               3/18/2020

31

1                         REPORTER'S CERTIFICATE

2              I, Chantell S. Halsted, a Court Reporter and

3     Notary Public in and for the State of Oregon, certify that I

4     transcribed in stenotype the foregoing proceedings from the

5     record provided to me on data CD in the above-entitled case;

6              I further certify that my stenotype notes were

7     reduced to transcript form by Computer-Aided Transcription

8     under my direction;

9              And I further certify that pages 1-31 contain a

10    full, true, and accurate record of my stenotype notes.

11             Witness my hand at Portland, Oregon, this 4th day

12    of June, 2020.

13             _____

14             Chantell S. Halsted
               Notary Public No.: 991529
15             My Commission Expires: 09-08-2023

16

17

18

19

20

21

22

23

24

25