IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **VERNON RASMUSSEN**, **ERIC RANEY**, **JAYSON MEE**, **JULIO VILLEDA**, **AARON GILLIHAN**,<br><br>Petitioners,<br><br>v.<br><br>**PAT GARRETT**,<br><br>Respondent. | Case No. 3:20-cv-00865-IM<br>3:20-cv-00889-IM<br>3:20-cv-00899-IM<br>3:20-cv-00901-IM<br>3:20-cv-00912-IM<br><br>**OPINION AND ORDER** |

**IMMERGUT, District Judge.**

Petitioners Vernon Rasmussen ("Rasmussen"), Eric Raney ("Raney"), Jayson Mee ("Mee"), Julio Villeda ("Villeda"), and Aaron Gillihan ("Gillihan") (collectively, "Petitioners"), pretrial detainees in custody at the Washington County Jail, bring this consolidated[1] habeas corpus action pursuant to 28 U.S.C. § 2241("Section 2241").[2] Petitioners allege they are in custody in

_____

[1] The Court granted Petitioners' Motion to Consolidate on June 16, 2020 (ECF No. 13).

[2] The Court takes judicial notice of the Oregon Circuit Court docket in *State of Oregon v. Aaron Michael Gillihan*, 19CR67114, which indicates that Gillihan entered a plea of guilty in the underlying criminal case on August 13, 2020, and was sentenced to thirty-two months in custody. Accordingly, Gillihan's petition is denied as moot. *See Burnett v. Lampert*, 432 F.3d 996, 1000–01 (9th Cir. 2005) (holding that where a petitioner "seeks relief [that] cannot be redressed by a

violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment because the state trial court set bail in an amount they cannot afford without properly finding that they present a flight risk or pose a danger to the community. Petitioners seek a conditional writ of habeas corpus ordering their release unless the state trial court provides new bail hearings and makes constitutionally valid findings that their detention is required. Respondent opposes the petitions, and moves to join the State of Oregon as a necessary party. For the reasons that follow, the Court DENIES Respondent's motion to join the State of Oregon as a necessary party to this action, DENIES the Petitions for Writ of Habeas Corpus, and DISMISSES this action with prejudice.

**Background**

I.      **Pretrial Release in Oregon**

The Oregon Constitution contains two sections pertaining to pretrial release: sections 14 and 43 of article I ("section 14" and "section 43", respectively). Section 14, which dates from the adoption of the state constitution, provides that all offenses "shall be bailable by sufficient sureties," except murder and treason. Or. Const. art I, s 14. Section 14 thus "establishe[s] pretrial release as a right in Oregon, distinct from the federal system." *State v. Slight*, 301 Or. App. 237, 245 (2019) (citing *Priest v. Pearce*, 314 Or. 411, 417 (1992)). The Oregon Constitution further guarantees that for offenses deemed bailable under section 14, the surety required to secure an individual's release shall not be "excessive." Or. Const. art I, s 16.

---

favorable decision of the court issuing a writ of habeas corpus," the petition is moot (internal citations and quotation marks omitted)).

Section 43, which Oregon voters adopted in 1999, confers to designated crime victims "[t]he right to have decisions of the court regarding the pretrial release of a criminal defendant based upon the principle of reasonable protection of the victim and the public, as well as the likelihood that the criminal defendant will appear for trial." Or. Const. art. I, s 43(1)(b). Notably, Section 43 provides that "violent felonies shall not be bailable" if the court determines "there is probable cause to believe the criminal defendant committed the crime, and the court finds, by clear and convincing evidence, that there is a danger of physical injury or sexual victimization to the victim or members of the public by the criminal defendant while on release." *Id.* As defined by section 43, a "violent felony" is one in which "there was actual or threatened serious physical injury to a victim or a felony sexual offense." *Id.*

"Oregon's statutory scheme for pretrial release—ORS 135.230 through ORS 135.290— was created in furtherance of [sections 14 and 43]," and provides for three types of pretrial release for bailable offenses: personal recognizance, conditional release, and security release. *Slight*, 301 Or. App at 246–47; O.R.S. 135.230(2), (6), (12); O.R.S. 135.260; O.R.S. 135.265. An individual released on personal recognizance is not required to meet any conditions, financial or otherwise, to secure his or her release, but must "promise . . . to appear in court at all appropriate times." O.R.S. 135.230(6). In contrast, conditional release allows for release with "regulations on the activities and associations of the defendant," and security release conditions a defendant's release "on a promise to appear in court at all appropriate times which is secured by cash, stocks, bonds or real property." O.R.S. 135.230(2), (12).

Under the statutory release scheme, the court first must determine whether the defendant is eligible for release. A defendant's release eligibility is governed by O.R.S. 135.240. *See also Slight*, 301 Or. App. at 249 (noting that Oregon's statutory release scheme provides "a mechanism

by which [any type of] release for a certain category of charged crimes . . . can be denied based upon an evidentiary determination"). The statute directs that if the defendant is charged with a violent felony — "a felony offense in which there was an actual or threatened serious physical injury to the victim, or a felony sexual offense" —the presiding magistrate must deny release if she finds: (1) that probable cause exists to believe that the defendant committed the crime, which can be demonstrated by an indictment; and (2) clear and convincing evidence indicates that the defendant presents a danger of physical injury or sexual victimization to the victim or members of the public if released. O.R.S. 135.240(4)(a).

A determination that an individual defendant is releasable under O.R.S. 135.240(4) "can occur entirely on paper, or, at a defendant's request, can occur following a hearing." *Slight*, 301 Or. App. at 248; *see also* O.R.S. 135.240(4)(b) (instructing that an individual charged with a violent felony is entitled to a hearing on the issue of release if he so requests). If a hearing is requested, the burden is on the state to produce evidence that release should be denied, but the defendant has the right to present evidence "on any relevant issue." O.R.S. 135.240(4)(c), (d). The defendant also may be represented by counsel. O.R.S. 135.240(4)(d). Absent a proper finding pursuant to the inquiry above, a presiding magistrate lacks authority to deny release, and must make a release decision using the primary release criteria. *Slight*, 301 Or. App. at 249. Recognizance release, however, may not be granted to those charged with violent felonies. Instead, the court must "set security or other appropriate conditions of release." O.R.S. 135.240(4)(e).

If the defendant is eligible for release, the presiding magistrate then must make a "release decision" — "a determination . . . using primary and secondary release criteria [to] establish[] the form of the release most likely to ensure the safety of the public and the victim, the defendant's court appearance and that the defendant does not engage in domestic violence while on release."

PAGE 4 – OPINION AND ORDER

O.R.S. 135.230(10); *See also Slight*, 301 Or. App. at 247 (noting that statutory release criteria "guide the magistrate's decision making as to what *form* of release — recognizance, security, or conditional — is most appropriate, and if conditional release, what conditions are best suited" under the circumstances). Personal recognizance is "the default presumptive form of release" for all bailable offenses except violent felonies. *Slight*, 301 Or. App. at 247. An individual thus "shall be released upon personal recognizance unless . . .[the statutory] [r]elease criteria show to the satisfaction of the [court] that such release is unwarranted[.]" O.R.S. 135.245(3)(a); *see also Gillmore v. Pearce*, 302 Or. 572, 589 (1987) (noting that in determining the appropriate form of release, "the first decision for the judge to make was whether to release plaintiff on his own recognizance"). The presiding magistrate therefore must decide whether recognizance release is appropriate for a given defendant by considering the primary release criteria:

> (1) the reasonable protection of the victim or public;
>
> (2) the nature of the current charge;
>
> (3) the defendant's prior criminal record, if any, and, if the defendant previously has been released pending trial, whether the defendant appeared as required;
>
> (4) any facts indicting the possibility of violations of law if the defendant is released without regulations; and
>
> (5) any other facts tending to indicate that the defendant is likely to appear.

O.R.S. 135.230(7)(a)–(e). The presiding magistrate also may consider any of the secondary release criteria:

> (1) the defendant's employment status and history and financial condition;
>
> (2) the nature and extent of the family relationships of the defendant;
>
> (3) the past and present residences of the defendant;

(4) names of persons who agree to assist the defendant in attending court at the proper time; and

(5) any facts tending to indicate that the defendant has strong ties to the community

O.R.S. 135.230(11)(a)–(e).

If, upon consideration of the statutory release criteria, the presiding magistrate determines personal recognizance is not appropriate, she must impose either conditional release or security release. O.R.S. 135.245(4). In selecting an alternative to recognizance release, however, the presiding magistrate must impose "the least onerous condition reasonably likely to ensure the safety of the public and the victim and the person's later appearance and, if the person is charged with an offense involving domestic violence, ensure that the person does not engage in domestic violence while on release." O.R.S. 135.245(3); *see also Cooper v. Burks*, 299 Or. 449, 451 (1985) (en banc) (noting that "the ascending degrees of onerous conditions begin with release upon personal recognizance, move to conditional release, and, finally, end with a security release"). Thus, if she determines conditional release also is not appropriate, or if the individual fails to agree to the provisions of a conditional release, the presiding magistrate must set security. O.R.S. 135.265(1). A defendant then must post ten percent of the security amount to secure his release. O.R.S. 135.265(2).

Generally, "the amount of bail is committed to the sound discretion of the court and its decision will not be disturbed except in a clear case of abuse of discretion." *Delaney v. Shobe*, 218 Or. 626, 628 (1959). That is not to say that the court may intentionally set security in an amount "so as to make it impossible, as a practical matter, for a prisoner to secure release." *Gillmore*, 302 Or. at 580 (noting that preventative detention is not authorized by the statutory release scheme). Rather, "the total amount of security to be posted must be no more than is necessary to reasonably assure the attendance of the person charged at trial." *Id.*; *see also* O.R.S. 135.265(1) (instructing

that a presiding magistrate must set a security amount "that will reasonably assure the defendant's appearance"). In determining the amount necessary to reasonably ensure a defendant's appearance, the presiding magistrate must "take into consideration such matters as the nature of the defendant, the nature of the offense and the possible penalties which could be imposed if the defendant were convicted." *Gillmore*, 302 Or. at 580. The Oregon Supreme Court described these considerations in explicit detail in *Delaney v. Shobe*, concluding that the following factors should inform the decision to set bail in a specific amount: "(1) ability of the accused to give bail, (2) nature of the offense, (3) penalty for the offense charged, (4) character and reputation of the accused, (5) health of the accused, (6) character and strength of the evidence, (7) probability of accused appearing at trial, (8) forfeiture of other bonds, (9) whether the accused was under bond in other cases, and (10) whether the accused was a fugitive from justice when arrested." 218 Or. at 628. It is well established, however, that the defendant's inability to afford a security amount set in accordance with the appropriate factors is not evidence that the amount necessarily is excessive. *See Gillmore*, 302 Or. at 581 (holding that while "on the high side," a $203,000 security amount the defendant could not afford was not excessive because "a trial judge would be entitled to conclude that a criminal defendant faced with [a thirty-year prison sentence] would be under enormous pressure to flee and, therefore, a significant security amount needed to be set").

"Notwithstanding any other provision of law," if a defendant is charged with a "Measure 11" offense,[3] the presiding magistrate "shall set a security amount of not less than $50,000," unless she determines that such amount is unconstitutionally excessive. O.R.S. 135.240(5)(a); *see also State v. Sutherland*, 329 Or. 359 (1999) (en banc) (holding O.R.S. 135.240(5) "is not facially

---

[3] Measure 11 offenses are those that, under a ballot measure approved by Oregon voters in 1994, carry lengthy mandatory prison sentences. Ballot Measure 11 (1994). Measure 11 is codified at O.R.S. 137.700 and O.R.S. 137.707.

unconstitutional under the Oregon or United States Constitutions," because "Measure 11 defendants may challenge the constitutionality of the minimum security release amount . . . on an as-applied basis and may request a hearing before the trial court for the purpose of challenging the propriety of imposing that or a higher amount"). For Measure 11 offenses, many of which also constitute "violent felonies" under Oregon's statutory release scheme, a presiding magistrate "may not release the defendant on any form of release other than a security release." *Id.* In addition to the required security condition, the presiding magistrate also may impose "any supervisory condition deemed necessary for the protection of the victim and the community." O.R.S. 135.240(4)(e).

## II.    The Individual Release Determinations

### A.    Rasmussen

On February 25, 2020, a Washington County grand jury returned an indictment charging Rasmussen with two counts of Rape in the First Degree; two counts of Unlawful Sexual Penetration in the First Degree; and four counts of Sexual Abuse in the First Degree. Case No. 3:20-cv-00865, Pet. (ECF No. 1) ("Rasmussen Pet."), App'x at 1–2. All charges in the indictment are felonies arising from Rasmussen's alleged sexual abuse of a child under the age of twelve, and all are Measure 11 offenses requiring the imposition of mandatory minimum sentences if he is convicted. *Id.* Each count of Rape and Unlawful Sexual Penetration carries a mandatory minimum custodial sentence of 300 months. O.R.S. 137.700(2)(b)(D), (F). The remaining charges, four counts of Sexual Abuse, carry a mandatory minimum custodial sentence of 75 months each upon conviction. O.R.S. 137.700(2)(a)(P). Based on these charges, the arrest warrant listed an initial security amount of $2,000,000 to secure Rasmussen's release. Rasmussen Pet., App'x at 3.

With the assistance of counsel, Rasmussen filed a motion in the Washington County Circuit Court (the "trial court") seeking release on his own recognizance, or in the alternative, a reduction of the security amount. Rasmussen Pet., App'x at 6–12. In the motion, Rasmussen argued that the statutorily required $50,000 minimum security amount should not apply in his case because it was unconstitutionally excessive. *Id.* at 8–9. Further, Rasmussen asserted that any bail amount that he could not afford was unconstitutional, absent a showing by clear and convincing evidence that withholding release was necessary, because setting an unattainable bail amount had the practical effect of functioning as a detention order. *Id.* at 9. Rasmussen thus argued that in order to set bail in excess of an amount he could afford to pay, the trial court must find by clear and convincing evidence that he poses a danger to the community or a risk of flight. *Id.* at 11.

On March 18, 2020, the trial court[4] held a hearing on the motion. Rasmussen called no witnesses, but submitted an affidavit detailing his criminal history, ties to the community, and indigency. *Id.* at 14. Through counsel, Rasmussen argued that the charges against him, though serious, detailed alleged conduct that was decades old. Rasmussen, Decl. of Elmer M. Dickens (ECF No. 18) ("Dickens, Decl"), Ex. 3 at 6. Rasmussen further explained that he had not been in contact with the victim since that time — save a single chance encounter — and that he had neither the means nor desire to contact the victim moving forward. Dickens Decl., Ex. 3 at 5–6; Rasmussen Pet., App'x at 14–15.

Rasmussen acknowledged, however, that his criminal history included numerous convictions for felony or misdemeanor drug and property offenses between 1997 and 2010, but argued that at least a decade had elapsed since his most recent conviction, and that the nature of

---

[4] Oregon Circuit Court Judge Rebecca Guptill presided over each Petitioner's respective release hearing.

his crimes did not suggest future violence. Dickens Decl., Ex. 3 at 5–6; Rasmussen Pet., App'x at 14. Rasmussen also conceded that he had a history of failure-to-appear offenses, failing to appear as ordered eight times between 1997 and 2012. Dickens Decl., Ex. 3 at 5; Rasmussen Pet., App'x at 14. This history notwithstanding, Rasmussen argued that several factors mitigated his risk of flight, including his status as a long-term Oregon resident; a five-year stable housing history with his wife, who consented to serve as a responsible supervising party upon Rasmussen's release; the recent birth of his child; and immediate family living in Forest Grove, Oregon. Dickens Decl., Ex. 3 at 7; Rasmussen Pet., App'x at 15. Notably, Rasmussen explained that he had no income and limited assets, and claimed he could not "honestly afford any bail amount" to secure his release. Dickens Decl., Ex. 3 at 7; Rasmussen Pet., App'x at 15. Rasmussen thus urged the trial court to reduce the security amount to an amount he could afford — zero — and to impose whatever conditions the trial court deemed necessary given the allegations and the evidence in the record. Dickens Decl, Ex. 3 at 7.

In opposition, the State argued that while the case involved historical allegations of abuse, Rasmussen admitted to touching the victim multiple times when she was between the ages of eight and twelve years old, and admitted to writing down sexual fantasies involving the victim in his journal. *Id.* at 9. In addition to the numerous failure-to-appear offenses, the State noted that Rasmussen had "many, many instances of probation violations," suggesting that he "is not somebody who is particularly inclined to follow Court orders[.]" *Id.* The alleged victim did not appear at the hearing to oppose release, but the State relayed that she had been contacted, that she had expressed deep concern about Rasmussen's potential release, and that she was "still extremely traumatized by the abuse." *Id.* at 10. Based on Rasmussen's criminal history, particularly his demonstrated failure to comply with court orders, the State argued that the trial court should be

concerned about whether Rasmussen would appear for trial or follow the conditions of his release, and that the security amount was appropriate given the seriousness of the charges. *Id.* The State submitted no additional evidence to supplement the evidence in the record.

In rebuttal, Rasmussen did not deny making admissions concerning the charges leveled against him, but instead argued that such admissions were the product of coercive interview tactics. *Id.* at 11–12. He reiterated that if the State wished to hold him ineligible for release, it must "put forward actual evidence from which the Court [could] find by clear and convincing evidence that it is inappropriate to release him," and that requesting an unaffordable security amount was akin to requesting a "detention order through the back door." *Id.* at 11. Rasmussen thus argued that absent the State's demonstration by clear and convincing evidence that release would be inappropriate, the imposition of a security amount that he could not afford was unconstitutional. *Id.*

The trial court considered the evidence in the record and imposed conditions on Rasmussen's release as follows:

> In terms of the . . . things that I'm considering, [Rasmussen] has a significant history of failure to appear and reasonably significant criminal history. The allegations in this case are serious. I do find that he does not have significant assets. Certainly[,] his security is incredibly high at this point in time, and he does have ties to the community, having a wife and a newborn at home. It sounds as though the wife is going to be a responsible party [if he is released].
>
> What I'm going to order is that security is reduced to 250,000, post 10 percent. I'm adding the requirement of responsible party approved by the release office. There can be no contact with the victim, family members of the victim, or any witnesses to this. He'll have to sign by -- sign a no-contact-with-minors addendum, with the one exception being his newborn baby. Other conditions the release office would recommend. Oh, yeah, no alcohol, no marijuana, no drugs, no possession of any pornography.

> Yeah, so you will be under house arrest. You can leave the house
> specifically for legal, medical, court, and treatment matters, and
> I'll want you to be accompanied by the responsible party for any of
> those purposes.

*Id.* at 13. The trial court thus required Rasmussen to post $25,000 to secure his release. *Id.*

Rasmussen subsequently petitioned the Oregon Supreme Court[5] for a writ of mandamus or habeas corpus, raising the same constitutional arguments asserted in the trial court. Rasmussen Pet., App'x at 64–122. The Oregon Supreme Court summarily denied the petition on May 21, 2020. *Id.* at 63. Unable to post bail, Rasmussen remains in custody awaiting trial.

**B.      Raney**

On December 4, 2019, a Washington County grand jury returned an indictment charging Raney with two counts of Assault in the Second Degree constituting Domestic Violence; two counts of Assault in the Fourth Degree constituting Domestic Violence; and one count of Unlawful Use of a Weapon. Case No. 3:20-cv-0089-IM, Pet. (ECF No. 1) ("Raney Pet."), App'x, at 2. The charges in the indictment arose from Raney's alleged assault of his wife in front of a minor child. *Id.* Assault in the Second Degree is a Measure 11 offense, and each count carries a mandatory minimum custodial sentence of 90 months upon conviction. O.R.S. 137.700(2)(a)(F). On December 5, 2019, a warrant issued for Raney's arrest, which set a security amount of $275,000 based on the charges in the indictment. Raney Pet., App'x, at 1. On February 18, 2020, law enforcement took Raney into custody. *Id.*

With the assistance of counsel, Raney filed a motion in the trial court seeking release on his own recognizance, or in the alternative, a reduction of the security amount. *Id.* at 6. Like

---

[5] Although there is no limit to seeking reconsideration of bail determinations in the Oregon Circuit Court, there is no mechanism to appeal bail determinations to a higher court, apart from seeking a writ of mandamus or habeas corpus to the Oregon Supreme Court.

Rasmussen, Raney argued that the $50,000 minimum security amount statutorily required for Measure 11 offenses should not apply in his case because it was unconstitutionally excessive. *Id.* at 7–8. Raney also asserted that any bail amount that he could not afford was unconstitutional, absent a showing by clear and convincing evidence that withholding release was necessary, because an unattainable bail amount functioned as a detention order. *Id.* at 8–10. Raney thus argued that in order to set bail in excess of an amount he could afford to pay, the trial court had to find by clear and convincing evidence that he poses a danger to the community or a risk of flight. *Id.* at 10.

On March 17, 2020, the trial court held a hearing on the motion. Raney called no witnesses, but submitted a declaration detailing his criminal history, his ties to the community, his indigency, and his inability to pay bail in the amount set. *Id.* at 12–13. The declaration also confirmed Raney's willingness to abide by any reasonable conditions of release, and named a responsible party with whom he would reside if released. *Id.* at 12. Through counsel, Raney argued that his prior criminal history was limited, consisting of only two convictions for driving while under the influence in 2012 and 2017, and three convictions for driving while suspended in 2013, 2018, and 2019. *Id.* at 38. Raney also acknowledged a previous history of failing to appear on two separate occasions, but argued that he turned himself in to police in both instances. *Id.* Raney requested release without a monetary bail condition, explaining that he was unemployed, had negative funds in his bank accounts, and had no "access to any money whatsoever himself." *Id.* at 37. In the alternative, Raney requested release to seek treatment for alcohol dependence through the Department of Veterans Affairs, and stated that he could not do so if he remained in custody. *Id.* at 39–40.

In response, the State detailed the reported facts of the case before reading into the record a statement from the alleged victim. *Id.* at 40–42. In the statement, the victim emphasized that

despite his assurances to law enforcement that he would turn himself in, "[Raney] avoided arrest

and the consequences for his actions for over three months." *Id.* at 42. The victim also stated that

Raney lacked resources and ties to Oregon. *Id.* at 43. Noting that Raney had family out of state,

the victim believed that he might flee to avoid prosecution. *Id.* at 43. Additionally, the victim

expressed "fear[] for [her] safety and for the safety of [her] two children and extended family,"

and ultimately urged the trial court to deny release:

> [Raney] has shown no remorse for his actions, and has indicated on
> multiple occasions via text message that he is a danger to himself.
> He is a violent and manipulative individual, particularly when
> abusing alcohol, who has previously shown blatant disregard for
> the law and the punishments imposed by the Court. He has also
> shown a disregard for the consequences of his actions or the
> turmoil he has caused in the lives of those around him. Please do
> not grant him the privilege of release from custody prior to trial.

*Id.* 43–44.

In rebuttal, Raney argued that any safety concerns would be appropriately addressed by

imposing conditions on his release, not by setting a bail amount which he could not afford. *Id.* at

45. The trial court then invited Raney to share anything else he wished to be considered. *Id.* at 47.

Raney acknowledged his struggles with alcoholism and expressed his commitment to treatment

for alcohol dependence if released. *Id.*

The trial court then ruled on the record:

> So at this point in time, I am going to reduce security. I'm not
> going to go below the 50,000 [statutory minimum], however.
>
> Prior to this incident, you were working full time making $27 an
> hour. I do understand that you're indigent and that you certainly
> cannot afford to pay 275,000, the 10 percent of that, but I am going
> to reduce it to 50,000, post 10 percent, plus a SCRAM monitoring
> bracelet. That's an alcohol monitoring bracelet that you'll have to
> wear.

> I am going to require a responsible party approved by the release office . . . . I'm going to require that you reside with him whenever you're not in an inpatient treatment facility. I'm not specifically going to order that he enter into the VA inpatient because I understand that there might not be a bed available immediately depending on circumstances, and it could be that a bed at a different facility is more appropriate.
>
> It also could be that you don't qualify for the inpatient bed for whatever reason, at which point I would want you to immediately get into an intensive outpatient treatment program, and provide proof to the release office and sign any releases necessary.
>
> You'll be on house arrest when you're not in treatment. You'll have to obey all house rules. You may only leave the residence for work, legal, medical treatment, or counseling matters. You may not leave the residence unless you're with that responsible party except to go to and from work, so that responsible party has to be with you at all other times, including at court.
>
> You may not possess or consume alcohol, marijuana, illegal drugs or dangerous weapons, and you may not have contact with the victim, victim's family, or any witnesses. In addition, you also have to abide by any terms in . . . the protective order proceeding.

*Id.* at 48–50. Unable to post the reduced bail amount, Raney remained in custody.

Raney subsequently filed a motion to reconsider the reduced security amount upon the emergence of the COVID-19 pandemic. *Id.* at 19–27. In the motion, Raney argued that he faced a heightened risk of contracting COVID-19 while in custody, and renewed his constitutional arguments concerning the imposition of a bail amount that he could not afford. *Id.* At a hearing on the motion on April 2, 2020, Raney, through counsel, informed the trial court that he suffers from Chronic Obstructive Pulmonary Disease, a lung condition that increases his risk of complications if he contracts COVID-19, and reiterated that he could not pay the amount required for his release. *Id.* at 60–62. Raney again asked the trial court to reduce his bail amount to zero. *Id.* at 61.

The State repeated the factual allegations underlying the charges, and recounted the substance of the victim's previous statement opposing release. *Id.* at 63–65. "[R]est[ing] on the

record" from the prior hearing, the State argued that the statutory minimum bail amount was "completely appropriate given [Raney's] history, [and] given the danger posed to the victim in this case." *Id.* at 65. The victim then addressed the court by phone, and opposed further reduction of the security amount in light of "the severity of the situation." *Id.* at 66.

Raney refuted the State's arguments, insisting that he did not pose a flight risk. *Id.* at 70. Raney also expressed a desire to volunteer in the fight against COVID-19, work he could not do if incarcerated. *Id.* at 63, 70. In closing, Raney urged the trial court to find the statutory minimum bail amount unconstitutional as applied, and argued that he "has the right to release, [that] he has the right to bail that he can afford, and [that] the $50,000 currently set is tantamount to no bail based on his financial circumstances." *Id.* at 68.

The trial court ruled on the record, in relevant part:

> So at this point in time, I am not compelled, that this -- that my original release order needs to be modified. It was a significant reduction from the 250,000, post 10 percent, down to 50,000, post 10 percent, and I don't believe that the conditions currently in the jail, combined with [Raney's] high-risk condition, are poor enough or concerning enough at this time to require a finding of the 50,000, post 10 percent, to be unconstitutional.

> That being said, I appreciate the comments that have been made, and the one change that I am going to make to my previous order is, I am going to allow the defendant, if he is able to arrange his release based on those conditions, I will allow specifically volunteer work, in addition to paid work, as something that you can participate in, if you are in fact released.

> I will note, part of me wants to say release to an inpatient treatment situation, there would be logistical difficulties with that, but that type of a situation is arguably not necessarily any safer for someone with an underlying health condition at this time. So I did consider that as a possibility, in terms of my thought process, but I don't find that that would be a safer alternative at this time.

> So again, I appreciate the concerns here and I appreciate certainly the health concerns that you have, and your comments, sir, but at

PAGE 16 – OPINION AND ORDER

> this point in time I am going to maintain the previous order without
> [sic] one change.

*Id.* at 71–72.

Raney subsequently petitioned the Oregon Supreme Court for a writ of mandamus or habeas corpus, raising the same constitutional arguments asserted in the trial court. Raney Pet., App'x at 81–139. The Oregon Supreme Court summarily denied the petition on May 21, 2020. *Id.* at 140. Unable to post the $5,000 bail amount required to secure his release, Raney remains in custody awaiting trial.

### C.      Mee

On May 15, 2019, a Washington County grand jury returned an indictment charging Mee with two counts of Sodomy in the First Degree; two counts of Using Child in Display of Sexually Explicit Conduct; and one count of Sexual Abuse in the First Degree. Case No. 3:20-cv-00899-IM, Pet. (ECF No. 1) ("Mee Pet."), App'x at 1–2. All charges in the indictment arose from Mee's alleged sexual abuse of a child under the age of twelve, and all are Measure 11 offenses that carry mandatory minimum custodial sentences upon conviction: 300 months for each count of Sodomy, 70 months for each count of Using Child in Display of Sexually Explicit Conduct, and 75 months for the single count of Sexual Abuse. *Id.*; O.R.S. 137.700(2)(a)(P); (2)(b)(B), (E). On May 16, 2019, a warrant issued for Mee's arrest, setting an initial security amount of $1,250,000 based on the charges in the indictment. Mee Pet., App'x at 4. Law enforcement took Mee into custody the next day. *Id.* at 5.

With the assistance of counsel, Mee filed a motion in the trial court seeking release on his own recognizance, or in the alternative, a reduction of the security amount required to secure his release. *Id.* at 8. In the motion, Mee argued that the initial bail amount was unconstitutional as

applied, and that any bail amount in excess of what he could afford was unconstitutional. *Id.* at 8–12.

The trial court held a hearing on the motion on March 18, 2020. At the hearing, Mee presented no witnesses, but submitted into evidence a declaration that set forth his indigency, lack of criminal history or failure-to-appear offenses, ties to the community, and medical history. *Id.* at 16–17. Mee also submitted documentation concerning the COVID-19 health crisis, its impacts in Oregon, and the various protocols implemented in the Washington County Jail to prevent the spread of the disease. Through counsel, Mee informed the trial court that he suffers from numerous health problems, such as HIV and multiple neurological diseases, that have left him confined to a wheelchair, and have rendered him particularly vulnerable to severe infection if he contracts COVID-19. Dickens Decl., Ex. 5 at 13. Mee argued that due to his health, he was "not in a position to . . . flee . . . [or] to pose a danger to anyone" if released, and noted that he had no criminal history and no history of failing to appear. *Id.* at 16. Mee also emphasized that he had no income, no appreciable assets, and had been living in a care facility for four months prior to his arrest and incarceration. *Id.* Mee thus urged the trial court to reduce the security amount to zero, and proposed alternative, non-monetary conditions of release. *Id.* at 15–16.

In response, the State presented the testimony of the alleged victim's father, who read a prepared statement to the court. *Id.* at 18. He described Mee's position of trust within the victim's family, and how Mee allegedly used that position to "groom" the victim. *Id.* at 19. He also described the trauma inflicted on the victim by the abuse, and his fear that the psychological damage could have long-lasting effects. *Id.* at 20. The victim's father warned that Mee's release would inflict "psychological terror" on the family, and that such terror would be "dire." *Id.* He also speculated that Mee would attempt to take his own life if released, noting Mee's previous online

fundraising efforts to obtain payment for assisted suicide. *Id.* at 21. The victim's father urged the court to deny any reduction in the bail amount to ensure Mee would be tried for his crimes. *Id.*

The State thus argued that Mee had been, "in some sense," a stepfather to the victim, and had taken advantage of that position of trust to sexually abuse a child. *Id.* at 22. The State also pointed to several evaluations of Mee's ability to aid and assist his defense, one of which allegedly "demonstrate[d] a significant degree of manipulation and disingenuousness" on Mee's part. *Id.* at 22–23. Given Mee's propensity for manipulation and the severity of the charges, the State argued that "the Court should have very grave concerns about releasing this individual into . . . the community." *Id.* at 23.

In rebuttal, Mee admitted the State's concerns were "fair game for the Court to determine . . . the appropriate conditions under which [he could] be safely in the community," but that they did not constitute evidence from which he could be found ineligible for release. *Id.* at 25. Mee thus asserted that setting an unattainable bail amount in the absence of clear and convincing evidence that release should be withheld constituted "a backdoor" detention order, and argued that the trial court "must not deny him the opportunity to be released on these conditions in the same way that somebody who is wealthy would have the opportunity." *Id.*

The trial court made extensive findings on the record concerning COVID-19, noting that the Washington County Jail was likely safer for Mee than the assisted-living facility he would need if released. *Id.* 25–29. The trial court then addressed the various concerns raised by the State, and issued a ruling:

> In terms of the public safety concerns in this particular case. The allegations here demonstrate or provide concern for the safety of community members, in particular, the allegations that this defendant took advantage of a close relationship in these circumstances and the severity of the crimes that are alleged are also extremely concerning to me.

PAGE 19 – OPINION AND ORDER

> That being said, I don't necessarily think that he is a flight risk, and I don't necessarily -- I don't believe that he's someone who has significant means to impose the security of what would be $125,000.
>
> Knowing all of that and, specifically, because of just simply how high the security is currently set, I will reduce security. I will reduce security to 250,000, post 10 percent, but I am adding conditions to that. For Mr. Mee to be released, I want to know that he has a bed at a care facility. I'm not going to release him without a plan of where he is going. He's going to then have to obey the routine conditions . . . order[ed] in a case such as this one.
>
> He's going to have to have no contact with the victim, family of the victim, and any witnesses. He'll have to sign a no-contact with minors addendum, and he'll also need to be on house arrest at that care facility. So he will not be able to leave that residence, other than for counseling, treatment, medical and legal purposes, period.

*Id.* at 29–30.

Mee subsequently petitioned the Oregon Supreme Court for a writ of mandamus or habeas corpus, raising the same constitutional arguments asserted in the trial court. Mee Pet., App'x at 64–120. The Oregon Supreme Court summarily denied the petition on May 21, 2020. *Id.* at 121. Unable to post the $25,000 bail amount required to secure his release, Mee remains in custody while awaiting trial.

### D.    Villeda

On February 14, 2020, a Washington Country grand jury returned an indictment charging Villeda with one count of Rape in the First Degree constituting Domestic Violence; one count of Sodomy in the First Degree constituting Domestic Violence; two counts of Sexual Abuse in the First Degree constituting Domestic Violence; one count of Endangering a Person Protected by a Family Abuse Prevention Act Restraining Order; one count of Tampering with a Witness; and three counts of Assault in the Fourth Degree constituting Domestic Violence. Case No. 3:20-cv-00901, Pet. (ECF No. 1) ("Villeda Pet."), App'x at 2–4. He stands accused of sexually assaulting

his ex-wife. *Id.* Rape, Sodomy, and Sexual Abuse are Measure 11 offenses that each carry a mandatory minimum custodial sentence: 100 months for each count of Rape, 100 months for each count of Sodomy, and 75 months for each count of Sexual Abuse. O.R.S. 137.700(2)(a)(J), (2)(a)(L), (2)(a)(P). On February 14, 2020, a warrant issued for Villeda's arrest setting an initial security amount of $260,000. Law enforcement took Villeda into custody two weeks later on February 28, 2020. Villeda Pet., App'x at 4–5.

With the assistance of counsel, Villeda filed a motion seeking a reduction of the security amount required to secure his release. *Id.* at 8–13. In the motion, Villeda argued that the initial bail amount was unconstitutional as applied, and that any bail amount in excess of what he could afford was unconstitutional absent a showing by clear and convincing evidence that withholding release was necessary. *Id.* at 9–11.

On March 27, 2020, the trial court held a hearing on the motion. Villeda presented no witnesses, but submitted into evidence a declaration that set forth his indigency, criminal history and failure-to-appear offenses, and his willingness to abide by any reasonable conditions of release. *Id.* at 14–15. Through counsel, Villeda acknowledged that his detention arose from two cases — the alleged assault of his ex-wife and a probation violation. *Id.* at 21–22. Villeda conceded that his ex-wife had a no-contact order in place against him at the time of the alleged assault, but noted that they had "voluntarily been maintaining contact despite the no-contact order." *Id.* 23–24. Villeda also acknowledged that he was on probation for a previous harassment conviction at the time of the alleged assault, but argued that his criminal history otherwise was limited to five misdemeanor convictions. *Id.* at 22. Despite these issues, Villeda stressed his indigence, and argued that "the appropriate way to address victim and public safety is through conditions of release, not through preventative detention achieved by an unaffordable money bail." *Id.* at 24. In

PAGE 21 – OPINION AND ORDER

light of the current charges, the pending probation violation, and the emerging COVID-19 health

crisis, Villeda urged the trial court to reduce the security amount to the statutory minimum,

$50,000, and argued that "[a]nything above and beyond that would be tantamount to no bail" at

all. *Id.*

In response, the State detailed the "egregious" factual allegations underlying the new

charges, stressing that the assault had occurred in violation of a restraining order. *Id.* at 30–32. The

State also read into the record a statement from the victim, in relevant part:

> I'm writing this e-mail to express my fears of Mr. Villeda's release
> on bail. Mr. Villeda is [a] very smart, intelligent, yet manipulative
> individual. He's an absolute flight risk. He . . . ran and evaded
> police in this case and prior cases as well. He . . . made contact
> with me after the incident to persuade me to lie to the police and to
> cover for him.
>
> Mr. Villeda has no regard for anyone but himself.
>
> Mr. Villeda has no permanent residence or employment. Even if
> he's released on bail to a responsible party, it is my fear that they
> will not take the stipulations of release seriously.
>
> I fear for my safety. Mr. Villeda is a very vengeful person. And I
> fear retaliation as it has happened before. Mr. Villeda always
> seems to know my whereabouts, what I'm doing, and who I'm
> with. Regardless of no-contact orders, Mr. Villeda has no respect
> for the law or the rules of the release agreement. Mr. Villeda's
> release on bail would put myself at risk.

*Id.* at 31–32. Given Villeda's disregard of the no-contact order, a criminal history that included

convictions for menacing, harassment, and violation of a release agreement, and a prior failure to

appear, the State urged the trial court to forego any reduction to the security amount. *Id.* at 33, 36.

In rebuttal, Villeda suggested safety concerns regarding his release could be mitigated "by

the imposition of an ankle monitor." *Id.* at 34. Villeda also stated that as an "agency-certified

medical interpreter," he would make himself available to aid the COVID-19 response if released.

*Id.* at 36.

PAGE 22 – OPINION AND ORDER

The trial court then ruled on the record:

> Okay. So I am going to find that this particular defendant does not
> have any high-risk factors [for COVID-19]. He is not of an age
> where that would be a concern either. He does have at least a
> history of some failure to appear. I understand your explanation for
> that, sir.
>
> And these are very serious allegations. They are still at this point
> allegations. However, I certainly do have to consider the safety of
> the victim, and the public safety in general as part of my orders.
>
> I am concerned about any history of violating court orders. I do
> understand that there are other protective orders in place, or a
> protective order in place.
>
> I am going to reduce security in the [assault] case to 100,000, post
> 10 percent and add conditions. And I'm going to reduce security in
> the [probation] case to just be conditional release with special
> conditions. The conditions are going to be the same on both cases.
>
> I'm reducing the security amount specifically in light of the
> defendant's indigent status and combining that with the overall
> concerns that I have about maintaining safe conditions in the jail. I
> have already previously today found that the current conditions in
> the jail are safe.
>
> . . . .
>
> I will require a responsible person. I am going to require that to be
> approved by the jail. Reside with a responsible person. Obey all
> house rules. You will be on 24/7 house arrest. May not leave the
> residence unless you are with the responsible person. You may not
> leave the residence except for counseling, legal, medical, and
> treatment purposes. You can work, but you have to be working
> from home. You may not possess or consume alcohol, illegal
> drugs, dangerous or deadly weapons, or marijuana.
>
> You are not to have any contact with the victim, the family
> members of the victim or any witnesses.
>
> You must follow all protective orders and court orders.
>
> And I am going to require GPS monitor via Vigilnet within 72
> hours of your release. I'm only going to say it in that fashion so
> that it can be managed in terms of the current Vigilnet rules. I'm
> hopeful that with those conditions and that amount of security, that

> you will be both appearing for your court appearances and that the
> victim and community will be safe as part of that release plan.

*Id.* at 36–38

Villeda subsequently petitioned the Oregon Supreme Court for a writ of mandamus or habeas corpus, raising the same constitutional arguments asserted in the trial court. Villeda Pet., App'x at 43–98. The Oregon Supreme Court summarily denied the petition on May 21, 2020 *Id.* at 99. Unable to post the $10,000 bail amount required for his release, Villeda remains in custody awaiting trial.

## **Standard of Review**

Pursuant to section 2241, a district court is authorized to entertain the habeas petition of any individual who is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Thus, "the general grant of habeas authority in [section 2241] is available for challenges by a state prisoner who is not in custody pursuant to a state court judgment [such as] a defendant in pre-trial detention[.]." *Stow v. Murashige*, 389 F.3d 880, 886 (9th Cir. 2004) (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004)); *accord Hoyle v. Ada Cty.*, 501 F.3d 1053, 1058 (9th Cir. 2007) (holding that section 2241 is an appropriate means by which a pretrial detainee may challenge his or her detention). Where a habeas petition challenges pretrial detention under section 2241, the stringent standards required on review of challenges to the validity of a state court judgment under 28 U.S.C. § 2254 do not apply. *See Stow*, 389 F.3d at 888 (holding that a petitioner who is not in custody pursuant to a state judgment of conviction "is not required to satisfy the demanding standards of [the Antiterrorism and Effective Death Penalty Act] embodied in § 2254 to obtain habeas relief"). Instead, the Court reviews the state court's factual findings with a presumption of correctness and reviews legal conclusions *de novo*. *Hoyle*, 501 F.3d at 1058–59.

PAGE 24 – OPINION AND ORDER

<u>Discussion</u>

I.      **Respondent's Motion to Join the State as a Necessary Party**

Respondent moves to join the State of Oregon (the "State") as a necessary party to this action. The Rules Governing Section 2254 Cases, which also apply to cases arising under section 2241, do not contain a joinder provision. *See* Rules Governing Section 2254 Cases ("Rules") 1(b) (instructing that "any or all of these rules" may be applied to a habeas petition not covered by Rule 1(a)," including a habeas petition brought under section 2241). The Court therefore must look to the Federal Rules of Civil Procedure ("FRCP") to determine whether the State should be joined as a respondent in this case. *See* Rule 12 (directing that the Federal Rules of Civil Procedure may be applied to a habeas proceeding "to the extent that they are not inconsistent with any statutory provisions or these rules"); *see also* Fed. R. Civ. P. 81(a)(4) (noting that the Federal Rules of Civil Procedure "apply to proceedings for habeas corpus . . . to the extent that the practice in those proceedings . . . . is not specified in a federal statute [or] the Rule Governing Section 2254 Cases"). Whether Petitioners have named the proper respondent implicates the Court's jurisdiction in these proceedings, and therefore the Court addresses this issue before turning to the substance of Petitioners' claims.

A.      **Legal Standards**

FRCP 19 provides for mandatory joinder of parties necessary to the litigation at hand. A party is "necessary" in two narrow circumstances: (1) when complete relief cannot be afforded without the absent party's participation, or (2) when the absent party claims a legally protected interest in the proceedings. Fed. R. Civ. P. 19(a)(1)(A), (B); *see also United States v. Bowen*, 172 F.3d 682, 688 (9th Cir. 1999) (acknowledging that a party is necessary under FRCP 19 only where complete relief is unavailable without the party's presence, or where the party claims a legally

protected interest in the proceedings). If the court finds that an absent party is "necessary," it then must determine whether joinder is "feasible," that is, whether joinder would deprive the court of subject-matter jurisdiction. Fed. R. Civ. P. 19(a), (b).

If joinder is feasible, the court must order the necessary individual to be made party to the action. Fed. R. Civ. P. 19(b). If joinder is not feasible, the court must determine "whether in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.* To make this determination, the Court considers: (1) the extent to which any party would be prejudiced by a judgment rendered in the person's absence; (2) the extent to which such prejudice could be mitigated by including protective provisions in the judgment, shaping the relief, or taking other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether an adequate remedy is available to the plaintiff if the action were dismissed for nonjoinder. Fed. R. Civ. P. 19(b)(1) –(4).

B.    **Analysis**

Respondent contends that the State is a necessary party to this action because only the State has the requisite authority to "conduct[] a thorough adversarial hearing that complies with the requirements for preventative detention by the United States Supreme Court." Resp't Resp. (ECF No. 17), at 28. Additionally, Respondent argues that "the State has a concrete, real and particularized interest in defending the release hearings and orders of the State trial court," and that disposition of these proceedings in the State's absence "will impair and foreclose the State's interests and create a precedent that may adversely affect all state trial courts and state prosecutors." *Id.* at 29. Respondent thus argues that the State "is a necessary and vital party" to the cases at bar. *Id.* at 30. Petitioners respond that they do not request an order requiring the State to conduct a thorough adversarial proceeding, but rather seek an order requiring their release if such

hearings are not conducted. Rasmussen, Pet'rs' Reply (ECF No. 19) ("Pet'rs' Reply"), at 19–20 n.5.[6] Petitioners thus argue that an order requiring their release is properly directed to Respondent as their immediate custodian. *Id.* at 19–20.

The federal habeas statute instructs that a petitioner must name as respondent "the person having custody over [him]." 28 U.S.C. § 2242; *see also* 28 U.S.C. § 2243 (instructing that "[t]he writ . . . shall be directed to the person having custody of the person detained"); *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (observing that "[t]he federal habeas statute straightforwardly provides that the proper respondent to a habeas petition" is the petitioner's custodian); *Brittingham v. U.S.*, 982 F.2d 378, 379 (9th Cir. 1992) (noting that "[t]he proper respondent in a federal habeas corpus petition is the petitioner's 'immediate custodian'") (quoting *Demjanjuk v. Meese*, 784 F.2d 1114, 1115 (D.C. Cir. 1986)). A petitioner therefore must direct his habeas petition to his custodian—the individual having "'*immediate custody* of the party detained, with the power to produce the body of such party before the court or judge[.]'" *Padilla*, 542 U.S. at 435 (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)) (emphasis in original); *see also Brittingham*, 982 F.2d at 379 (noting that a custodian "'is the person having a day-to-day control over the prisoner . . . the only one who can produce the body of the petitioner'").

Failure to name the proper respondent "deprives federal courts of personal jurisdiction." *Belgarde v. Montana*, 123 F.3d 1210, 1212 (9th Cir. 1997) (citing *Stanley v. Cal. S. Ct.*, 21 F.3d 359, 360 (9th Cir. 1994)). The Supreme Court has observed that the language of the federal habeas statute generally contemplates "only one proper respondent to a given prisoner's habeas petition." *Padilla*, 542 U.S. at 434. Thus, in a habeas proceeding challenging a petitioner's current physical

---

[6] Because the page numbers affixed to Petitioners' Reply do not align with the ECF page numbers, the Court cites to the ECF page numbers to avoid confusion.

confinement, the default rule is that "the proper respondent is the warden of the facility where the [petitioner] is being held[.]" *Padilla*, 542 U.S. at 435; *see also Braden v. 30th Judicial Cir. Ct. of Ky.*, 410 U.S. 410 U.S. 484, 494–95 (1973) (noting that a writ of habeas corpus "is directed to . . . [the] jailer"); *Stanley*, 21 F.3d at 360 (stating that the proper respondent "typically is the warden of the facility in which the petitioner is incarcerated").

Petitioners properly have directed their habeas petitions to Respondent who, as the Sheriff of Washington County, administers the Washington County Jail and serves as Petitioners' immediate custodian. Respondent nevertheless urges the Court to join the State, arguing that Petitioners' cases fall within both circumstances requiring joinder under Rule 19. Relying on *Smith v. Idaho*, 392 F.3d 350 (9th Cir. 2004), Respondent first argues that he lacks authority to order the trial court to conduct a new release hearing, and therefore Petitioners cannot be afforded complete relief unless the State is party to these proceedings. Resp't Resp., at 24–25. In *Smith*, the petitioner named as respondent the State of Idaho rather than his immediate custodian, depriving the district court of personal jurisdiction. *Smith*, 392 F.3d at 355. In a footnote, the Ninth Circuit explained that under those circumstances, *sua sponte* consideration of a separate issue — whether the named respondent had the power to provide the desired relief — was required. *Id.*at 355 n.3 (citing *Belgarde*, 123 F.3d at 1212). The Ninth Circuit reasoned that if the named respondent did not have the power to release the petitioner as requested, "the court may not grant effective relief, and thus should not hear the case unless the petition is amended to name a respondent who can grant the desired relief." *Id.*

Respondent contends that the reasoning of *Smith* is analogous to the analysis under Rule 19, and should be applied here. *Smith*, however, concerned wholly distinguishable factual circumstances in which the petitioner named the State of Idaho as respondent, rather than the

individual having day-to day control of his person. The Ninth Circuit thus considered whether the State, as the named party lacking immediate custody of the petitioner, nevertheless had the requisite authority to grant the requested relief — the petitioner's release from custody. In doing so, the *Smith* court acknowledged the well-established rule that a habeas petitioner must name the individual "'having custody of him or her as the respondent to the petition.'" *Id.* at 355 (quoting *Stanley*, 21 F.3d at 360). Indeed, the footnote upon which Respondent relies notes that the petitioner's release could be ordered by "the petitioner's custodian *or* a superior of that custodian" having authority to act in his stead. *Smith*, 392 F.3d at 355 n.3 (emphasis in original).

Here, Petitioners seek a conditional writ of habeas corpus ordering their release unless, after a hearing satisfying heightened constitutional standards, the trial court finds release is inappropriate. Unlike the petitioner in *Smith*, Petitioners direct their petitions to the proper respondent. As the individual having immediate control of Petitioners, Respondent possesses the requisite authority to order their release if such hearings do not occur. Petitioners therefore may be afforded complete relief if the Court determines Petitioners' claims have merit, and the issuance of a conditional writ does not foreclose the State's ability to prevent Petitioners' release by providing for constitutionally adequate hearings if it so chooses.

Alternatively, Respondent argues that the State "is best suited" to protect its interest in state-court criminal proceedings. Resp't Resp., at 24–25. However, "[j]oinder is 'contingent . . . upon an initial requirement that the absent party *claim* a legally protected interest relating to the subject matter of the action.'" *Bowen*, 172 F.3d at 689 (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir. 1983)) (emphasis in original). The record indicates that Petitioners provided the State with notice of their claims prior to filing their habeas petitions in this Court, and the State declined to claim an interest in this action. *See* Pet'rs' Reply, Attach. 2

(ECF No. 19-2) (email stating that the Oregon Department of Justice does not represent county sheriffs in these types of habeas actions). Moreover, Respondent informed the Court during oral argument that the State expressly declined his request to intervene in this matter. Respondent's insistence that the State has an interest in the outcome of these proceedings, without more, is not enough to find that the State is a "necessary" party within the meaning of FRCP 19. *See Northrop Corp.*, 705 F.2d at 1043–44 (holding the government was not a necessary party under FRCP 19 because it "never asserted a formal interest in either the subject matter of this action or the action itself. On the contrary, the record reflects that the [g]overnment has meticulously observed a neutral and disinterested posture").

In sum, Respondent is situated to provide the relief requested without interference from the State, and the State has not claimed that it has a legally protected interest in the subject matter or outcome of these proceedings. The State therefore is not a necessary party to this action within the meaning of FRCP 19. Accordingly, Respondent's motion to join the State as a necessary party is DENIED.

## III.    Abstention

### A.    Legal Standards

Despite the grant of authority that flows from section 2241, courts have "long recognized that in some circumstances considerations of comity and concerns for the orderly administration of criminal justice require a federal court to forego the exercise of its habeas corpus power." *Francis v. Henderson*, 425 U.S. 536, 539 (1976). The *Younger* abstention doctrine addresses such concerns by forbidding federal courts from enjoining pending state criminal proceedings. *Younger v. Harris*, 401 U.S. 37, 53–54 (1971); *see also San Jose Silicon Valley Chamber of Commerce Political Action Comm. v. City of San Jose*, 546 F.3d 1089, 1091 (9th Cir. 2008) (noting that

*Younger* abstention is a "jurisprudential doctrine rooted in overlapping principles of equity, comity, and federalism"); *Middlesex Cty. Ethics Comm'n v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) (stating that *Younger* "and its progeny espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances"). The Ninth Circuit has held that abstention is appropriate when: (1) the state judicial proceedings are ongoing; (2) the proceedings implicate important state interests; (3) the state proceedings provide an adequate opportunity to raise constitutional challenges; and (4) the relief requested "seek[s] to enjoin" or has "the practical effect of enjoining" the ongoing state judicial proceedings. *Arevalo v. Hennessy*, 882 F.3d 763, 765 (9th Cir. 2018) (citing *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 758 (9th Cir. 2014)). "Even where the first three elements are satisfied, federal courts should not abstain absent a *reason* to abstain — 'i.e., if the court's action would [interfere in ways proscribed by *Younger*].'" *Cook v. Harding*, 190 F. Supp. 3d 921, 935 (C.D. Cal. 2016); *see also Edwards v. Leaders in Cmty. Alternatives, Inc.*, No. C 18-04609 WHA, 2018 WL 6591449, at *3 (N.D. Cal. Dec. 14, 2018) (stating that "[a]ll four elements of *Younger* must be present in order for abstention to be appropriate"). Where all elements are met, a district court must abstain from hearing the case and dismiss the action. *See Beltran v. State of Cal.*, 871 F.2d 777, 782 (9th Cir. 1988) (stating that "[w]here *Younger* abstention is appropriate, a district court cannot refuse to abstain, retain jurisdiction over the action, and render a decision on the merits after the state proceedings have ended . . . [because] *Younger* abstention requires *dismissal* of the federal action" (emphasis in original)).

*Younger* abstention, however, "remains an extraordinary and narrow exception to the general rule" that federal courts have a "'virtually unflagging'" obligation to hear and decide the cases before them. *Arevalo v. Hennessy*, 882 F.3d 763, 765 (9th Cir. 2018) (first quoting *Cook v.*

*Harding*, 879 F.3d 1035, 1038 (9th Cir. 2018), then quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)) (internal quotation marks omitted); *see also Kugler v. Helfant*, 421 U.S. 117, 124 (1975) ("[o]nly if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process"). Indeed, even where *Younger* abstention is appropriate, "federal courts do not invoke it if there is a 'showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate.'" *Arevalo*, 882 F.3d at 765– 66 (citing *Middlesex Cty. Ethics Comm'n*, 457 U.S. at 435). "[C]ircumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation." *Kugler*, 421 U.S. at 125. A petitioner hoping to escape *Younger*'s proscription on federal intervention therefore must demonstrate that: "(1) he would suffer irreparable harm that is 'both great and immediate' if the federal court declines jurisdiction; (2) there is bad faith or harassment, on the part of the state, in prosecuting him; or (3) the state court system is biased against Petitioner's federal claim." *Bibbs v. United States*, Case No. CV 20-4222-JVS-KK, 2020 WL 2521755, at *2 (C.D. Cal. May 18, 2020) (citing *Middlesex Cty. Ethics Comm'n*, 457 U.S. at 432; *Kugler*, 421 U.S. at 124–25. "Minimal respect for the state processes . . . precludes any *presumption* that the state courts will not safeguard federal constitutional rights." *Middlesex Cty. Ethics Comm'n*, 457 U.S. at 431 (emphasis in original).

### B.    Analysis

Respondent argues that *Younger* applies "to preclude unconditional release or any other remedy" in this case. Resp't Resp., at 30. Specifically, Respondent asserts that the first three prongs of the Ninth Circuit's test for *Younger* abstention "are all easily met," but urges the Court to

disregard the fourth — whether the relief sought seeks to enjoin ongoing state criminal proceedings. *Id.* at 31. Respondent claims that relief, if granted, "would cause an upheaval in the entire Oregon criminal justice system, and would effectively eviscerate the security release scheme adopted by Oregon voters in Ballot Measure 11[.]" *Id.* at 32. Respondent thus contends that even if disposition of Petitioners' claims would not necessarily impede the underlying state criminal prosecutions, "the relief requested will significantly interfere with the operation of all ongoing state criminal prosecutions." *Id.*

As an initial matter, there is no dispute that the first three prongs of the Ninth Circuit's *Younger* test are met here. State criminal charges are currently pending against each Petitioner, and all are in custody while awaiting trial. Each Petitioner thus is subject to ongoing criminal proceedings in state court. Furthermore, the State's interests in ensuring Petitioners' appearance at trial and preventing crimes by criminal defendants while on pretrial release are substantial. *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (noting that "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling"); *Bell v. Wolfish*, 441 U.S. 520, 534 (1979) (observing that "the Government has a substantial interest in ensuring that persons accused of crimes are available for trials"). Finally, the Petitioners all have had ample opportunity to litigate the constitutional claims raised here in the state courts, at the trial level and before the Oregon Supreme Court. The parties disagree, however, as to whether the fourth prong is met under the circumstances of this case.

Petitioners argue that the Ninth Circuit's decision in *Arevalo v. Hennessy* is controlling, and requires the Court to decline abstention. Rasmussen, Pet'rs' Reply (ECF No. 19), at 22–25.[7]

---

[7] The page number affixed to Petitioners' Reply do not align with the pagination assigned in ECF. The Court thus cites the ECF page numbers to avoid confusion.

In that case, the petitioner, who was in custody awaiting trial on charges arising from a domestic dispute, moved for a reduction of the $1.5 million bail amount initially set by the trial court. The petitioner argued that the bail amount was excessive, and that financial conditions of release are unconstitutional if imposed without certain procedural protections and a specific finding that the State's interest could not reasonably be served by less-onerous, non-financial conditions. *Arevalo*, 882 F.3d at 764. After a hearing on the motion, the trial court lowered the bail amount to $1 million. *Id.* at 765.

The petitioner subsequently filed habeas petitions with the California Court of Appeals and the California Supreme Court, raising the same constitutional arguments without success. *Id.* The petitioner then filed an emergency petition for the writ of habeas corpus in federal district court. *Id.* In its answer, the State of California acknowledged that the petitioner had received constitutionally inadequate process, and agreed that the petition should be granted. *Id.* Despite California's concession that the petition had merit, the district court declined to hear the petitioner's constitutional claims, holding *sua sponte* that *Younger* compelled abstention. *Id.*

The Ninth Circuit disagreed, explaining that the circumstances of the case counseled against *Younger* abstention for two reasons. First, the Ninth Circuit noted that in *Gerstein v. Pugh*, 420 U.S. 103 (1975), the Supreme Court confirmed that *Younger* abstention did not bar federal intervention where the injunctive relief sought "'was not directed at the [plaintiff's] state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution.'" *Arevalo*, 882 F.3d at 766 (quoting *Gerstein*, 420 U.S. at 107 n.9). As in *Gerstein*, the Ninth Circuit determined that "the issues raised in the bail appeal are distinct from the underlying criminal prosecution and would not interfere with it," and that the issue of "whether the petitioner is entitled to a constitutional hearing

is separate from the state prosecution." The Ninth Circuit thus concluded *Younger* abstention was not appropriate. *Id.* Second, the court observed that deprivations of constitutional rights and physical liberty by detention constitute irreparable injury, and noted that it had previously applied the irreparable harm exception where "full vindication of [a constitutional] right necessarily requires intervention before trial." *Arevalo*, 882 F.3d at 766–767 (first citing *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017), then citing *Mannes v. Gillespie*, 967 F.2d 1310, 1312 (9th Cir. 1992)) (internal quotation marks omitted). Accordingly, the court determined that the petitioner's six-month detention without having received a constitutionally adequate bail hearing "easily" fell within the irreparable harm exception to the *Younger* abstention doctrine. *Arevalo*, 882 F.3d at 767. Finding *Younger* abstention did not bar consideration of the petitioner's claims, the Ninth Circuit reversed the judgment and remanded to the district court. *Id.* at 767–768.

Here, as in *Arevalo*, Petitioners all are in custody awaiting trial for serious offenses, and allege they have been deprived of a constitutionally adequate bail hearing. Petitioners have exhausted their claims in the state courts, and no other remedy exists with respect to the constitutional claims they raise here. Petitioners' underlying criminal prosecutions are wholly separate from issues concerning the constitutional adequacy of the bail hearings they were provided, and addressing Petitioners' claims would not impede Petitioners' criminal cases. Furthermore, Petitioners allege that their continued pretrial detention is depriving them of their physical liberty in violation of their constitutional rights, circumstances that, if true, constitute irreparable injury. Accordingly, under *Arevalo*, abstention is inappropriate.

Respondent's efforts to distinguish *Arevalo* are unavailing. Although Respondent places great weight on *Arevalo*'s unusual posture, particularly the State's concessions as to the merits of the petitioner's claims, the Ninth Circuit did not expressly limit its holding in *Arevalo*, nor is an

implicit intention to limit the reach of its holding readily apparent in the *Arevalo* analysis. Indeed, the Ninth Circuit began its opinion in *Arevalo* by stating that the issue under consideration was "whether [*Younger*] requires a district court to abstain from hearing a habeas petition that challenges the conditions of pretrial detention in state court." *Arevalo*, 882 F.3d at 764. The Ninth Circuit's framing of the issue in generally applicable terms without reference to the unique circumstances of the case suggests it did not intend to limit its holding only to the case before it or to cases presented in an identical posture. Moreover, the Ninth Circuit subsequently relied on *Arevalo* to decline abstention in *Page v. King*, 932 F.3d 898 (9th Cir. 2019), a case in which the merits of the petitioner's claims were contested, and the court's analysis relied squarely on a more generalized formulation of *Arevalo*'s holding. *See Page*, 932 F.3d at 903 (noting that *Arevalo* held "that *Younger* does not 'require[] a district court to abstain from hearing a petition for a writ of habeas corpus challenging the conditions of pretrial detention in state court' where (1) the procedure challenged in the petition is distinct from the underlying criminal prosecution and the challenge would not interfere with the prosecution, or (2) full vindication of the petitioner's pretrial rights require intervention before trial" (emphasis omitted)).

Respondent urges the Court to abstain pursuant to the Supreme Court's decision in *O'Shea v. Littleton*, 414 U.S. 488 (1974), arguing *O'Shea*, rather than *Arevalo* is controlling. In *O'Shea*, nineteen plaintiffs brought a class action lawsuit challenging a variety of discriminatory practices utilized in the trial courts of Alexander County, Illinois. *O'Shea*, 414 U.S. at 490. The plaintiffs alleged, among other things, that a county magistrate and associate judge set bail according to an unofficial bail schedule without considering the individual facts of each case, and requested a court order enjoining all practices of which they complained. *Id.* at 492. Upon review, the Supreme Court relied on *Younger*, observing that the plaintiffs sought an injunction "aimed at controlling

or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *Id.* at 500. Such relief, the Court noted, would "indirectly accomplish the [same] kind of interference" proscribed by *Younger* by instituting "an ongoing federal audit of state criminal proceedings." *Id.* The Supreme Court thus held that the principles of equity, comity, and federalism precluded federal intervention. *Id.* at 499.

The Ninth Circuit has since interpreted *O'Shea* "as standing for the more general proposition that [federal courts] 'should be very reluctant to grant relief that would entail heavy federal interference in such sensitive state activities as administration of the judicial system.'" *Courthouse News Serv. v. Planet*, 750 F.3d 776, 789–90 (9th Cir. 2014) (quoting *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 703 (9th Cir. 1992)). In short, "*O'Shea* compels abstention where the plaintiff seeks an 'ongoing federal audit' of the state judiciary, whether in criminal proceedings or in other respects." *Courthouse News Serv.*, 750 F.3d at 790 (citing *E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1124 (9th Cir. 2011) (per curiam)). In keeping with this interpretation, courts in this circuit have invoked *O'Shea* abstention when granting relief would require ongoing federal intrusion in the administration of state judicial systems. *See*, *e.g.*, *Alaska Pretrial Detainees for End of Unwarranted Courtroom Shackling v. Johnson*, Case No. 3:17-cv-00226-SLG, 2018 WL 2144345, at *2 (D. Alaska May 9, 2018) (holding *O'Shea* compelled abstention where plaintiffs sought injunction requiring the state court to forego shackling pretrial detainees absent an individual judicial determination that shackling is necessary, finding such relief would require the court "to step into the role of ongoing compliance monitor and enforcer of the injunction"); *Barnett v. Becerra*, Case No. 17-cv-05514-SI, 2018 WL 1070820, at *4 (N.D. Cal. Apr. 30, 2018) (noting abstention would be appropriate under *O'Shea* where a *pro se* complaint was partially construed as a request for "federal oversight over state court decisions of whether to appoint counsel for

disabled individuals in their Family Court cases" because doing so would require ongoing federal monitoring of state court system).

O'Shea, however, is distinguishable from the case at bar and does not detract from precedential force of *Arevalo*. Unlike the plaintiffs in *O'Shea*, Petitioners here allegedly do not seek an injunction requiring blanket changes to the manner in which the state courts administer the bail system. Such a decision undoubtedly would require this Court to monitor the state courts for compliance and enforcement of its order. Rather, Petitioners allegedly seek only individual relief: a conditional writ of habeas corpus ordering release in the absence of a constitutionally adequate hearing to determine whether continued detention is warranted in these particular cases. Although resolution of Petitioners' claims necessarily requires this Court to pass judgment on the constitutionality of proceedings conducted by the state trial court, granting the individual relief requested would not necessarily require long-term federal intervention or result in an ongoing audit of the state court system. Indeed, in addressing claims substantially similar to those presented here, the *Arevalo* court expressly rejected abstention under *O'Shea* because "the requested relief may be achieved without an ongoing intrusion into the state's administration of justice." *Arevalo*, 882 F.3d at 766 n.2; *cf. Walker v. City of Calhoun,* 901 F.3d 1245, 1254–55 (11th Cir. 2018) (concluding that *Younger* does not apply where the plaintiff challenged the imposition of bail without individual inquiry as to the ability to pay or the efficacy of alternative release conditions, and noting that unlike the "pervasive federal court supervision of State criminal proceedings" requested in *O'Shea*, the plaintiff "merely asks for a prompt pre-trial determination of a distinct issue, which will not interfere with subsequent prosecution"); *ODonnell v. Harris Cty.*, 892 F.3d 147, 156 (5th Cir. 2018) (rejecting *Younger* abstention where plaintiffs alleged the county's bail practices resulted in the detention of indigent arrestees in violation of the Due Process Clause and

the Equal Protection Clause because the "non-discretionary procedural safeguards" requested would "not require federal intrusion into pre-trial decisions on a case-by-case basis"). *O'Shea* thus does not compel abstention in this case.

That is not to say, however, that Respondent's concern about the scope of the relief requested in this case holds no weight. Petitioners insist that they are not challenging the constitutionality of Oregon's pretrial release scheme, the validity of the statutory bail requirements with respect to Measure 11 offenses, or otherwise requesting "a wholesale change" to the manner in which security release is set in Oregon. Certainly, Petitioners make no claim that any of the statutes governing pretrial release are unconstitutional. Yet in their supporting memorandum, Petitioners include a footnote suggesting their challenges extend beyond the alleged individual constitutional violations at issue in this case:

> Notably, Oregon law specifically provides for a bail hearing that comports with federal constitutional requirements. Under the Oregon Constitution, the requirements of Article I, sections 16 and 43 allow for detention only under very narrow circumstances and require all findings in support of detention to be made by clear and convincing evidence. By routinely imposing unaffordable security amounts that operate as detention orders issued without the procedural and substantive safeguards enshrined in the Oregon constitution, Oregon's trial courts violate both the letter of the law and the norm in favor of pretrial release that undergirds Oregon's system.

Pet'rs' Memo. at 25 n.6.

Additionally, at oral argument, counsel for Petitioners revealed that numerous petitions identical to those before this Court are presently pending in the state courts. Presumably, those petitions will be filed in federal court if the state courts deny relief. Indeed, a substantially similar petition has already been filed in this District and currently is pending before Judge Aiken. *See Eggleston v. Harrold*, Case No. 6:20-cv-01336-AA. In light of the numerous petitions raising identical issues that apparently are forthcoming, Petitioners' insistence that they do not seek to

make a broader challenge to the Oregon bail system appears to ring somewhat hollow. A broad challenge to the general manner in which the Oregon courts conduct bail hearings, if meritorious, would result in ongoing federal interference with the state criminal process by requiring this Court to continuously monitor the state courts' procedures for compliance, and would provide any pretrial detainee dissatisfied with the outcome of his constitutional bail reduction hearing grounds on which seek further review in federal court. To be sure, the federal courts should not serve as a means to audit the state courts' bail determinations because such an arrangement would constitute precisely the kind of ongoing federal intrusion *O'Shea* sought to avoid.

The Court finds that *Arevalo* precludes abstention to the extent Petitioners' claims are framed as individual constitutional violations. Respondent fails to provide facts or legal authority sufficient to cast doubt on the applicability of *Arevalo* in that context, and other courts in this circuit favorably have cited its holding. *See*, *e.g.*, *Page*, 932 F.3d at 904–05 (relying on *Arevalo* to hold that the district court erred by abstaining under *Younger* where the petitioner challenged the state's alleged failure to hold a constitutionally adequate probable cause hearing); *Bibbs*, 2020 WL 2521755*,* at *2 (citing *Arevalo* for the proposition that *Younger* abstention is not appropriate where a petitioner challenges a constitutionally inadequate bail hearing in state court and had properly exhausted his state remedies); *Palafox-Lugo v. Lombardo*, Case No. 2:18-cv-01294-GMN-VCF, 2018 WL 9986855, at * 2 (D. Nev. Sept. 17, 2018) (noting that *Arevalo* instructs that bail challenges distinct from the criminal prosecution are not barred by the *Younger* abstention doctrine, but dismissing petitioner's section 2241 habeas petition for failure to exhaust his remedies in state court). Indeed, *Arevalo*'s authority has been recognized in this district. *See*, *e.g.*, *Hirt v. Jackson Cty.*, Case No. 1:19-cv-00887-AC, 2020 WL 3104502, at *4 (D. Or. June 11, 2020) (citing *Arevalo* to support the proposition that federal habeas corpus is an appropriate remedy when

a pretrial detainee challenges a bail determination and has exhausted his remedies in state court). Accordingly, *Younger* abstention does not preclude this Court's consideration of Petitioners' claims insofar as they allege individual constitutional violations.[8]

## IV.    The Merits

Petitioners allege that their continued detention while awaiting trial violates their rights to equal protection and due process. Petitioners' claims rest on two contentions: (1) that they are in custody because they cannot afford to pay a secured money-bail amount that was imposed without constitutionally required procedural protections; and (2) that they are in custody because the trial court entered "the functional equivalent of an order of detention" without making procedurally valid findings that they present a danger to the community or pose a flight risk. Rasmussen, Mem. in Supp. of Pet. (ECF No. 3), at 11. Petitioners thus claim their pretrial detention is constitutionally impermissible because: (1) they are being held on account of their indigency, in violation of the equal protection clause; (2) the trial court failed to consider whether setting unattainable bail amounted to a *de facto* order of detention, which is constitutionally permissible only if narrowly tailored to serve a compelling government interest, in violation of Petitioners' substantive due process rights; (3) and the trial court effectively detained them without making adequate findings to justify a valid detention order, in violation of Petitioners' procedural due process rights.

---

[8] To the extent Petitioners seek to challenge Oregon's bail system as a whole, or the procedures utilized by the state courts in conducting bail hearings, *O'Shea* compels the Court to abstain from issuing any ruling that will require Oregon courts to implement system-wide changes to the statutory bail scheme, or will result in ongoing federal oversight of Oregon's judicial system. *See Courthouse News Serv.*, 750 F.3d at 790 (noting that *O'Shea* compels abstention where the plaintiff seeks an "ongoing federal audit" of the state judiciary). Accordingly, to the extent any future petitions demonstrate that the challenges raised in the collective cases are indeed broader, abstention may be appropriate.

Petitioners also argue that to comport with due process, the "clear and convincing evidence" standard must govern the trial court's analysis as to whether detention is warranted.

Respondent asserts Petitioners received significant reductions to the bail amount after a hearing at which they were represented by counsel and given opportunity to submit evidence to the trial court. Resp't Resp., at 6–7. Respondent thus claims Petitioners' continued custody does not violate their constitutional rights.

A    **Due Process**

1.    **Legal Standards**

The Due Process Clause of the Fourteenth Amendment provides that the government may not deprive "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. Due process thus "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Indeed, "[t]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in the denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (internal citations and quotations omitted).

The Due Process Clause "confers both substantive and procedural rights." *Albright v. Oliver*, 510 U.S. 266, 272 (1994). Substantive due process "prohibits States from infringing fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest." *Lawrence v. Texas*, 539 U.S. 558, 593 (2003). Procedural due process "'minimize[s] substantively unfair or mistaken deprivations of' life, liberty, or property" by guaranteeing all persons fair procedures by which they may "contest the basis upon which a State proposes to

deprive them of protected interests." *Carey v. Piphus*, 435 U.S. 247, 259–60 (1978) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 87 (1972)). Put simply, "[w]hen government action depriving a person of life, liberty, or property survives substantive due process scrutiny, [procedural due process requires that] it must still be implemented in a fair manner." *Salerno*, 481 U.S. at 746 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

To invoke the protection of the Due Process Clause, a petitioner first must identify a protected interest to which such protection extends, and demonstrate a governmental deprivation of that interest. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (explaining that the Due Process Clause "protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake"); *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (noting that a substantive due process claim requires that a plaintiff, "as a threshold matter, show a government deprivation of life, liberty, or property"); *see also Ingraham v. Wright*, 430 U.S. 651, 672 (1977) (noting that due process — whether procedural or substantive — "is required only when a decision of the State implicates an interest within the protection of the Fourteenth Amendment"). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty' . . . or it may arise from an expectation or interest created by state laws or policies." *Austin*, 545 U.S. at 221; *see also Sandin v. Conner*, 515 U.S. 472, 483–84 (1995) (noting that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause").

If the liberty interest at stake is "fundamental," substantive due process forbids government infringement "'*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Reno v. Flores*, 507 U.S. 292, 302 (1993); *cf. Glucksberg*, 521 U.S. at 720 (noting that substantive due process protects only certain

"fundamental" liberty interests); *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018) (explaining that "[t]he range of liberty interests that substantive due process protects is narrow," and therefore "[o]nly those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause").

The procedural component of the Due Process Clause, on the other hand, "protects more than just fundamental rights. It protects all liberty interests that are derived from state law or from the Due Process Clause itself." *Mullins v. Oregon*, 57 F.3d 789, 795 (9th Cir. 1995). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Eldridge*, 424 U.S. at 332. Due process, however, is "flexible and calls for such procedural protections as the particular situation demands.'" *Id.* at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)); *see also Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961) (noting that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation"). To determine if a particular procedure satisfies due process, the court must weigh three factors: "[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Eldridge*, 424 U.S. at 335.

### 2.    Analysis

Petitioners assert that they have been deprived of their liberty interest in pretrial release without constitutionally adequate process. Specifically, Petitioners argue that the trial court set bail at an unaffordable amount without considering their ability to pay, effectively ordering them

detained. Rasmussen Memo. at 20–21. Petitioners argue further that the trial court did so without ensuring their detention was narrowly tailored to serve a compelling government interest by finding that they presented a risk of flight or a danger to the community that alternatives to detention could not reasonably mitigate. *Id.* at 21. Petitioners also argue that, procedurally, the trial court failed to make such findings explicit on the record. *Id.* at 33–34. Rather, Petitioners allege that the trial court "made no findings at all" to justify detention, and instead entered a de facto detention order "based on speculation regarding the nature of the charge." *Id.*

"Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty" protected by the Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *accord Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (noting that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action"); *see also Turner v. Rogers*, 564 U.S. 431, 445 (2011) (explaining that "loss of personal liberty through imprisonment" is sufficient to trigger due process protections); *Hernandez v. Sessions*, 872 F.3d 976, 993 (9th Cir. 2017) (recognizing that it is "beyond dispute" that liberty is a fundamental right). The right to be free from government restraint is particularly compelling when an individual accused of a crime has not been convicted at trial or entered a guilty plea. *See Stack v. Boyle*, 342 U.S. 1, 5 (1951) (explaining that the "traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction," and that without it, "the presumption of innocence, secured only after centuries of struggle, would lose its meaning"); *see also Gerstein*, 420 U.S. at 114 (explaining that "[p]retrial confinement may imperil the suspect's job, interrupt his source of income, . . . impair his family relationships" and

hinder his "ability to assist in preparation of his defense"); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (observing that "the costs to the arrestee of pretrial detention are profound").

That is not to say, however, that all instances of pretrial detention are unconstitutional. Indeed, an individual's "important[t] and fundamental" interest in his liberty "may . . . be subordinated to the greater needs of society" where the government's interests are "sufficiently weighty." *Salerno*, 481 U.S. at 750–51; *see also Pugh v. Rainwater*, 572 F.2d 1053 1056 (5th Cir. 1978) (noting that due process requires "a delicate balancing of the vital interests of the state with those of the individual"). A criminal defendant therefore may be detained while awaiting trial if his detention is necessary to further the government's "substantial interest[s]" in ensuring his appearance at trial and protecting the community. *See Salerno*, 481 U.S. at 749 (citing *De Veau v. Braisted*, 363 U.S. 144, 155 (1960)) (finding "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling"); *Bell*, 441 U.S. at 534 (noting that "confinement of [persons accused of crimes] pending trial is a legitimate means of furthering" the government's interest in ensuring their appearance at trial); *see also Knight v. Sheriff of Leon Cty.*, 369 F. Supp. 3d 1214, 1219 (N.D. Fla. 2019) (noting that "a state may detain a defendant when necessary to reasonably assure the defendant's appearance as required and the safety of the community"). Put simply, a defendant's interest in freedom before trial is fundamental, but that interest must yield where pretrial detention is "narrowly tailored to serve a compelling state interest." *Coleman v. Hennessy*, Case No. 17-cv-06503-EMC, 2018 WL 541091, at *1 (N.D. Cal. Jan. 5, 2018) (citing *Lopez-Valenzuela*, 770 F.3d at 780).

A state, therefore, cannot not imprison an individual awaiting trial solely on account of his indigency because doing so serves no compelling state interest. *See Bearden v. Georgia*, 461 U.S. 660, 671 (1983) (acknowledging that the Fourteenth Amendment prohibits "punishing a person

for his poverty"). That does not mean, however, that there is a constitutional right to affordable bail. *See United States v. Mantecon-Zayas*, 949 F.2d 548, 551 (1st Cir. 1991) (allowing for the imposition of bail "that a defendant in good faith cannot fulfill" where it is "an indispensable component of the conditions of release"); *see also Gillmore*, 302 Or. at 577 (upholding the trial court's imposition of a security amount the defendant could not afford because it was necessary to reasonably assure the attendance of the defendant at trial). Indeed, the Constitution guarantees only that bail will not be imposed in an amount that is "excessive." *See Salerno*, 481 U.S. at 754–55 (noting that the Eighth Amendment does not create an absolute right to bail, but requires only that "the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil"). Detention resulting from an indigent defendant's inability to post bail therefore is not absolutely prohibited, but due process principles require that a trial court must consider the defendant's indigency and whether alternative, non-financial conditions of release could adequately satisfy the purpose of bail before setting bail in an amount the defendant cannot afford. *See Pugh*, 572 F.2d at 1057 (concluding that "incarceration of those who cannot [pay bail], without meaningful consideration of other possible alternatives, infringes on . . . due process . . . requirements"); *see also*, *e.g.*, *Jones v. City of Clanton*, No. 215CV34-MHT, 2015 WL 5387219, at *2 (M.D. Ala. Sept. 14, 2015) (holding that "the use of a secured bail schedule to detain a person after arrest, without an individualized hearing regarding the person's indigence and the need for bail or alternatives to bail, violates the Due Process Clause of the Fourteenth Amendment").

In the instant case, the record demonstrates that each Petitioner was afforded at least one, if not multiple individualized hearings to challenge the security amount as initially set. During his respective hearings, each Petitioner was represented by counsel and given opportunity to present witnesses, evidence, and argument as he wished. All hearings were adversarial in nature and

conducted by an impartial decisionmaker. In each case, the trial court expressly considered the appropriate statutory factors to determine conditions of release — such as criminal history, past instances of failing to appear, and the defendant's indigency, the nature of the alleged crimes and the sentence that each defendant could receive if convicted, among other things — before then setting a bail amount. In several cases, the victim submitted a statement to the trial court that provided additional evidence relevant to the inquiry. *See Slight*, 301 Or. App. at 254 (holding that a statement provided by the victim's mother constituted admissible evidence properly considered by the trial court in making a release decision). In each case, the trial court also considered the argument that bail as originally set was excessive, as evidenced by the fact that she reduced the amount in every instance. The trial court noted the individual considerations motivating the decision to reduce the security amount and to impose additional conditions of release in each case. Moreover, Petitioners each had the opportunity to request reconsideration of the trial court's determination as many times as they wished, which the trial court uniformly granted, and each was permitted to appeal the trial court's bail determination to the Oregon Supreme Court. This Court thus cannot say that Petitioners' due process rights were violated because the record indicates that each received the process to which he was due.

Petitioners nevertheless contend that the trial court failed to make adequate findings that their detention is narrowly tailored to serve the State's compelling interest. Pet'r's Reply at 10. Specifically, Petitioners argue that the trial court could not have made the required substantive findings because it was "explicitly *not* attempting to justify detention," but rather considering appropriate conditions of release under Oregon's statutory scheme. *Id.* at 11–12. Petitioners also argue that the procedures utilized by the trial court were constitutionally inadequate because in each case, the trial court failed to make adequate findings concerning dangerousness or flight risk,

failed to inquire into less restrictive alternatives to further the State's interests, and failed to make such findings by clear and convincing evidence. Pet'rs' Memo. at 28, 33.

As an initial matter, Petitioners' argument that the trial court could not have made the requisite substantive findings because it engaged in a separate inquiry under Oregon law is unpersuasive. Oregon law requires state trial courts to first determine whether a defendant is releasable under O.R.S. 135.240(4), and if so, it then must then consider the primary and secondary release criteria to determine the least onerous conditions of release that will ensure the defendant's attendance at trial and protect the community from any danger the defendant might pose. *See* O.R.S. 135.240(4)(a) (governing eligibility for release for defendants accused of violent felonies); O.R.S. 135.245(3) (requiring that where recognizance relief is inappropriate, the trial court must impose the least onerous type of release to ensure attendance and community safety). The primary and secondary release criteria speak to factors that may increase or decrease a defendant's potential risk of flight or danger to the community, and thus inform the presiding judge's determination as to what condition, or combination of conditions, may be appropriate in a given case. In other words, in determining the appropriate conditions of release pursuant to the statutory scheme, the judge is considering the very issues that due process requires.

Furthermore, the release criteria address the appropriate form of release appropriate for a given case. In all cases presently before the Court, Petitioners are all charged with at least one extremely serious offense with mandatory minimum sentences under O.R.S. 137.700,[9] which forecloses the possibility of recognizance release and mandates the imposition of security release in a minimum amount of $50,000. The security amount may be reduced if the court determines the

---

[9] Gillihan was not charged with any Measure 11 offenses, but all charges against him constituted violent felonies under Oregon's statutory release scheme.

amount imposed is constitutionally excessive. *See* O.R.S. 135.240(5). [10] Bail is excessive if set in an amount higher than necessary to further a compelling government interest — *i.e.*, "a figure higher than an amount reasonably calculated [to ensure the defendant's presence at trial.]" *Stack*, 342 U.S. at 5. Accordingly, the trial court was not required to justify detention pursuant to O.R.S. 135.240(4)(a), but the court instead was required to consider whether the security amount set in each case was necessary to further the State's interests. The trial court evaluated the individual circumstances in each case, including each defendant's financial ability to pay bail, and based on that analysis, determined that the circumstances warranted some reduction in the statutorily provided security amounts.

This Court is not persuaded by Petitioners' insistence that their continued detention is unconstitutional because the trial court failed to make requisite findings concerning their ability to pay the bail amount set, failed to consider alternatives to detention, and otherwise failed to make

---

[10] O.R.S. 135.240(5) provides, in relevant part:

(a) Notwithstanding any other provision of law, the court shall set a security of amount of not less than $50,000 for a defendant charged with an offense listed in ORS 137.700 (Offenses requiring imposition of mandatory minimum sentences) . . . unless the court determines that amount to be unconstitutionally excessive, and may not release the defendant on any form of release other than a security release if:

(A) The United States Constitution or the Oregon Constitution prohibits the denial of release under [O.R.S. 135.240(4)];

(B) The court determines that the defendant is eligible for release under subsection (4) of this section; or

(C) The court finds that the offense is not a violent felony.

(b) In addition to the security amount describe in paragraph (a) of this subsection, the court may impose any supervisory conditions deemed necessary for the protection of the victim and the community.

factual findings to justify their pretrial detention. In each case, the trial court expressly acknowledged and considered the Petitioners' indigency in reducing the initial security amount. *See* Dickens Decl., Ex. 3 at 13 (expressly finding that " [Rasmussen] does not have significant assets," and considering his indigence in lowering the security amount); Raney Pet., App'x at 48–49 (considering Raney's inability to pay security amount as set, acknowledging his indigence, and reducing the security amount); Dickens Decl., Ex. 5 at 29–30 (finding that Mee is not "someone who has significant means" to afford security as set, and "[k]nowing all of that," reducing the security amount); Villeda Pet., App'x at 36–37 (noting that the security amount was reduced "specifically in light of the defendant's indigent status"). Moreover, as explained above, the trial court considered the appropriate factors in each case, implicitly concluded the initial security amount was excessive, and reduced the security amount as necessary to ensure each Petitioners' attendance at trial. *See Delaney*, 218 Or. at 628 (holding that the amount of bail imposed must be determined based on a variety of factors, including nature of the offense, the likely punishment if convicted, the character of the defendant, the defendant's previous failures to appear as ordered, and the likelihood that the defendant will show up for trial); *see also Gillmore*, 302 Or. 579 (noting that only factors going to flight risk are considered in setting a security amount, but dangerousness may also be considered to determine if conditions other than security are appropriate). That Petitioners still could not afford the reduced amount does not in and of itself violate the Constitution. *See United States v. Jessup*, 757 F.2d 378, 388-89 (1st Cir. 1985) (holding that a judge is entitled to set bail at an amount necessary to mitigate risk of flight, and if such amount is unaffordable and causes that defendant to be detained, such detention is "not because he cannot raise the money, but because without the money the risk of flight is too great"). Although the trial court's findings could have been articulated more clearly, the record reflects the presiding judge

based her bail determinations on the proper criteria, and her determinations are entitled to deference. *See Delaney*, 218 Or. at 628 (explaining that a bail decision will not be disturbed absent "a clear abuse of discretion").

Finally, Petitioners' argument that constitutionally adequate process is afforded only if the trial court makes findings on the record under a "clear and convincing" evidentiary standard is unpersuasive. The Oregon Constitution and statutory release scheme requires a clear and convincing evidentiary standard with respect to a defendant's dangerousness to deny release without bail. *See* Or. Const. art. I, s 43(1)(b); O.R.S. 135.240(4)(a). The release statute applicable to offenses brought pursuant to O.R.S. 137.700, such as those at issue in this case, requires the court to impose a $50,000 minimum security amount and consider whether additional conditions of release are necessary. O.R.S. 135.240(5)(a). A defendant, however, may challenge the bail amount as excessive. *Id.* Accordingly, the statutory scheme for offenses brought under O.R.S. 137.700 is not a mandatory detention statute which requires a clear and convincing finding.

In order to determine the appropriate conditions of release in any particular case under O.R.S. 137.700, courts may consider whether a defendant poses a danger to the community and a flight risk. *See Gillmore*, 302 Or. at 579 (holding that the court may consider factors going to risk of flight and dangerousness to determine whether bail should be reduced or alternative conditions of release should be imposed); O.R.S. 135.240(5) (instructing that security release is mandatory for Measure 11 defendants, but the court may impose any additional conditions of release necessary to protect the victim and the community). In determining the amount of bail that is appropriate under the circumstances, the court considers only what amount will reasonably assure the defendant's appearance. O.R.S. 135.265(1). Oregon law is silent as to the appropriate evidentiary standard for flight risk, but some federal courts that have considered the question have

found that a preponderance of the evidence standard does not offend due process. *See Hill*, 2019 WL 4928915, at *17 (noting that a preponderance of the evidence standard is appropriate in the context of pretrial detention "where the government's strong and compelling interests in protecting the safety of the community and in ensuring the defendant's appearance in court must be weighed against the individual's right to personal liberty pending trial"); *Weatherspoon*, 2018 WL 1053548, at *8 (rejecting the petitioner's argument that *United States v. Salerno* requires findings by clear and convincing evidence, reasoning that *Salerno* applied a clear and convincing standard because the Federal Bail Reform Act specifically called for it, and finding that the preponderance of the evidence standard dictated by the Tennessee Bail Reform Act did not violate the constitution). To the extent that Petitioners ask this Court to instruct the state courts as to the proper burden of proof with respect to risk of flight, this Court declines to do so.

Whether the writ should issue in this case requires only a determination that the procedures received by Petitioners were or were not constitutionally adequate. Indeed, the claims at issue here are framed as individual constitutional violations that do not require this Court to weigh in on the manner in which Oregon courts must conduct release hearings generally. This Court thus declines to issue an advisory opinion as to the specific procedural framework that should govern bail determinations in Oregon. *See Coleman*, 2018 WL 541091, at *2 (declining to issue guidance to the state court as to the proper burden of proof because the petitioner's request to do so "effectively ask[ed] [the] Court to issue an advisory opinion"); *Rodriguez-Ziese v. Hennessy*, Case No. 17-cv-06473-BLF, 2017 WL 6039705, at *3 (N.D. Cal. Dec. 6, 2017) (declining the petitioner's "invitation to issue an advisory opinion to the state trial court" to "expressly describe the procedural safeguards required for a constitutionally permissible bail hearing"). Though this Court's analysis assuredly would benefit had the trial court clearly articulated the standard of proof

she applied with respect to flight risk, this Court is not of the opinion that a clear and convincing evidentiary standard is necessary to avoid a constitutional violation. *See Cafeteria Workers*, 367 U.S. at 895 (recognizing that that due process is flexible, and does not require the imposition and satisfaction of rigid, universally applicable procedural frameworks to satisfy its requirements). The Court, therefore, is satisfied that even absent a specified standard of proof, Petitioners received all the process to which they were entitled under the circumstances. There was ample evidence of both risk of flight and dangerousness to satisfy a preponderance of the evidence and a clear and convincing standard. Accordingly, this Court finds the conditions imposed and the bail amount were supported under any standard.

In sum, Petitioners were afforded due process. They each had a meaningful opportunity to be heard, they each received as many hearings as they requested, they each were represented by counsel throughout, and they each were permitted to present any evidence they wished. The trial court's decision reducing the security amount in each case demonstrated that the presiding judge had before her and considered appropriate statutory factors concerning Petitioners' flight risk and dangerousness to determine conditions of release and then set a security amount. The presiding judge found the initial security amount excessive in every instance, but she was required only to reduce it to an amount necessary to reasonably ensure Petitioners' attendance at trial, not an amount that Petitioners necessarily could afford. The Oregon Supreme Court has articulated the manner in which release determinations must be made in Oregon, and those procedures comport with due process. The trial court properly abided by those procedures and the individual bail determinations at issue deserve deference. This Court thus concludes that Petitioners' continued detention does not violate due process. Accordingly, habeas relief is DENIED.

2.      **Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." In other words, the Equal Protection Clause commands "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *see also Williams v. Illinois*, 399 U.S. 235, 241 (1970) (acknowledging the Court's "allegiance to the basic command that justice be applied equally to all persons"). Under the Equal Protection Clause, imprisonment "solely because of indigent status is invidious discrimination and not constitutionally permissible." *Pugh*, 572 F.2d at 1056 (citing *Williams*, 399 U.S. 235).

Petitioners argue that the trial court violated their rights to equal protection by setting bail without considering their indigency. Specifically, Petitioners claim the trial court failed to make "procedurally proper finding[s] that [they are each] able to pay" the bail amounts set in their respective cases. Rasmussen Memo at 13–14. However, as explained above, the trial court explicitly considered Petitioners' indigence in each case, and nonetheless set a security amount it determined to be necessary to further the State's interests. Indeed, the trial court set security in each case with respect to Petitioners' individual circumstances. There is no indication from the record before this Court that Petitioners were imprisoned solely on the basis of their indigent status, or that the trial court subjected Petitioners to invidious discrimination on the basis of financial status. Accordingly, Petitioners' rights to equal protection were not violated, and habeas relief is DENIED.

**<u>Conclusion</u>**

For the reasons stated, Petitioners' habeas petitions pursuant to 28 U.S.C. § 2241 are

DENIED, and this proceeding is DISMISSED, with prejudice. Petitioners have not made a

substantial showing of the denial of a constitutional right, and therefore this Court DENIES a

Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this 27th day of September, 2020.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge